**No. 2025-1131**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

VIDEOLABS, INC.,
*Appellant*,

v.

NETFLIX, INC.,
*Appellee*.

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board
No. IPR2023-00628

# APPELLANT VIDEOLABS, INC.'S OPENING BRIEF

Christine E. Lehman
Naveed Hasan
Brian C. Baran
REICHMAN JORGENSEN
LEHMAN & FELDBERG LLP
1909 K St. NW, Suite 800
Washington, DC 20006
(202) 894-7310
clehman@reichmanjorgensen.com

Jaime F. Cardenas-Navia
Michael Matulewicz-Crowley
REICHMAN JORGENSEN
LEHMAN & FELDBERG LLP
400 Madison Ave., Suite 14D
New York, NY 10017
(212) 381-1965
jcardenas-navia@reichmanjorgensen.com

*Attorneys for Appellant*
*VideoLabs, Inc.*

## U.S. Patent No. 7,233,790 Claim 2 (Appx84)

**2.** A method of providing access to digital content for use on wireless communication devices, the method comprising:

receiving and storing in a server system a plurality of items of digital content to be made available for use in wireless communication devices used by a plurality of wireless services subscribers, including receiving and storing a plurality of different implementations of at least one of the items of digital content, where each implementation of any given item of digital content corresponds to a different set of device capabilities;

operating the server system to maintain a product catalog containing a description of the items of digital content, wherein the product catalog includes, in association with each item of digital content, a reference to each implementation of said item of digital content;

receiving a request from a wireless device used by one of the subscribers;

in response to the request, selecting a portion of the product catalog to be presented to the subscriber, based on device capabilities of the wireless device used by the subscriber; and

presenting the selected portion of the product catalog to the subscriber via a wireless network, such that the selected portion, as presented to the subscriber, provides only a single description of each item of digital content in said portion, regardless of the number of implementations of each said item.

## CERTIFICATE OF INTEREST

Counsel for VideoLabs, Inc., certify under Federal Circuit Rule 47.4 that the following information is accurate and complete to the best of their knowledge:

1. The full name of the only entity represented by undersigned counsel in this case is VideoLabs, Inc.

2. VideoLabs, Inc. is the real party in interest. There are no other real parties in interest for VideoLabs, Inc.

3. VideoLabs, Inc. has no parent corporation, and no publicly held company owns 10% or more of its stock.

4. Other than those who have already entered an appearance in this Court, no law firms, partners, or associates (a) appeared for VideoLabs, Inc. in the originating agency or (b) are expected to appear in this Court.

5. The related or prior cases relevant to this appeal are listed on a separately filed notice.

6. No additional information is required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) or 26.1(c) (bankruptcy case debtors and trustees).

Dated: February 7, 2025

*/s/ Jaime F. Cardenas-Navia*
Jaime F. Cardenas-Navia

## TABLE OF CONTENTS


INTRODUCTION .......... 1

STATEMENT OF RELATED CASES .......... 5

STATEMENT OF JURISDICTION .......... 5

ISSUES PRESENTED .......... 6

STATEMENT OF THE CASE .......... 7

A. The ’790 patent .......... 7

B. The asserted prior art .......... 12

C. The inter partes review proceeding .......... 14

SUMMARY OF ARGUMENT .......... 20

STANDARD OF REVIEW .......... 24

ARGUMENT .......... 25

I. The Board Erred as a Matter of Law by Discarding the Claimed Relationship Between “Items” and “Implementations.” .......... 25

A. Claim 2 expressly requires a product catalog linking multiple implementations to one piece of content. .......... 27

B. Without its incorrect construction, the Board’s anticipation and obviousness findings collapse. .......... 32

II. The Board Erred as a Matter of Law by Failing to Enforce the “Only a Single Description” Limitation. .......... 35

A. The Board erred as a matter of law by ignoring Netflix’s petition’s failure to argue that Mehta discloses the “only a single description” limitation. .......... 36

B. On the merits, the Board erred by reading the “only a single description” limitation out of the patent. .......... 43

C. Netflix and the Board’s obviousness theory cannot fill the gap left by Mehta’s failure to disclose the “only a single description” limitation. .......... 49

CONCLUSION .......... 55

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*ACTV, Inc. v. Walt Disney Co.*,
346 F.3d 1082 (Fed. Cir. 2003) .......... 45

*Alacritech, Inc. v. Intel Corp.*,
966 F.3d 1367 (Fed. Cir. 2020) .......... 24

*Apple Inc. v. Gesture Tech. Partners*,
__ F.4th __, 2025 WL 299939 (Fed. Cir. Jan. 27, 2025) ... 34, 35, 49, 54

*Arbutus Biopharma Corp. v. ModernaTX, Inc.*,
65 F.4th 656 (Fed. Cir. 2023) .......... 25

*Arendi S.A.R.L. v. Apple Inc.*,
832 F.3d 1355 (Fed. Cir. 2016) .......... 51, 53

*Ark. Game & Fish Comm'n v. United States*,
568 U.S. 23 (2012) .......... 44

*Bayer Schering Pharma AG v. Barr Labs., Inc.*,
575 F.3d 1341 (Fed. Cir. 2009) .......... 52, 53

*Corephotonics, Ltd. v. Apple Inc.*,
84 F.4th 990 (Fed. Cir. 2023) .......... 37, 41, 42, 43

*Curtiss–Wright Flow Control Corp. v. Velan, Inc.*,
438 F.3d 1374 (Fed. Cir. 2006) .......... 31

*Cutsforth, Inc. v. MotivePower, Inc.*,
636 F. App'x 575 (Fed. Cir. 2016) .......... 40

*Donner Tech., LLC v. Pro Stage Gear, LLC*,
979 F.3d 1353 (Fed. Cir. 2020) .......... 40

*In re Google LLC*,
56 F.4th 1363 (Fed. Cir. 2023) .......... 25

*Google LLC v. EcoFactor, Inc.*,
92 F.4th 1049 (Fed. Cir. 2024) .......... 30

*Grace Instrument Indus., LLC v. Chandler Instruments Co.*,
57 F.4th 1001 (Fed. Cir. 2023) .................................................. 27, 44

*Hockerson–Halberstadt, Inc. v. Converse Inc.*,
183 F.3d 1369 (Fed. Cir. 1999) .................................................. 45

*In re Hodges*,
882 F.3d 1107 (Fed. Cir. 2018) .................................................. 34, 41, 49, 54

*Intel Corp. v. Qualcomm Inc.*,
21 F.4th 801 (Fed. Cir. 2021) .................................................. 30, 31, 32, 48

*Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*,
821 F.3d 1359 (Fed. Cir. 2016) .................................................. 42

*K/S Himpp v. Hear–Wear Techs., LLC*,
751 F.3d 1362 (Fed. Cir. 2014) .................................................. 51

*Kaken Pharm. Co. v. Iancu*,
952 F.3d 1346 (Fed. Cir. 2020) .................................................. 34, 50

*Koninklijke Philips N.V. v. Google LLC*,
948 F.3d 1330 (Fed. Cir. 2020) .................................................. 36

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007) .................................................. 52, 53

*Local Union 1261, Dist. 22, United Mine Workers of Am. v. Fed. Mine Safety & Health Review Comm'n*,
917 F.2d 42 (D.C. Cir. 1990) .................................................. 44

*In re Magnum Oil Tools Int'l, Ltd.*,
829 F.3d 1364 (Fed. Cir. 2016) .................................................. *passim*

*Microsoft Corp. v. IPA Techs. Inc.*,
2022 WL 989403 (Fed. Cir. Apr. 1, 2022) .................................................. 41

*Mintz v. Dietz & Watson, Inc.*,
679 F.3d 1372 (Fed. Cir. 2012) .................................................. 51, 52

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .................................................. 40

*Netflix, Inc. v. Avago Techs. Int'l Sales Pte. Ltd.*,
2024 WL 3507601 (Fed. Cir. July 23, 2024) .................................................. 41

*Netflix, Inc. v. DivX, LLC*,
84 F.4th 1371 (Fed. Cir. 2023) ........ 42

*In re NuVasive, Inc.*,
842 F.3d 1376 (Fed. Cir. 2016) ........ 24, 40, 41

*Orexo AB v. Actavis Elizabeth LLC*,
903 F.3d 1265 (Fed. Cir. 2018) ........ 52, 53

*Personalized Media Commc'ns, LLC v. Apple Inc.*,
952 F.3d 1336 (Fed. Cir. 2020) ........ 24

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc) ........ 26, 29, 31

*In re Power Integrations, Inc.*,
884 F.3d 1370 (Fed. Cir. 2018) ........ 31

*Provisur Techs., Inc. v. Weber, Inc.*,
50 F.4th 117 (Fed. Cir. 2022) ........ 40, 41

*Regents of the Univ. of Minn. v. Gilead Scis., Inc.*,
61 F.4th 1350 (Fed. Cir. 2023) ........ 24

*Retractable Techs., Inc. v. Becton, Dickinson & Co.*,
653 F.3d 1296 (Fed. Cir. 2011) ........ 32, 45

*SAS Inst., Inc. v. Iancu*,
138 S. Ct. 1348 (2018) ........ 36

*In re Smith Int'l, Inc.*,
871 F.3d 1375 (Fed. Cir. 2017) ........ 34, 49, 54

*United States v. Adams*,
383 U.S. 39 (1966) ........ 26

*Valve Corp. v. Ironburg Inventions Ltd.*,
8 F.4th 1364 (Fed. Cir. 2021) ........ 24

**Statutes**

5 U.S.C. §706(2) ........ 24

28 U.S.C. §1295(a)(4)(A) ........ 5

35 U.S.C. §6(b)(4) ........ 5

35 U.S.C. §141(c) ........ 5, 20

35 U.S.C. §142 ........ 5, 20

35 U.S.C. §282(b) ........ 26

35 U.S.C. §311 ........ 14

35 U.S.C. §312(a)(3) ........ 36, 39

35 U.S.C. §316(e) ........ 37

35 U.S.C. §319 ........ 5, 20

**Regulations**

37 C.F.R. §42.100(b) ........ 26

37 C.F.R. §42.104(b)(4) ........ 36, 37

37 C.F.R. §90.3(a)(1) ........ 5, 20

**Other Authorities**

*Of*, Merriam–Webster, https://www.merriam-webster.com /dictionary/of (last visited February 7, 2025) ........ 27

## INTRODUCTION

The Patent Trial and Appeal Board rewrote petition and patent alike in this inter partes review. In doing so, it made three independent legal errors, each of which warrants reversal.

Appellant VideoLabs, Inc. owns U.S. Patent No. 7,233,790, which teaches a new way to manage digital content from multiple suppliers and deliver it to a wide range of wireless devices. Specifically, the ’790 patent describes a centralized online store where users are shown only the content that is compatible with their devices. For instance, a Mac user accessing the store would not see applications that run only on Windows computers. To achieve this device-specific filtering, the store’s servers record the device capabilities needed to run each version (or “implementation”) of each item of content and compare those capabilities with the capabilities of each device that accesses the store.

After filtering for compatibility, the ’790 patent’s online store presents each user with just a single description of each item of content, no matter how many implementations of it are compatible with the user’s device. For example, the store might have a dozen versions of a movie, four of which could play on a user’s device, but would nonetheless offer the movie to the user as a single entry in the catalog, not four separate entries. This second type of filtering is enabled by associating each item of content with its implementations on the store’s servers. These stored, hierarchical relationships between items of content and their associated

implementations enable a streamlined presentation of content compatible with a user's device.

The Board erred by rewriting the claims to eliminate the hierarchical item–implementation relationships and the streamlined presentation they enable. As a result, the Board invalidated the patent based on prior art references that did not contemplate, let alone disclose, the '790 patent's second type of filtering. And the Board did so even though it had no business reaching the merits at all; petitioner Netflix, Inc. waited until its reply to address one of the limitations at issue and skipped another limitation altogether.

The Board's first error involves the item–implementation relationship that rests at the core of the patented invention. Faced with express claim language calling for a product catalog that links multiple implementations to one item of content, the Board construed that requirement out of the patent. Fearful of importing limitations from the specification, the Board discounted the specification support for VideoLabs' reading of the claims—and neglected to consider the claim language at all. In the end, its decision left an entire limitation ("in association with each item of digital content") on the cutting-room floor. Perhaps because Netflix ignored that limitation, the Board explained neither what it thought the limitation did nor why it was leaving the limitation with no work to do. Had the Board enforced the claimed item–implementation relationship as written, it would have had no choice but

to find the asserted prior art lacking. Under the correct construction, there is no dispute that the only reference at issue is missing this limitation.

Turning to the "only a single description" limitation, which prevents users from seeing multiple versions of the same item, the Board made two additional independent legal errors in its anticipation finding. First, the Board ignored well-established law requiring it to confine Netflix to the petition it filed, in which Netflix neglected to address this limitation. Over VideoLabs' objection—which the Board noted but neglected to adjudicate—the Board allowed Netflix to use its reply brief to attempt to cure its petition's failure of proof. By not even attempting to explain itself, the Board violated the Administrative Procedure Act. Not that it mattered much; there is nothing the Board could have said to change what the statute required it to do: deny the petition. Giving Netflix a second bite at the apple in its reply was legal error.

That brought the Board to the merits, where it erred again. The Board again misconstrued the claims, this time by stretching the "only a single description" limitation to the breaking point. Despite the limitation's prominent place in the claim language and the specification's explanation of the critical role it plays, the Board reimagined it to be meaningless. The '790 patent recognizes that after filtering for device compatibility, there can still be multiple implementations of an item of content that work with a user's device. And the claims say what to do

when that happens: provide "only a single description" for the item, not separate descriptions for each implementation. Ignoring that teaching, the Board thought that showing one description per implementation—as the prior art did—sufficed because, so long as only one implementation is compatible, there will only be one description. That misses the point.

To be sure, the Board purported to find in the alternative that the "only a single description" limitation is obvious. But the Board's analysis expressly depends on its anticipation finding and thus is no alternative at all. Anyhow, Netflix and the Board's obviousness theory involves more handwaving than substance. Neither Netflix nor the Board identified the missing limitation anywhere in the prior art or in the knowledge of an ordinarily skilled artisan. Nor did they explain how any reference could be modified to perform it. Instead, they jumped from the mundane observation that some devices have small screens to the conclusion that a person of ordinary skill would come up with the '790 patent's specific technique. That is insufficient as a matter of law.

Nothing in the record could cure the Board's legal errors on remand. Netflix's petition will still have just as many holes in it. And there is neither argument nor evidence to support a finding that the asserted prior art satisfies the limitations at issue under the correct construction. This Court should therefore reverse the Board's decision.

## STATEMENT OF RELATED CASES

No appeal was previously taken from the underlying proceeding.

The patent at issue in this appeal, U.S. Patent No. 7,233,790 ("the '790 patent"), is also at issue in the following pending cases:

- *Starz Entertainment, LLC v. VL Collective IP, LLC*, No. 1:21-cv-01448-JLH (D. Del.)
- *VideoLabs, Inc. v. Netflix Inc.*, No. 1:22-cv-00229-JHS (D. Del.)
- *Roku Inc. v. VideoLabs, Inc.*, IPR2025-00072 (PTAB)

## STATEMENT OF JURISDICTION

The Board had jurisdiction over this inter partes review proceeding under 35 U.S.C. §6(b)(4). The Board issued its final written decision on October 2, 2024. Appx1. VideoLabs timely filed its notice of appeal on October 25, 2024. Appx2743-45; *see* 35 U.S.C. §§141(c), 142, 319; 37 C.F.R. §90.3(a)(1). This Court has jurisdiction under 28 U.S.C. §1295(a)(4)(A).

## ISSUES PRESENTED

1. Did the Board act contrary to law by construing the claims not to require any stored relationship between an "item of content" and multiple "implementations of" that item and thus reading the "in association with each item of digital content" limitation out of the patent?

2. Did the Board act contrary to law by allowing Netflix to address the "only a single description" limitation for the first time in reply after Netflix failed to address the limitation in its petition?

3. Did the Board act contrary to law by construing the "only a single description" limitation to be satisfied by showing one description per implementation, rather than to require presenting "only a single description" despite multiple compatible implementations of the same item?

## STATEMENT OF THE CASE

### A. The '790 patent

The '790 patent is concerned with how to manage and deliver digital content from multiple suppliers to a wide range of wireless devices with varying capabilities. Appx77 (1:13-2:17). At the time of the invention in the early 2000s, consumers and content providers faced a fragmented landscape of digital storefronts for purchasing content. Appx77 (1:50-56). The proliferation of different devices with different capabilities—and the corresponding need for different "implementations" (or versions) of content to support different devices—made it challenging to "efficiently allow many digital content providers to distribute many different types of digital content to subscribers using many different types of mobile devices." Appx77 (2:13-17). The '790 patent's inventors responded to this challenge by using a "download manager" to enable the creation of a centralized, scalable store. Appx61 (abstract); Appx77 (1:56-59); Appx79-82 (6:33-12:37). In particular, the download manager stores the relationships between items of content and their various implementations and leverages that information to more efficiently serve a range of devices.

**1.** In the early 2000s, the '790 patent's inventors recognized that wireless devices like cellphones, PDAs, and laptops—each with different technical capabilities—were becoming ubiquitous. Appx77 (1:22-39). And these devices increasingly had internet access and capabilities that

included "allow[ing] their users to play games, access World Wide Web pages, exchange email, exchange and download files, exchange short messaging service (SMS) messages, and send and receive video." Appx77 (1:34-39). With those capabilities came "increasing demand among the users of these devices … for new and interesting types of digital content" to use on their devices, "such as games and other applications, images, ring tones, screensavers, [and] wallpapers." Appx77 (1:40-45).

As the number and variety of digital devices rose, so did the number of providers offering digital content to meet that growing demand. Appx77 (1:40-2:17). Because of the wide variety of devices on the market, content providers had to make available multiple "implementations" of each item of content to ensure that the content could work properly across the range of available devices. Appx77 (1:60-2:17). For example, a provider seeking to make a game available for both a Nokia cellphone and a Blackberry PDA might need to make one implementation for the Nokia phone and another for the Blackberry to account for differences in programming languages, operating systems, video codecs, and so on. *See id.*; Appx83 (13:16-24); Appx73 (fig.11). In addition to the need to match devices with suitable implementations of content, different devices also required different "provisioning protocols." Appx77 (1:60-2:7); *see* Appx73 (fig.11).

The result was a fragmented array of digital storefronts for purchasing content, with different content and device suppliers each

offering their own specialized stores. Appx77 (1:50-59) (describing the prior art storefronts). Each store had to "deploy [any given] item of content multiple times" to account for the different devices it wanted to serve. Appx77 (1:60-2:7). And a customer would have to both locate the appropriate store for her device and, when faced with multiple implementations, know which would work with that device. *See* Appx77 (1:60-2:17).

**2.** The '790 patent addresses these problems with a "download manager" that leverages the distinction between content generally and the various implementations of a particular item of content. Appx61 (abstract); Appx78 (3:45-4:8); *see also* Appx79-82 (6:32-12:37) (describing the download manager in detail). For example, a specific ringtone (an item of content) might be available in both .mp3 and .wav formats (its implementations). *See* Appx2054-55 ¶39; Appx73 (fig.11); Appx77 (1:40-2:17); Appx83 (13:16-35). Or carrying the concept forward to today's technology, the movie *The Lion King* (an item of content) might be offered in several resolutions, such as 480p, 720p, 1080p, and 4K (its implementations). *See* Appx2054-55 ¶39. Although the claims require a minimum of one item in the catalog with at least two associated implementations, the specification enables any number of implementations associated with each item. *See, e.g.*, Appx81 (9:37-62).

As the '790 patent uses the term, "each implementation corresponds to a different set of device capabilities." Appx77 (2:60-63). That set of

capabilities in turn corresponds to one or more devices. *See, e.g.*, Appx67 (fig.5) ("devices supported"); Appx81 (9:56-58) ("As shown in [Figure 5], each implementation entry **57** also includes a list (**59**A or **59**B) of devices supported by that implementation."); Appx81 (9:56-58); Appx81 (9:44-48) ("[E]ach [implementation] may be designed for a different specific client device or set of client devices"). And just as an implementation can be compatible with multiple devices, a device may be able to use multiple implementations of the same item of content. Appx81 (9:51-56) (describing filtering a product catalog such that it shows "only those products that have at least one implementation compatible with the subscriber's device").

Among the download manager's core capabilities is storing the relationship between each item of content and its various implementations. Appx80-83 (7:31-45, 9:37-62, 12:39-13:35); *see* Appx65-68 (figs.3-6). The download manager also stores, for each implementation, the corresponding device capabilities. Appx80-83 (7:31-45, 8:30-9:12, 12:39-13:35); *see* Appx66-67 (figs.4-5).

Recording these relationships in a product catalog enables the download manager to create a centralized, scalable content store. Appx77 (1:50-2:17), Appx80-81 (8:66-9:12). The download manager uses the stored relationships to filter the product catalog so that it displays only those items of content with at least one implementation suitable for a particular user's device. Appx81-82 (9:37-62, 11:64-12:18); Appx71

(fig.9); *see also* Appx84 (15:52-55) ("selecting a portion of the product catalog to be presented to the subscriber, based on device capabilities of the wireless device used by the subscriber"). And the download manager presents that filtered set of content items in a streamlined way, showing only a single entry per content item even when multiple implementations are suitable for the user's device. *See* Appx67 (fig.5); Appx78 (3:19-20) (explaining that Figure 5 "shows the relationships between a product entry and implementations of the product in the product catalog"); Appx81 (9:37-62) (discussing Figure 5); *see also, e.g.*, Appx71 (fig.9); Appx77 (2:60-67). Together, these two techniques spare users from sorting through a morass of different implementations that may or may not work with their devices. Appx80-83 (8:66-9:12, 9:49-62, 12:13-18).

In a preferred embodiment, rather than leaving the user to choose among the suitable implementations of a selected content item, the download manager automatically identifies the "best-fit implementation" for that item and delivers it to the user. Appx82-83 (12:39-13:35); *see* Appx74 (fig.12).

**3.** Claim 2, which is representative for the purpose of this appeal, *see* Appx6-7, Appx36-37, reflects this invention:

> A method of providing access to digital content for use on wireless communication devices, the method comprising:
>
> receiving and storing in a server system **a plurality of items of digital content** to be made available for use in wireless communication devices used by a plurality of wireless services subscribers, including receiving and storing **a plurality of**

**different implementations of at least one of the items of digital content**, where each implementation of any given item of digital content corresponds to a different set of device capabilities;

operating the server system to maintain a product catalog containing a description of the items of digital content, **wherein the product catalog includes, in association with each item of digital content, a reference to each implementation of said item** of digital content;

receiving a request from a wireless device used by one of the subscribers;

in response to the request, selecting a portion of the product catalog to be presented to the subscriber, based on device capabilities of the wireless device used by the subscriber; and

presenting the selected portion of the product catalog to the subscriber via a wireless network, such that the selected portion, as presented to the subscriber, **provides only a single description of each item of digital content in said portion, regardless of the number of implementations** of each said item.

Appx84 (15:35-61) (emphasis added).[1]

## B. The asserted prior art

**1.** The primary prior art reference at issue is U.S. Patent Application Publication No. 2002/0131404 (published Sept. 19, 2002) ("Mehta"). Appx264-344. Similar to the '790 patent, Mehta discloses a system for maintaining and distributing wireless applications. Appx264

[1] The Board did not distinguish between independent claims 2 and 9. Appx36, Appx42. Claims 3-7 and 10-14 depend from those claims. Appx84-85. Claims 1 and 8 were amended in reexamination after Netflix filed its petition, Appx6 n.1, and are now substantively identical to claims 2 and 9, respectively. *See* Appx1841-43 (reexamination certificate); Appx37, Appx42.

(abstract). But Mehta views the problem more narrowly than does the ’790 patent and thus proposes a narrower solution.

Mehta teaches a “Mobile Application System” that “provide[s] applications, resources, and other content to mobile subscriber devices, such as wireless devices.” Appx323 ¶5. That system is meant to deliver content to devices “with greater assurance of their ability to successfully execute” the content. *Id.* Mehta’s system pursues that objective by checking “for authorized access by the subscriber, compatibility with a requesting subscriber device, and/or compliance with security and billing policies.” *Id.*

As relevant here, Mehta discloses that the Mobile Application System can “retrieve a list of available applications that can be downloaded to [a] subscriber’s device.” Appx328 ¶67. After identifying applications meeting the subscriber’s search criteria or starting from an “initial list” (*e.g.*, a “default list” supplied by the system or a “personalized list” supplied by the subscriber), the system “filters th[e] initial list based upon subscriber and device capabilities.” *Id.* This filtering allows the system to return a list of applications “compatibl[e] with” the subscriber’s device. Appx323 ¶5; *accord* Appx336 ¶117 (“In [some] embodiments, the [Mobile Application System] only lists those applications that are supported by the subscriber’s device.”). In this way, Mehta’s system “allows the subscriber to avoid the problem of having to explicitly select a compatible application.” Appx336 ¶117. Mehta does not, however,

recognize the separate problem of having multiple compatible implementations of an item of content, and so it does not address what to do in that situation. Put another way, Mehta's filtered lists do not distinguish between different items of content and different implementations of the same item; they simply present the compatible applications (items) without any further hierarchy or organization.

**2.** The Board also addressed a white paper by Schläpfer et al., which Netflix advanced as a secondary reference for obviousness. Appx1041-66. The Schläpfer paper describes the development and testing of Java mobile applications. Appx1043. As relevant to Netflix's argument, Schläpfer discusses "Java 2 Micro Edition," which it says is useful for serving "resource-constrained devices." Appx1044. For example, Schläpfer notes that mobile phones and PDAs "have simple user interfaces, minimum memory budgets (starting at around 128 kB) and low-bandwidth intermittent network connections." Appx1045. Schläpfer also discusses the use of a "Mobile Information Device Profile" for devices with "a small display," "a touch screen or keypad," and the ability to "communicat[e] via a mobile network with limited bandwidth." Appx1047.

### C. The inter partes review proceeding

**1.** In February 2023, Netflix petitioned for inter partes review of all claims of the '790 patent under 35 U.S.C. §311. Appx86, Appx93. Netflix argued that claims 1-4 and 8-11 were anticipated by Mehta and that all

claims were obvious in view of Mehta and Schläpfer. Appx114. The Board instituted review. Appx1866-67.

**2.** The Board issued its final written decision on October 2, 2024. Appx1. The Board agreed with Netflix as to both the anticipation and obviousness grounds. Appx58.

**a.** The Board's analysis of two disputed anticipation issues is relevant here: (i) the required relationship between "items" and "implementations" and (ii) the "only a single description" limitation.

**i.** First, the Board addressed the claimed relationship between "items" and their "implementations," particularly as it appears in claim 2's "receiving and storing" and "operating" steps. Appx13-26. Netflix contended that Mehta disclosed multiple implementations of an item of content by teaching the existence of "functionally equivalent programs." Appx13-14. VideoLabs responded that Mehta does not disclose the claimed relationship between items and their implementations because it does not store any relationship between the alleged implementations and any corresponding item of content. Appx2005 (explaining that Mehta, unlike the '790 patent, does not "distinguish between (1) the content and (2) implementations of that content"); Appx2001-03 (explaining that Mehta's "functionally equivalent" applications are distinct "items of content that share a function, not two versions of a single piece of content"); *see also* Appx1993-2009.

Despite its earlier claim that it was not engaging in claim construction, Appx10, the Board recognized that this dispute required it to interpret the claims, *see* Appx20-22. Relying only on this Court's cases cautioning against reading limitations from the specification into the claims, the Board rejected VideoLabs' interpretation and embraced Netflix's. Appx20-22. According to the Board, the claims do not require any hierarchical relationship between items and their implementations, and so "Mehta's 'flat database'" suffices to disclose multiple implementations of the same item. Appx21-22.

Applying its construction, the Board found that Mehta disclosed "different implementations of the same application" (*i.e.*, item of content) by disclosing "receiving and storing functionally equivalent programs having the same name that are capable of running on multiple kinds of devices." Appx22. The Board did not find that Mehta stored any relationship between the "functionally equivalent programs" and their shared name. *See* Appx20-22.

The Board carried that reasoning forward to the "operating" step, which requires maintaining a "product catalog" that "includes, in association with each item of digital content, a reference to each implementation of said item of digital content," Appx84 (15:45-49). The Board found that Mehta disclosed this step by describing a "data repository" (the product catalog) that includes "application profiles," each of which "includes a URL for an application" (the reference to an

implementation). Appx24-26. The Board did not address the phrase "in association with each item of digital content"—perhaps because Netflix had also ignored that phrase. *See id.*; Appx121-24 (petition); Appx2267-69 (Netflix's reply).

**ii.** Second, the Board addressed the "presenting" step's "only a single description" limitation. Appx26-31. That limitation requires presenting to the user a portion of the product catalog that "provides only a single description of each item of digital content in said portion, regardless of the number of implementations of each." Appx84 (15:56-61).

Netflix's petition had ignored the "only a single description" limitation. *See* Appx127-29. Only after VideoLabs objected to the omission, Appx2009-10, did Netflix attempt to address it in its reply brief, Appx2269-72. The Board acknowledged VideoLabs' argument that Netflix's omission required denying its petition, Appx27, but the Board neglected to adjudicate the issue and instead adopted the theory Netflix raised for the first time in its reply brief. *See* Appx28-31 (Board's decision); Appx2269-72 (Netflix's reply).

On the merits, there was no dispute that Mehta does not teach any particular response—let alone providing "only a single description"—to a scenario where multiple implementations of a given item are compatible with the user's device. *See* Appx28-31 (Board's decision); Appx127-29 (petition); Appx2269-72 (Netflix's reply). The Board nonetheless concluded that Mehta disclosed the "only a single description" limitation.

Appx28-31. According to the Board, "each implementation" in Mehta's system "corresponds to a different device," such that after filtering for compatibility, Mehta only ever shows a single implementation: "the one implementation that works with the subscriber's device." Appx29-30. And because that single implementation has a single description, the Board thought the "only a single description" limitation satisfied despite Mehta's silence as to whether to provide a single description for multiple implementations. Appx29-31.

**b.** The Board next adopted Netflix's alternative theory of obviousness in view of Mehta and Schläpfer. Appx38-47. The Board recognized that for claim 2, Netflix relied exclusively on its anticipation theory for everything but the "only a single description" limitation. Appx42-43. As to that limitation, Netflix contended that if Mehta did not disclose it, adding Schläpfer to the mix made it obvious because Schläpfer teaches the problem of "limited screen space" on mobile devices. *Id.* The Board adopted that theory.

According to the Board, "Schläpfer describes the known problem of a mobile device having limited resources such as a small display screen." Appx46. From that known problem, the Board found "that a person of ordinary skill would have therefore recognized that the amount of information displayed on the small screen would be limited." Appx46. And from there, the Board jumped to the conclusion that a person of ordinary skill "would have displayed only a single description of each

item of digital content—such as the title—regardless of the number of implementations of each item as taught by Mehta for the benefit of limiting the amount of information displayed on the small display screen." Appx47.

Aside from incorporating its anticipation analysis of Mehta, the Board did not identify anything in Mehta or Schläpfer that taught providing "only a single description" of multiple implementations. *See* Appx45-47. Nor did the Board find that this technique would have been common sense or otherwise known to the person of ordinary skill. *See id.* Instead, the Board relied solely on the assertion that there were only "three identified, predictable solutions" to the problem of limited screen space, one of which was the "only a single description" limitation. Appx46-47. That remarkable conclusion in turn rested on the fact that VideoLabs identified "two other ways to accomplish limiting the amount of information shown on a small screen." Appx46 (citing Appx2089-90 ¶105); *see* Appx2089-90 ¶105 (VideoLabs' expert testifying that "there are many ways to accomplish" this result and providing two broad examples: "display[ing] less information" or "only display[ing] the most important or valuable applications"). Put another way, the Board reasoned that because the record reflected three examples of how to respond to limited screen space, there must be only three ways to respond, and so all three ways must have been obvious. *See* Appx46-47.

**3.** VideoLabs timely appealed. Appx2743-45; *see* 35 U.S.C. §§141(c), 142, 319; 37 C.F.R. §90.3(a)(1).

## SUMMARY OF ARGUMENT

The Board erred as a matter of law as to two separate claim requirements: first, the claimed relationship between "items" and "implementations," and second, the "only a single description" limitation.

I. The relationship between items of content and their implementations is foundational to the '790 patent, but the Board's construction deleted it from the claims. Without that legal error, there is no record support for the Board's unpatentability findings, and so reversal is warranted.

A. The plain language of claim 2 expressly requires a product catalog that links multiple implementations to one item of content. The text not only delineates between "implementations" and "items" but also binds them together; each implementation is "of"—and thus belongs to—a particular item of content. And that relationship must be stored in the claimed product catalog: At the "operating" step, claim 2 requires the catalog to "include[], in association with each item of digital content, a reference to each implementation of said item." Appx84 (15:45-49). And the specification explains that storing these logical, hierarchical relationships between items and their implementations is an essential component of the invention.

The Board, for its part, read claim 2 to not require any stored relationship between items and their implementations at all. That construction cannot be squared with the intrinsic evidence or the rules of claim construction. Contrary to a basic canon of construction, the Board's interpretation makes an entire limitation superfluous; it leaves "in association with each item of digital content" with no work to do. The Board did not even attempt to explain its decision to delete this limitation. All the Board said in defense of its construction was that limitations should not be read in from the specification. But the Board misunderstood the law on that point. The claim construction question here has nothing to do with reading limitations in from the specification; rather, the question is what the claim's express terms mean. The Board's narrow focus on not reading in limitations from the specification led it to ignore the claim language expressly requiring the product catalog to store item–implementation relationships—and ultimately to read that requirement out of the claim.

B. The Board's error is dispositive. It is undisputed that Mehta does not store any relationship between an item and multiple implementations of that item. And for that matter, Netflix made no argument at all about the "in association with" limitation. Without the Board's incorrect construction eliminating the need for a stored hierarchical item–implementation relationship and deleting the "in association with" limitation from the patent, its anticipation finding

cannot survive. And the Board's obviousness finding is no alternative here; it relied exclusively on anticipation for the "different implementations" and "in association with" limitations.

II. The Board's conclusion as to the "only a single description" limitation is wrong as a matter of procedure and wrong on the merits. The Board failed to confine Netflix to its petition as the statute requires and instead allowed Netflix to argue for the first time in reply that Mehta anticipated this limitation. The Board then implicitly construed the limitation to be meaningless, allowing it to be satisfied by the mere happenstance of having one implementation per device and thus one description. Each of those errors independently warrants reversal. And the Board's alternative finding of obviousness cannot fix the problem.

A. Black-letter law confines the Board to the bounds of the petition. When a petitioner fails to address all the limitations of a challenged claim in its petition, the Board's only option is to deny the petition; it cannot allow the petitioner to fill the gaps for the first time in its reply brief. But that is exactly what the Board did here. Netflix's anticipation analysis ignored the "only a single description" limitation; it addressed only the first part of the '790 patent's selection and presentation process, in which the catalog is filtered for compatibility. That omission should have been the end of the road. The Board's unexplained decision to ignore it fell short of its obligations under the Administrative Procedure Act and was

contrary to law. Because Netflix's defective petition cannot be cured, the Board's error warrants reversal.

B. The Board made an independent legal error on the merits. Instead of enforcing the "only a single description" limitation, the Board implicitly construed it to be meaningless. According to the Board, the limitation can be satisfied by pure happenstance: Presenting one description per implementation does the trick so long as there happens to be only one implementation compatible with a user's device. But the claim language and specification make clear that the limitation does real work; it requires presenting "only a single description" despite the availability of multiple compatible implementations of the same item of content. Because Mehta undisputedly teaches no such thing, there is no substantial evidence for the Board's anticipation finding under the correct construction.

C. The Board's alternative finding of obviousness cannot save its merits decision. At the outset, that finding is not alternative at all; the Board expressly relied on its anticipation finding. So at the very least, the Board would need to try again on remand. But there is no point in a remand on this record because Netflix and the Board's obviousness theory is insufficient as a matter of law. Neither Netflix nor the Board mapped the missing "only a single description" limitation to any reference or even to the knowledge of a person of ordinary skill. Nor did they explain how Mehta—which is missing the hierarchical item–

implementation relationships the ’790 patent relies on to provide “only a single description”—could be modified to achieve it.

## STANDARD OF REVIEW

This Court “review[s] Board decisions for compliance with the [Administrative Procedure Act], setting aside actions of the Board that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.” *Regents of the Univ. of Minn. v. Gilead Scis., Inc.*, 61 F.4th 1350, 1358 (Fed. Cir. 2023) (attribution omitted); *see* 5 U.S.C. §706(2). The Court’s review “is confined to the grounds upon which the Board actually relied.” *Alacritech, Inc. v. Intel Corp.*, 966 F.3d 1367, 1372 (Fed. Cir. 2020) (cleaned up). Those grounds must “be clearly disclosed and adequately sustained.” *In re NuVasive, Inc.*, 842 F.3d 1376, 1382 (Fed. Cir. 2016) (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943)).

The Court “review[s] de novo the Board’s ultimate claim constructions and any supporting determinations based on intrinsic evidence.” *Personalized Media Commc’ns, LLC v. Apple Inc.*, 952 F.3d 1336, 1339 (Fed. Cir. 2020). “[A]ny subsidiary factual findings involving extrinsic evidence” are reviewed “for substantial evidence.” *Id.* Where “the Board did not rely on extrinsic evidence” in construing the claims, this Court “can determine the correct construction.” *Valve Corp. v. Ironburg Inventions Ltd.*, 8 F.4th 1364, 1379 (Fed. Cir. 2021) (attribution omitted).

"Anticipation is a question of fact reviewed for substantial evidence." *Arbutus Biopharma Corp. v. ModernaTX, Inc.*, 65 F.4th 656, 662 (Fed. Cir. 2023). "Obviousness is a question of law based on underlying factual findings." *In re Google LLC*, 56 F.4th 1363, 1367 (Fed. Cir. 2023). This Court "review[s] the Board's legal conclusions de novo and any underlying findings of fact for substantial evidence." *Id.*

## ARGUMENT

### I. The Board Erred as a Matter of Law by Discarding the Claimed Relationship Between "Items" and "Implementations."

As noted, two key building blocks of the '790 patent's claim 2 are "a plurality of items of digital content" and, for at least one of those items, "a plurality of different implementations of" the item. Appx84 (15:37-44); *supra* pp.9-10. "[E]ach implementation of any given item of digital content corresponds to a different set of device capabilities." Appx84 (15:42-44). The claimed product catalog records the relationship between each item of content and its implementations: In the patent's terms, it "includes, in association with each item of digital content, a reference to each implementation of said item of digital content." Appx84 (15:47-49).

This relationship between items and implementations is foundational to claim 2. But the Board removed it from the patent. That was contrary to law. And without the Board's incorrect construction, there is no record support for its anticipation and obviousness findings.

Under the Board's regulations, claims must be construed in inter partes review proceedings "using the same claim construction standard that would be used ... in a civil action under 35 U.S.C. [§]282(b)." 37 C.F.R. §42.100(b); Appx9.

"[T]he words of a claim are generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc) (cleaned up). That meaning cannot be determined in a vacuum. The person of ordinary skill "read[s] the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313. Similarly, "claims must be read in view of the specification, of which they are a part." *Id.* at 1315 (cleaned up). The specification "is always highly relevant" and "is the single best guide to the meaning of a disputed term." *Id.* (attribution omitted). Indeed, "[u]sually, it is dispositive." *Id.* (attribution omitted). It is thus "fundamental that claims are to be construed in the light of the specifications and both are to be read with a view to ascertaining the invention." *United States v. Adams*, 383 U.S. 39, 49 (1966). "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Phillips*, 415 F.3d at 1316 (attribution omitted).

### A. Claim 2 expressly requires a product catalog linking multiple implementations to one piece of content.

**1.** Start with the claim language. *Grace Instrument Indus., LLC v. Chandler Instruments Co.*, 57 F.4th 1001, 1008 (Fed. Cir. 2023) ("We begin by considering the language of the claims themselves."). Claim 2 distinguishes between "items of digital content" and "implementations **of**" those items. Appx84 (15:40-49) (emphasis added). The use of the word "of" to link the "implementations" and "items" indicates that each implementation belongs to a particular item of content. *See, e.g.*, *Of*, Merriam–Webster, https://www.merriam-webster.com/dictionary/of (last visited February 7, 2025) (preposition def.6a) ("used as a function word to indicate belonging or a possessive relationship").

Next, the "operating" step further defines the required relationship between items of content and their implementations:

> operating the server system to maintain a product catalog containing a description of the items of digital content, wherein the product catalog includes, **in association with each item** of digital content, **a reference to each implementation of said item** of digital content.

Appx84 (15:45-49) (emphasis added). That language on its face requires not just a conceptual relationship between implementations and items, but also that the relationship be stored in the catalog. The catalog must store "a reference to each implementation" of each item, and that reference must be "in association with" the respective item. *Id.* In this way, the claimed catalog must be one that associates each item with its corresponding implementations. *See id.*

**2.** The specification confirms the point. It explains that the '790 patent's download manager stores the relationships between each item of content and its implementations. Appx80-83 (7:31-45, 9:37-62, 12:39-13:35); *see* Appx65-68 (figs.3-6); *supra* pp.10-11. Figure 5 illustrates this logical, hierarchical relationship, in which two or more implementations are associated in memory with their corresponding item of content ("product"):




FIG. 5

Appx67; *see also* Appx68 (fig.6) (similar). As the specification explains, Figure 5 shows that the claimed catalog "includes, for each product entry **56**, a reference **58** to at least one implementation **57** of that product." Appx81 (9:38-40). And "as represented in" Figure 5, "any particular

product may have multiple implementations published on the download manager." Appx81 (9:44-48).

As discussed above, recording these relationships in its product catalog is fundamental to how the download manager fulfills its function of creating a centralized, scalable content store. *See supra* pp.9-11; Appx77 (1:56-59); Appx81 (9:4-12). The download manager uses the stored relationships both to filter the catalog based on device capabilities and to show users only a single entry for each item even when there are multiple suitable implementations for the user's device. *Supra* pp.10-11; *see* Appx71 (fig.9), Appx81-82 (9:37-62, 11:64-12:18) (filtering); Appx67 (fig.5), Appx78 (3:19-20), Appx81 (9:37-62) (single entry). And the stored relationships also facilitate the optional "best-fit implementation" feature described as part of a preferred embodiment. *Supra* p.11; Appx82-83 (12:39-13:35) (teaching that the download manager can automatically identify the optimal implementation for a user's selected item of content and deliver that implementation to the user); *see* Appx74 (fig.12).

**3.** The Board's contrary view is irreconcilable with the intrinsic evidence and ordinary principles of claim construction.

Despite its earlier assertion that it was not construing any claim terms, Appx10, the Board expressly engaged with this issue as a matter of claim construction. Appx20-22 (discussing what "the claims require" and purporting to apply *Phillips* and other claim construction cases); *see*

*also Google LLC v. EcoFactor, Inc.*, 92 F.4th 1049, 1056 (Fed. Cir. 2024) ("We have found implicit claim construction even when the Board does not recognize that it is construing a claim," such as when "the Board's findings established the scope of the patented subject matter." (cleaned up)). According to the Board, the claim "does not require storing the implementations in a multi-level data structure." Appx21-22. Indeed, the Board did not understand the claims to require the catalog to store any relationship between items and their implementations at all. *See* Appx20-22 (discussing the required "plurality of different implementations of at least one of the items"); Appx24-26 (discussing the "operating" step but ignoring its "in association with" requirement).

For starters, the Board's construction flouts a basic canon of claim construction by making an entire limitation superfluous. *See, e.g.*, *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 809-10 (Fed. Cir. 2021) ("It is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous." (attribution omitted)). The Board does not—and cannot—explain what work the claim phrase "in association with each item of digital content" does under its construction, Appx84 (15:47-48). If the Board were right that the catalog need not store any particular relationship between items and their implementations, the "operating" step could simply have said that the catalog "includes a reference to each implementation of said item of digital content." Nothing in the claim language or specification justifies the Board's

unexplained decision to read the "in association with" language out of the claim. *See, e.g.*, *Intel*, 21 F.4th at 809-10 (collecting cases); *In re Power Integrations, Inc.*, 884 F.3d 1370, 1376 (Fed. Cir. 2018) ("Another problem with the board's claim construction is that it renders claim language meaningless."). To the contrary, the specification repeatedly illustrates how the claimed association works and why it is important to the patented invention. *Supra* pp.9-11.

What's more, the Board's explanation for its construction is faulty on its face. The Board relied exclusively on this Court's precedent warning against reading limitations in from the specification. Appx20-22. But perhaps because it skipped over the first step of any claim construction analysis—reading the text of the claims—the Board missed the point of those cases. *See* Appx20-22 (no analysis of the claim language). What this Court has said not to do is "to narrow the claims to the preferred embodiment" by adding limitations not present in the claim language. *See, e.g.*, *Curtiss–Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1379-80 (Fed. Cir. 2006). By contrast, it is entirely appropriate to look to the specification to help "discern the meaning of [claim] term[s] in the context of th[e] invention and field of art." *Id.* The Board failed to heed this distinction between "importing limitations from the specification into the claim" and "using the specification to interpret the meaning of a claim." *Phillips*, 415 F.3d at 1323.

As explained, the claim language itself expressly sets out both the required relationship between items and implementations and the requirement that the product catalog store that relationship. *Supra* pp.9-11. The Board's failure to consider that language led it to give short shrift to the supporting evidence in the specification. In the end, the Board's narrow focus on not reading in limitations from the specification led it to neglect its fundamental obligation "to capture the scope of the actual invention." *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011); *accord Intel*, 21 F.4th at 809 (same).

### B. Without its incorrect construction, the Board's anticipation and obviousness findings collapse.

**1.** The Board's anticipation analysis depends on its incorrect conclusion that the claims do not require any stored relationship between items of content and their implementations. Netflix did not contend, and the Board did not find, that Mehta stores any relationship between an item and multiple implementations of that item. *See* Appx119-24 (Netflix's petition); Appx17-22 (Board finding that Mehta discloses the claimed "different implementations" merely because it teaches "receiving and storing functionally equivalent programs having the same name that are capable of running on multiple kinds of devices").

Indeed, Netflix's petition ignored the requirement that multiple implementations be "in association with" an item of content and thus did not map anything in Mehta to it. Appx121-24; *see In re Magnum Oil*

*Tools Int'l, Ltd.*, 829 F.3d 1364, 1377-81 (Fed. Cir. 2016). Its reply likewise ignored the issue. Appx2267-69.

The Board followed Netflix's lead. Rather than confronting the "in association with" requirement, the Board rested its conclusion that Mehta discloses the "operating" step solely on its finding that Mehta teaches a "data repository" (mapped to the product catalog) that stores a URL for each application (the alleged "reference to each implementation"). *See* Appx24-26. Neither the Board nor Netflix identified any stored relationship that would satisfy the "in association with" limitation under the correct construction. Even assuming that Mehta discloses multiple implementations in the first place, it undisputedly stores those implementations (the "functionally equivalent" applications with a shared name) separately from one another, without any identified relationship to the same item of content. *See* Appx20-26 (Board's analysis); Appx120-23, Appx2263-69 (Netflix's argument); Appx333 ¶98 (Mehta, in its sole mention of "functionally equivalent programs," describing its system's ability "to store and support functionally equivalent programs having the same name"); *supra* pp.13-14 (discussing Mehta's lack of any logical, hierarchical relationship between items and implementations). As a result, the Board's anticipation finding cannot survive without its incorrect construction eliminating the need for such a stored relationship.

**2.** The Board's obviousness finding is equally tainted by its error. The Board's obviousness analysis as to the "different implementations" and "in association with" limitations relied exclusively on its view that Mehta anticipates them. Appx42. Netflix did not argue, and the Board did not find, that Schläpfer has anything to add on this point. *See* Appx42-47 (Board discussing Schläpfer only as to claim 2's "only a single description" limitation); Appx140-44 (same in Netflix's petition).

***

At a minimum, that the Board's analysis of Mehta is "infected by the erroneous claim construction" requires vacating the Board's decision. *Kaken Pharm. Co. v. Iancu*, 952 F.3d 1346, 1355 (Fed. Cir. 2020) (collecting cases). But here, the proper remedy is reversal because the record demonstrates that the claim construction issue is dispositive—particularly in light of Netflix's failure to preserve any argument about the "in association with" limitation before the Board. *See In re Smith Int'l, Inc.*, 871 F.3d 1375, 1383-84 (Fed. Cir. 2017) (reversing the Board's findings where some "depended on an incorrect claim construction," others were factually unsupported, and no factual disputes remained for the Board to decide); *In re Hodges*, 882 F.3d 1107, 1113-14 & n.7 (Fed. Cir. 2018) (reversal is appropriate at least when the Board "committed legal error and no further factual findings are required" (attribution omitted)); *see also Apple Inc. v. Gesture Tech. Partners*, __ F.4th __, 2025 WL 299939, at *6 (Fed. Cir. Jan. 27, 2025) ("Because correcting the

Board's analysis results in only one permissible factual finding, reversal is appropriate." (cleaned up)).

## II. The Board Erred as a Matter of Law by Failing to Enforce the "Only a Single Description" Limitation.

Claim 2's "presenting" step requires, among other things, that "the selected portion, as presented to the subscriber, provides **only a single description of each item** of digital content in said portion, **regardless of the number of implementations** of each said item." Appx84 (15:56-61). Put another way, when more than one implementation of a given item would work for a user's device, the '790 patent responds by consolidating all the compatible implementations into a single entry in the product catalog. *Id.*; *supra* pp.10-11. For example, if a movie is available for a user's device in three different resolutions (*e.g.*, 720p, 1080p, and 4K), the catalog displays only a single entry describing the movie, rather than three separate entries for each available resolution.

The Board gave short shrift to this limitation both procedurally and substantively. As a threshold matter, the Board erred by ignoring Netflix's failure to address the "only a single description" requirement in its petition's discussion of Mehta—and neglecting to adjudicate VideoLabs' objection to that failure. The Board thus violated its statutory duty to stick to the petition and its APA obligations to boot. On the merits, the Board read the "only a single description" limitation out of the patent by concluding that it could be fulfilled by a catalog that only

ever has a single implementation per item—and thus, in providing a separate description for each implementation, only ever provides one description per item. That misses the point of the limitation. Finally, without the Board's finding that Mehta discloses this limitation, its alternative finding of obviousness rests on a legally insufficient theory.

### A. The Board erred as a matter of law by ignoring Netflix's petition's failure to argue that Mehta discloses the "only a single description" limitation.

The Board improperly departed from Netflix's petition in its anticipation analysis. The governing statute and binding precedent limit the Board to adjudicating the arguments presented in the petition. In creating the inter partes review process, "Congress opted for a party-directed, adversarial process" in which the petitioner "gets to define the contours of the proceeding." *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1355 (2018). The statute "makes the petition the centerpiece of the proceeding both before and after institution"; the petition "guide[s] the life of the litigation." *Id.* at 1356, 1358; *see also Koninklijke Philips N.V. v. Google LLC*, 948 F.3d 1330, 1336 (Fed. Cir. 2020) ("[I]t is the petition, not the Board's 'discretion,' that defines the metes and bounds of an inter partes review.").

At the outset, the petition must "identif[y], in writing and with particularity, each claim challenged, the grounds on which the challenge to each claim is based, and the evidence that supports the grounds for the challenge to each claim." 35 U.S.C. §312(a)(3); *see also* 37 C.F.R.

§42.104(b)(4) ("The petition must specify where each element of the claim is found in the prior art … relied upon."). Throughout the proceeding, "the petitioner shall have the burden of proving a proposition of unpatentability by a preponderance of the evidence." 35 U.S.C. §316(e). "[A] petitioner cannot employ mere conclusory statements" to meet that burden. *Magnum Oil*, 829 F.3d at 1380. Nor can a petitioner "raise[] a new theory or argument" for the first time in its reply brief. *Corephotonics, Ltd. v. Apple Inc.*, 84 F.4th 990, 1008 (Fed. Cir. 2023).

This Court "review[s] de novo" whether a reply argument is new. *Corephotonics*, 84 F.4th at 1008. The separate question whether the reply complies with the Board's regulations requiring it to be responsive is "review[ed] for abuse of discretion." *Id.*

**1.** In its petition's anticipation analysis, Netflix failed to address the requirement that subscribers are presented with a portion of the product catalog that "provides only a single description of each item of digital content in said portion, regardless of the number of implementations of each said item," Appx84 (15:56-61).

Instead, Netflix addressed only the first part of the '790 patent's selection and presentation process. Appx125-29. Netflix argued that Mehta's filtering "based upon subscriber and device capabilities" disclosed the '790 patent's "selecting" step. Appx125-27 (emphasis omitted) (quoting Appx328 ¶67); *see* Appx84 (15:52-55) ("selecting a portion of the product catalog to be presented to the subscriber, based on

[the subscriber's] device capabilities"). It then argued that by providing that filtered list to the subscriber, Mehta disclosed the '790 patent's "presenting" step. Appx127-29.

Fair enough, that argument addresses the beginning of the "presenting" step, which requires "presenting the selected portion of the product catalog to the subscriber via a wireless network." Appx84 (15:56-57). But Netflix's petition has nothing to say about what comes next: providing "only a single description of each item of digital content in [the selected] portion, regardless of the number of implementations of each said item." Appx84 (15:57-61). To the contrary, Netflix contended that Mehta shows the subscriber "only a portion of the list of applications, corresponding to the **versions** that will work for the subscriber and regardless of the number of application versions." Appx129 (emphasis added). Netflix nowhere suggested, much less established, that Mehta gives multiple versions only a single description.

VideoLabs pointed out this gap in Netflix's petition and explained, citing controlling authority, that it warranted denying the petition. Appx2009-10. And for all Netflix's bluster in its reply that VideoLabs' objection was "unsupported" and "incredulous," Netflix could not point to anything in its petition that addressed the "only a single description" requirement. Appx2269-72. Instead, Netflix repeated its argument about Mehta's initial capability-based filtering and then added a new

theory that Mehta's Figures 2 and 11F taught the "only a single description" requirement. *Id.*

Despite Netflix's citation implying that its petition made the Figure 11F argument, *see* Appx2270 (citing Appx128), Netflix's petition said no such thing—not on the cited page, Appx128, and not anywhere else. In fact, Netflix's petition never so much as cites Mehta's Figure 11F. *See* Appx86-164. As for Figure 2, Netflix did not even attempt to point to any relevant discussion in its petition. Appx2271-72. Again, there is none; Mehta's Figure 2 came up only in a quotation from a different part of Mehta that Netflix twice used for an unrelated argument about packaging and provisioning. Appx152-53 (citing Appx342 ¶148); Appx161 (same).

At that point, the Board had no lawful choice but to close the book on Netflix's petition. Netflix's failure to "articulate specific reasoning, based on evidence of record, to support" its assertion that Mehta disclosed the "only a single description" requirement was fatal as a matter of law. *See Magnum Oil*, 829 F.3d at 1380. The Board's unexplained decision to press on violated both the APA and 35 U.S.C. §312(a)(3)'s requirements for petitions.

**2.** Despite acknowledging the parties' dispute, the Board neglected to adjudicate it. *Compare* Appx27-28 (summarizing the parties' arguments), *with* Appx28-31 ("Analysis" section failing the analyze the

issue). Instead, the Board marched on to the merits and adopted Netflix's new-in-reply theory about Mehta's figures wholesale. *See* Appx28-31.

That is a straightforward violation of the APA. If the Board, as its silence suggests, forgot to decide the issue, then it "entirely failed to consider an important aspect of the problem": whether Netflix's petition satisfied the statutory requirements. *See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Or if the Board decided but failed to explain its decision, then it fell short of the requirement that "the grounds upon which [it] acted be clearly disclosed and adequately sustained." *NuVasive*, 842 F.3d at 1383 (quoting *Chenery*, 318 U.S. at 94). As this Court has reminded the Board, "it is not adequate" for the Board "to summarize and reject arguments without explaining why [it] accepts the prevailing argument." *Id.*; *accord Cutsforth, Inc. v. MotivePower, Inc.*, 636 F. App'x 575, 578-79 (Fed. Cir. 2016) (vacating and remanding because the Board spent most of its decision "summarizing the parties' arguments" and "offer[ed] only conclusory analysis of its own"); *see also Donner Tech., LLC v. Pro Stage Gear, LLC*, 979 F.3d 1353, 1359, 1362 (Fed. Cir. 2020) (remanding where it was "unclear whether the Board meaningfully considered all [relevant] arguments and evidence"). Far from "fully and particularly set[ting] out the bases upon which it reached its decision," the Board said nothing at all. *See Provisur Techs., Inc. v. Weber, Inc.*, 50 F.4th 117, 123 (Fed. Cir. 2022). Its failure to provide any reasonably discernable path to follow

means its decision cannot be sustained. *See id.* at 123-24; *NuVasive*, 842 F.3d at 1382-85.

This Court should exercise its discretion to reach the question the Board left unanswered and reverse. Because this Court reviews de novo whether a reply argument is new, *Corephotonics*, 84 F.4th at 1008, the issue was fully presented to the Board and would not benefit from any factual development, and the answer is straightforward, there is nothing to be gained from a remand. *See Hodges*, 882 F.3d at 1113-14 & n.7; *see also Netflix, Inc. v. Avago Techs. Int'l Sales Pte. Ltd.,* 2024 WL 3507601, at *7 (Fed. Cir. July 23, 2024) ("The Board's failure to reach this issue does not mean we cannot, however, since we review *de novo* whether a petitioner's reply brief has improperly raised a new theory or argument."). A remand would simply prolong this litigation while doing little to facilitate this Court's review.

**3.** Setting the Board's silence aside, excusing Netflix's failure to address the "only a single description" limitation in its petition was contrary to law. *See Magnum Oil*, 829 F.3d at 1380. Netflix was not free to stop after the first part of the "presenting" step; it needed to "grapple with" the "only a single description" language, too. *See Microsoft Corp. v. IPA Techs. Inc.*, 2022 WL 989403, at *6 (Fed. Cir. Apr. 1, 2022) (affirming the Board's conclusion that a petition's "complete failure to address" an issue "was a failure to meet the particularity requirements for what must be in the petition and cannot be left to be filled in on reply"). Because the

petition did not "indicate what it is about [Mehta] that discloses" the "only a single description" requirement, Netflix's petition was insufficient as a matter of law. *See Netflix, Inc. v. DivX, LLC*, 84 F.4th 1371, 1378-79 (Fed. Cir. 2023); *see also id.* at 1379 ("[W]e do not fault the Board for holding Netflix to the argument it chose to make in the [relevant] section of its petition … .").

With at most a conclusory assertion in its petition that the "only a single description" requirement is satisfied, there was nothing more Netflix could do in its reply. Once a petition rests on a conclusory assertion, anything the reply adds or the Board comes up with itself is necessarily beyond the petition and thus prohibited by statute. *See Magnum Oil*, 829 F.3d at 1377-81; *see also Corephotonics*, 84 F.4th at 1008 (new theories or arguments are prohibited "even if" they are "responsive to the patent owner's response or the Board's institution decision"); *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369 (Fed. Cir. 2016) ("Once the Board identifies new issues presented for the first time in reply, neither this court nor the Board must parse the reply brief to determine which, if any, parts of that brief are responsive and which are improper.").

In any event, Netflix's about-face as to how Mehta works from its petition to its reply confirms that its reply argument was new and therefore impermissible. As noted, far from arguing that Mehta teaches displaying only a single description of each item, Netflix's petition

contended that Mehta shows the subscriber the "versions"—plural—"that will work for the subscriber," no matter how many. Appx129. Netflix then reversed that view in its reply, arguing for the first time that Mehta shows each user only a single version of each item of content. Appx2269-70. And to support that new account of Mehta, Netflix pointed for the first time to Figures 2 and 11F. Appx2269-72.

Netflix's new figure-based argument became the lynchpin of the Board's decision as to the "single description" limitation. Appx28-30 ("We find that Mehta, in displaying the title of an application only once as shown in Figures 2 and 11F, even though multiple applications can have the same title, describes 'presenting … only a single description of each item of digital content … regardless of the number of implementations' of the item as claimed." (alterations in original)). The Board's reliance on Netflix's new argument was contrary to law. *See, e.g.*, *Corephotonics*, 84 F.4th at 1008.

Because the Board failed to hold Netflix to the statutory requirements for its petition warrants reversal as to the anticipation ground. *See Magnum Oil*, 829 F.3d at 1380-81. The implications for the Board's obviousness analysis are addressed below. *Infra* pp.49-54.

### B. On the merits, the Board erred by reading the "only a single description" limitation out of the patent.

Regardless, the Board is wrong on the merits. According to the Board, Mehta teaches the "only a single description" limitation because

in Mehta, "when implementations have the same name, each implementation corresponds to a different device," and so Mehta "would only present to the subscriber the one implementation that works with the subscriber's device." Appx29-30. Put another way, because Mehta (as the Board understood it) never has more than a single implementation of a given item to display after its compatibility filtering is complete, it never has any occasion to provide more than a single description for that item.

That conclusion rests on a faulty implicit construction of the '790 patent's "only a single description" limitation under which the limitation is satisfied simply by presenting one description per implementation. Contrary to the Board's implicit construction, the plain meaning of the "only a single description" limitation requires multiple compatible implementations of the same item.

**1.** Once again, the claim language comes first. *Grace Instrument*, 57 F.4th at 1008. And in considering that language, context is critical. For claims as for statutes, if the first step in interpreting a phrase is to read it, the next is to "[r]ead on," *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 36 (2012); *cf. Local Union 1261, Dist. 22, United Mine Workers of Am. v. Fed. Mine Safety & Health Review Comm'n*, 917 F.2d 42, 45 (D.C. Cir. 1990) (Ginsburg, R.B., J.) ("If the first rule of statutory construction is 'Read,' the second rule is 'Read On!'"). Giving meaning to the requirement to "provide[] only a single description … regardless of

the number of implementations" of an item requires understanding what the claimed method has already done by the time the "presenting" step is reached. *See, e.g.*, *Retractable Techs.*, 653 F.3d at 1305 ("It is axiomatic that the claim construction process entails more than viewing the claim language in isolation."); *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003) ("the context of the surrounding words of the claim also must be considered"); *Hockerson–Halberstadt, Inc. v. Converse Inc.*, 183 F.3d 1369, 1374 (Fed. Cir. 1999) (mistake to focus on "a single element in isolation").

Before even reaching the "presenting" step, claim 2 requires "selecting a portion of the product catalog to be presented to the subscriber based on" the subscriber's "device capabilities." Appx84 (15:52-55).

After the product catalog has been whittled down to implementations compatible with the user's device, it is time for the "presenting" step. That step requires

> presenting the selected portion of the product catalog to the subscriber via a wireless network, such that the selected portion, as presented to the subscriber, provides **only a single description** of each item of digital content in said portion, **regardless of the number of implementations** of each said item.

Appx84 (15:56-61) (emphasis added). On its face, the "presenting" step assumes that for at least one item of content, multiple implementations compatible with the device survived the "selecting" step's filtering and

are thus present within the “selected portion of the product catalog.” The bulk of the step’s language—everything from “such that” on—is focused on explaining how to respond to that fact. The limitation thus requires providing a single description for each item despite having multiple compatible implementations of at least one item—as distinct from providing a single description merely because there is only one compatible implementation.

Claim 9, which is the system counterpart to claim 2’s method, confirms the point. It requires “code which, when executed by [a] processor, causes the processing system to … cause the selected portion of the product catalog to be presented to the subscriber” such that it “provides only a single description of each item of digital content in said portion, regardless of the number of implementations of each said item.” Appx85 (17:1-32). Code that merely provided one description per implementation would lack the capability claim 9’s “only a single description” limitation requires. Likewise, a method that merely provides one description per implementation fails to satisfy claim 2’s corresponding limitation.

**2.** The specification reinforces this reading. The ’790 patent’s Figure 5 (reproduced above) illustrates a product catalog that provides a single description at the item level despite multiple implementations associated with that item. Appx67 (fig.5); *see* Appx81 (9:37-10:4); *supra* pp.10-11. And in discussing Figure 5, the specification explains that once

filtered (as happens in claim 2's "selecting" step), the catalog shows "only those products that have **at least one** implementation compatible with the subscriber's device." Appx81 (9:44-56) (emphasis added); *see* Appx67 (fig.5). Thus, just as it teaches providing a single description at the item level, the specification contemplates multiple compatible implementations of that item.

The specification goes on to discuss an advantage of this approach: The user can use the single description to choose an item, and the '790 patent's delivery manager can then "select[] the best implementation of the product based on [that user's] device capabilities." Appx83 (13:18-21). Doing so requires determining the "best-fit implementation." Appx82-83 (12:65-15). As the specification explains, the initial "product discovery" (*i.e.*, the filtering that happens in the "selecting" step) "relies on the 'static' capabilities" of the user's device, Appx83 (13:7-10), which are a "well-known set of attributes" that can be defined in advance, Appx80 (8:55-58). By contrast, determining the "best-fit implementation" accounts for the device's "'active' capabilities," Appx83 (13:5-15), which "represent a dynamic collection of attributes extracted during an interaction between the client device and the download manager," Appx80 (8:61-64), and thus can reflect "exact and often new enhancements," Appx83 (13:10). Providing "only a single description" of an item at the "presenting" step enables this "advantageous" "ability to deliver the 'best-fit' content based on 'active' (dynamic) capabilities."

Appx83 (13:3-5). That is, after the initial capability-based filtering, best-fit "[c]ontent provisioning provides the second part of targeting products to a given subscriber based on his device's capabilities." Appx83 (13:5-7). None of that makes sense unless there are sometimes multiple implementations available for a user's device—the scenario the "presenting" step assumes.

**3.** The Board's contrary view, under which the "only a single description" limitation is satisfied whenever only a single implementation is available, misses the point of that limitation. Read in context, the "presenting" step, and in particular the "only a single description" limitation, teaches a better response to having multiple options compatible with the same device than simply presenting all those options separately and leaving the user to wade through them. If, as the Board thought, the limitation could be satisfied by the mere happenstance of only ever having a single compatible implementation, then it would both capture and be anticipated by methods that are missing this core aspect of the patented invention. That result clashes with basic principles of claim construction. *See, e.g.*, *Intel*, 21 F.4th at 809 (goal of claim construction is "to capture the scope of the actual invention" (attribution omitted)); *id.* at 809-10 (warning against reading claim terms to be "void, meaningless, or superfluous" (attribution omitted)).

***

Applying the correct construction, the Board's analysis of Mehta collapses. Under both the Board's understanding of Mehta (in which there is only ever one compatible implementation to show a user), Appx30, and VideoLabs' understanding (in which Mehta does not teach a catalog that associates multiple implementations with the same item to begin with), Mehta has nothing to say about how to respond to the availability of multiple compatible implementations for a single item. *See supra* pp.13-14. As a result, Mehta does not teach displaying only a single description where there are multiple compatible implementations for a single item.

In short, the record demonstrates that the claim construction issue is dispositive; none of the various interpretations of Mehta would change the result. This Court should therefore reverse the Board's decision as to the anticipation ground. *See Smith Int'l*, 871 F.3d at 1383-84; *Hodges*, 882 F.3d at 1113-14 & n.7; *see also Apple*, 2025 WL 299939, at *6.

### C. Netflix and the Board's obviousness theory cannot fill the gap left by Mehta's failure to disclose the "only a single description" limitation.

The Board's alternative conclusion that the combination of Mehta and Schläpfer renders obvious the "only a single description" limitation cannot prop up its decision. First off, the Board's analysis repeatedly relied on and so is tainted by its finding that Mehta teaches this limitation on its own. *See* Appx47. According to the Board, the combination works because Schläpfer's teaching that mobile devices have

small screens would give the person of ordinary skill "good reason to pursue the known option of displaying only a single description of each item of digital content regardless of the number of implementations of each item **as taught by Mehta**." Appx46-47 (emphasis added). In other words, the Board found that because Mehta anticipates this limitation, the combination of Mehta and Schläpfer makes it obvious. So without the anticipation finding, the Board must at a minimum go back to the drawing board. *See Kaken Pharm.*, 952 F.3d at 1355.

But a more fundamental flaw in the Board's analysis warrants reversal: Netflix and the Board's obviousness theory is insufficient as a matter of law. Obviousness comes into play assuming that Mehta does not itself teach the "only a single description" limitation. *See* Appx143-44 (Netflix assuming for the sake of argument that Mehta is missing this limitation). The trouble with Netflix's theory, which the Board adopted, is that it does not identify any other source of that limitation. Nobody contends that Schläpfer discloses it. Rather, Schläpfer's sole role in the obviousness theory is to teach that mobile devices have "limited resources" like small screens and thus to ostensibly provide a reason to modify Mehta. Appx46-47 (Board relying on Schläpfer only to teach "the known problem of displaying items of digital content on a mobile device having a small display screen"); Appx143-44 (same for Netflix). Nor did Netflix argue—or the Board find—that the person of ordinary skill's

knowledge or common sense could supply the missing limitation. Appx143-44; *see* Appx46-47 (Board relying only on Mehta).

Netflix's and the Board's failure to map anything—not Mehta, not Schläpfer, and not the person of ordinary skill's knowledge—to the missing limitation leaves them without a viable obviousness theory. Although "common sense" has its "proper place in the obviousness inquiry," it "is typically invoked to provide a known motivation to combine, not," as here, "to supply a missing claim limitation." *Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1361 (Fed. Cir. 2016). Absent an "unusually simple" limitation and "particularly straightforward" technology, common sense is unlikely to suffice to supply a missing limitation. *Id.* at 1362. And under no circumstances can it "be used as a wholesale substitute for reasoned analysis and evidentiary support." *Id.* Rather, where common sense "is used to supply a missing limitation," this Court's review "must be searching," especially "where the missing limitation goes to the heart of an invention." *Id.* at 1363. The Board "cannot accept general conclusions about what is 'basic knowledge' or 'common sense' as a replacement for documentary evidence"; unless the limitation is "evidently and indisputably within the common knowledge of those skilled in the art," record evidence is required. *K/S Himpp v. Hear–Wear Techs., LLC*, 751 F.3d 1362, 1365-66 (Fed. Cir. 2014); *see also Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1377 (Fed. Cir. 2012) (district court erred by invoking common sense "without any record

support showing that this knowledge would reside in the ordinarily skilled artisan").

The Board failed to heed those restrictions on the use of common sense to supply missing limitations. Neither Netflix nor the Board identified any record support for the notion that providing only a single description of an item despite multiple implementations was a technique known to the person of ordinary skill. Netflix did not even make that argument. *See* Appx142-44 (petition); Appx2277-79 (reply).

The Board likewise erred by relying on hindsight to leap from its finding that Schläpfer taught the problem of small screens to the '790 patent's specific method as a purported solution to that problem. Appx46-47. The Board did not identify any evidence or reasoned explanation for its conclusion that the prior art would have "guide[d] an inventor toward [the '790 patent's] particular solution," *Bayer Schering Pharma AG v. Barr Labs., Inc.*, 575 F.3d 1341, 1347 (Fed. Cir. 2009). *See also Orexo AB v. Actavis Elizabeth LLC*, 903 F.3d 1265, 1273 (Fed. Cir. 2018) ("[R]ecognizing a need does not render the solution obvious."). Instead, the Board concluded from VideoLabs' two examples of other potential "ways to accomplish limiting the amount of information shown on a small screen" that there must be only "three identified, predictable solutions." Appx46.

That makes no sense. For its maneuver to work, the Board needed to prove that "there are a **finite number** of identified, predictable

solutions." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007) (emphasis added); *accord Bayer Schering*, 575 F.3d at 1347-50 (affirming an obviousness finding where the record established that the prior art would lead a person of ordinary skill to "a crossroads where he must choose between two known options"). Proof that there are at least three options is not, without more, proof that there are only three options—and especially not in the face of the commonsense reality that there are innumerable ways to make use of a small screen. So on this point, too, there is neither record evidence nor a reasoned explanation to support the Board's conclusion.

Contrast what Netflix and the Board did with a proper analysis: To develop a legally sufficient obviousness argument, Netflix would have needed to, at a minimum, identify a source of the missing limitation (whether in a prior art reference or the knowledge of a person of ordinary skill), explain how Mehta could have been modified with that information to get to the claimed invention, and explain why a person of ordinary skill would have been motivated to make that particular modification or combination and would have reasonably expected to succeed in doing so. *See, e.g.*, *Orexo*, 903 F.3d at 1271 ("A party seeking to invalidate a patent on obviousness grounds must demonstrate … that a person of ordinary skill would have selected and combined and modified the subject matter of the references in the manner of the claimed invention, with a reasonable expectation of success."); *Arendi*, 832 F.3d at 1360-66.

None of that happened here, and for good reason: Nothing in the record can bridge the chasm between Mehta and the ’790 patent. The ’790 patent leverages its stored item–implementation relationships to achieve the “only a single description” limitation. *Supra* pp.10-11. By contrast, Mehta (at best) teaches associating a single implementation with each item of content; it is missing the mechanism through which the ’790 patent achieves the limitation. *Supra* pp.13-14. Neither Netflix nor the Board has any explanation for how to fill that gap in Mehta’s teachings. Rather, Netflix and the Board’s conclusory analysis skips straight to the result (showing “only a single description”) without considering how to achieve it.

At the end of the day, Netflix and the Board are left with nothing more than handwaving. That cannot carry Netflix’s burden. *See Magnum Oil*, 829 F.3d at 1380. Because the sole obviousness argument Netflix preserved is insufficient as a matter of law, there is nothing for the Board to do on remand, and reversal is therefore warranted. *See Apple*, 2025 WL 299939, at *6; *Smith Int’l*, 871 F.3d at 1383-84; *Hodges*, 882 F.3d at 1113-14 & n.7.

## CONCLUSION

This Court should reverse the Board's decision.

Dated: February 7, 2025

Respectfully submitted,

*/s/ Jaime F. Cardenas-Navia*

Christine E. Lehman
Naveed Hasan
Brian C. Baran
REICHMAN JORGENSEN
LEHMAN & FELDBERG LLP
1909 K St. NW, Suite 800
Washington, DC 20006
(202) 894-7310
clehman@reichmanjorgensen.com

Jaime F. Cardenas-Navia
Michael Matulewicz-Crowley
REICHMAN JORGENSEN
LEHMAN & FELDBERG LLP
400 Madison Ave., Suite 14D
New York, NY 10017
(212) 381-1965
jcardenas-navia@reichmanjorgensen.com

*Attorneys for Appellant*
*VideoLabs, Inc.*

# ADDENDUM

Final Written Decision,
IPR2023-00628 (Oct. 2, 2024) .................................................. Appx1-60

U.S. Patent No. 7,233,790 .......................................................... Appx61-85

Trials@uspto.gov
571-272-7822

Paper 42
Date: October 2, 2024

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

NETFLIX, INC.,
Petitioner,

v.

VIDEOLABS, INC.,
Patent Owner.

---

IPR2023-00628
Patent 7,233,790 B2

---

Before JEFFREY S. SMITH, STACEY G. WHITE, and STEPHEN E. BELISLE, *Administrative Patent Judges.*

SMITH, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

# I. INTRODUCTION

## A. Background and Summary

Petitioner, Netflix, Inc., filed a Petition (Paper 1, "Pet.") requesting *inter partes* review of claims 1–14 of U.S. Patent No. 7,233,790 B2 (Ex. 1001, "the '790 patent") pursuant to 35 U.S.C. § 311(a). We issued an Institution Decision (Paper 17, "Inst. Dec.") instituting the petitioned review.

VideoLabs, Inc. ("Patent Owner") then filed a Patent Owner Response (Paper 24, "PO Resp.") to the Petition. Petitioner filed a Reply (Paper 28, "Reply") to the Patent Owner Response. Patent Owner filed a Sur-Reply (Paper 31, "PO Sur-Reply) to the Reply. We also granted Petitioner's Motion to Submit Supplemental Information. *See* Papers 20, 22, 26, 29.

We have jurisdiction under 35 U.S.C. § 6(b)(4) and § 318(a). This Decision is a final written decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 as to the patentability of claims 1–14 of the '790 patent. We determine Petitioner has shown by a preponderance of the evidence that those claims are unpatentable.

## B. Real Parties-In-Interest

Petitioner identifies itself (Netflix, Inc.) and Netflix Streaming Services, Inc. as its real parties-in-interest. Pet. 71. Patent Owner identifies itself (VideoLabs, Inc.) as well as VL IP Holdings LLC and VL Collective IP LLC as real parties-in-interest. Paper 4, 2.

## C. Related Matters

The Petition states that the '790 patent is the subject of the following proceedings:

*VideoLabs, Inc. v. Netflix Inc.*, No. 1-22-cv-00229, D. Del., filed Feb. 23, 2022;

> *Starz Entertainment, LLC v. VL Collective IP, LLC,* No. 1-21-cv-01448, D. Del., filed Oct. 13, 2021;
>
> *Unwired Planet, LLC v. Apple, Inc.*, No. 3-13-cv-04134, N.D. Cal., filed Sept. 19, 2012;
>
> *Unwired Planet, LLC v. Apple, Inc.*, No. 3-12-cv-00505, D. Nev., filed Sept. 19, 2012.

Pet. 71. Patent Owner identifies the following additional proceeding as one in which the ’790 patent was involved (Paper 19):

> *Ex Parte* Reexamination Proceeding No. 90/015,063, issued Aug. 11, 2023.[1]

## II. THE ’790 PATENT

The ’790 patent relates to “facilitating management and delivery of digital content from multiple content suppliers to multiple wireless services subscribers in multiple domains.” Ex. 1001, 1:14–18. The ’790 patent explains that a download manager acts as an intermediary between content suppliers and wireless services subscribers. *Id.* at 4:11–15, Fig. 2.

[1] On August 11, 2023, a reexamination certificate was issued which amended independent claims 1 and 8. Ex. 2018.

Figure 3 of the ’790 patent is shown below.




Figure 3, shown above, schematically illustrates the components of the download manager along with a provisioning manager. Ex. 1001, 3:15–16. In the embodiment of Figure 3, download manager 1 includes delivery manager 31, product manager 32, business & operations manager 33, and multiple protocol handlers 34. *Id.* at 6:36–38. “[P]roduct manager 32 is the download manager’s interface to the various content suppliers and provides centralized product cataloging (including enabling qualified content

suppliers to register content for analysis and publication) and complete product life cycle support." *Id.* at 6:46–50. Product manager 32 includes product catalog 54 that contains descriptions of all published items of content (products), and specifically includes, for each product entry, a reference to at least one implementation of that product, wherein an implementation can be a binary file representing the product. *Id.* at 9:37–42, Fig. 3. Delivery manager 31 includes device capability manager 37 that is responsible for device recognition, capability determination, and management. *Id.* at 7:31–39, Fig. 3. The '790 patent explains that "[w]hen a request to view available products is received from the client device," the product manager determines from the product catalog which products are supported by the client based on the capabilities of that client device. *Id.* at 12:9–13. The download manager then sends a response to the client "to cause the client device to display product information relating to only those products supported by the client device." *Id.* at 12:13–17.

## III. ILLUSTRATIVE CLAIM

Independent claim 1 of the ’790 patent as amended[2] recites:

> 1. A method of providing access to digital content for use on wireless communication devices, the method comprising:
>
> receiving and storing in a server system a plurality of items of digital content to be made available for use in wireless communication devices used by a plurality of wireless services subscribers, including receiving and storing a plurality of different implementations of at least one of the items of digital content, where each implementation of any given item of digital content corresponds to a different set of device capabilities;
>
> operating the server system to maintain a product catalog containing a description of the items of digital content, wherein the product catalog includes, in association with each item of digital content, a reference to each implementation of said item of digital content;
>
> receiving a request from one of the wireless communication devices;
>
> in response to the request, selecting a portion of the product catalog to be presented on the one wireless communication device, based in part on device capabilities of the one wireless communication device; and
>
> presenting the selected portion of the product catalog to the one wireless communication device, such that the selected portion, as presented, provides a single description of each item of digital content in said portion, regardless of a number of implementations that are available for each said item.

Ex. 2018, 1:20–2:8.

Independent claim 2 recites:

> 2. A method of providing access to digital content for use on wireless communication devices, the method comprising:

---

[2] On August 11, 2023, a reexamination certificate was issued which amended independent claims 1 and 8. Ex. 2018.

> receiving and storing in a server system a plurality of items of digital content to be made available for use in wireless communication devices used by a plurality of wireless services subscribers,
>
> including receiving and storing a plurality of different implementations of at least one of the items of digital content, where each implementation of any given item of digital content corresponds to a different set of device capabilities;
>
> operating the server system to maintain a product catalog containing a description of the items of digital content, wherein the product catalog includes, in association with each item of digital content, a reference to each implementation of said item of digital content;
>
> receiving a request from a wireless device used by one of the subscribers;
>
> in response to the request, selecting a portion of the product catalog to be presented to the subscriber, based on device capabilities of the wireless device used by the subscriber; and
>
> presenting the selected portion of the product catalog to the subscriber via a wireless network, such that the selected portion, as presented to the subscriber, provides only a single description of each item of digital content in said portion, regardless of the number of implementations of each said item.

Ex. 1001, 15:34–61.

## IV. ASSERTED GROUNDS

Petitioner asserts that claims 1–14 of the ’790 patent are unpatentable on the following grounds (Pet. 22).

| Claim(s) Challenged | 35 U.S.C. §[3] | Reference(s)/Basis |
|---|---|---|
| 1–4, 8–11 | 102(a), (e) | Mehta[4] |
| 1–14 | 103(a) | Mehta, Schläpfer[5] |

Petitioner is supported by testimony from Anthony Wechselberger (Exs. 1002, 1026). Patent Owner opposes Petitioner’s challenges and is supported by testimony from Dr. Michael T. Goodrich (Ex. 2020).

## V. LEVEL OF ORDINARY SKILL

Petitioner identifies a person of ordinary skill as someone with “a bachelor’s degree in electrical or computer engineering, or a closely related scientific field such as computer science, and two years of work experience with digital multi-media content distribution and management, and associated system infrastructures.” Pet. 16. “Alternatively, any lack of experience could be remedied with additional education (*e.g.*, a master’s degree), and likewise, a lack of education can be remedied with additional work experience (*e.g.*, 4–5 years).” *Id.* Patent Owner does not address the level of ordinary skill. *See generally*, PO Resp.

---

[3] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) (“AIA”), amended 35 U.S.C. §§ 102, 103. Because the ’790 patent has an effective filing date prior to the effective date of the applicable AIA amendment, we refer to the pre-AIA version of §§ 102, 103.
[4] U.S. Publication No. 2022/0131404 A1; pub. Sept. 19, 2002 (Ex. 1003).
[5] Schläpfer et al., Mobile Applications with J2ME, July 7, 2001 (Ex. 1009).

The level of ordinary skill in the art usually is evidenced by the references themselves. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001); *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995); *In re Oelrich*, 579 F.2d 86, 91 (CCPA 1978). As Petitioner's description of a person of ordinary skill appears commensurate with the subject matter before us, we apply Petitioner's definition for purposes of this Decision.

## VI. CLAIM CONSTRUCTION

We interpret claim terms using "the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b)." 37 C.F.R. § 42.100(b) (2019). In this context, claim terms "are generally given their ordinary and customary meaning" as understood by a person of ordinary skill in the art in question at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (citations omitted) (en banc). "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17). Extrinsic evidence is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (citations omitted).

We construe only those claim terms that require analysis to resolve the controversy. *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) (holding that "only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy"). Any special definition for a claim term must be set forth in the specification with reasonable clarity, deliberateness, and precision. *In re*

*Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). Petitioner and Patent Owner agree that no claim terms require specific construction to resolve the unpatentability issues presented in the Petition. Pet. 23; PO Resp. 10–11. We agree and do not construe any terms.

## VII. ANALYSIS

### *A. Legal Standards*

"In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")); *see also* 37 C.F.R. § 42.104(b) (requiring a petition for *inter partes* review to identify how the challenged claim is to be construed and where each element of the claim is found in the prior art patents or printed publications relied upon).

To establish anticipation, each and every element in a claim, arranged as recited in the claim, must be found in a single prior art reference. *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir. 2008). Although the elements must be arranged or combined in the same way as in the claim, "the reference need not satisfy an *ipsissimis verbis* test," i.e., identity of terminology is not required. *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009) (citing *In re Bond*, 910 F.2d 831, 832–33 (Fed. Cir. 1990)).

A claim is unpatentable under 35 U.S.C. § 103(a) if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406

(2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) when in evidence, objective evidence of obviousness or nonobviousness, i.e., secondary considerations.[6] *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). An obviousness analysis "need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *KSR*, 550 U.S. at 418.

Additionally, the obviousness inquiry typically requires an analysis of "whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2016) (requiring "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness")). Furthermore, Petitioner does not satisfy its burden of proving obviousness by employing "mere conclusory statements," but "must instead articulate specific reasoning, based on evidence of record, to support the legal conclusion of obviousness." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016).

### *B. Claims 1–4 and 8–11 As Anticipated By Mehta*

#### *1. Mehta – Exhibit 1003*

Mehta relates to "maintaining and distributing wireless applications to wireless devices over a wireless network." Ex. 1003 ¶ 2. Mehta discloses a Mobile Application System ("MAS") that "is a collection of interoperating

[6] The parties do not direct us to any objective evidence of non-obviousness.

server components that work individually and together in a secure fashion to provide applications, resources, and other content to mobile subscriber devices." *Id.* ¶ 59.

Figure 1 of Mehta is shown below.




*Fig. 1*

Figure 1 above is a block diagram that illustrates how subscribers request and download software from an MAS. *Id.* ¶ 18. The MAS includes a provisioning manager which includes verifiers "used to determine compatibility of an application." *Id.* ¶ 82, Fig. 5. When the MAS receives a request, the "Device Verifier" of the provisioning manager "determines the type and capabilities of the subscriber device" and "whether the device capabilities are sufficient to support a specific application." *Id.* ¶¶ 82–85. Mehta's MAS may analyze "a subscriber profile, a device profile, and an application profile to determine whether the subscriber is authorized to use the application and whether the application's needs . . . are met by the device." *Id.* ¶ 67. The MAS then "compiles and returns a list of

applications that are available and appropriate based on the subscriber, application profiles, and device profiles." *Id.* ¶ 70.

### *2. Independent Claim 2*

Preamble

The preamble of claim 2 recites a "method of providing access to digital content for use on wireless communication devices, the method comprising." Petitioner contends that Mehta discloses the preamble in describing a Mobile Application System ("MAS") and methods for providing applications, resources, and other content to mobile subscriber devices. Pet. 26–27, 31 (citing Ex. 1003 ¶¶ 2, 5, 59–60, 62, 103, 127). Patent Owner does not contend otherwise. We find that Petitioner has shown that Mehta discloses the features recited in the preamble of claim 2.[7]

"Receiving and Storing" and "Including"

Claim 2 recites "receiving and storing in a server system a plurality of items of digital content to be made available for use in wireless communication devices used by a plurality of wireless services subscribers."

Claim 2 recites "including receiving and storing a plurality of different implementations of at least one of the items of digital content, where each implementation of any given item of digital content corresponds to a different set of device capabilities."

*The Petition's Contentions*

Petitioner contends that Mehta discloses the "receiving and storing" limitation in describing an MAS that receives applications from content providers and carrier services to provision them for deliver to the subscriber

---

[7] Because Petitioner has shown that the features in the preamble are satisfied by the prior art, we need not determine whether the preamble is limiting. *See Vivid Techs.*, 200 F.3d at 803.

device. Pet. 27–28, 31 (citing Ex. 1003 ¶¶ 59, 62, 64, 68). Petitioner contends that Mehta discloses the “including” limitation in describing an MAS that stores and supports functionally equivalent programs that are capable of running multiple kinds of devices. Pet. 28–29, 31 (citing Ex. 1003 ¶¶ 64, 68, 98).

*Summary of the Subsequent Contentions of the Parties*

Patent Owner contends that the claims require receiving and storing both “a plurality of items of digital content” and “a plurality of different implementations of at least one of the items of content.” PO Resp. 13. Patent Owner contends that Figure 6 of the challenged patent shows the relationship between a product and its implementations. *Id.* Patent Owner contends that the description of Figure 6 discloses that a product catalog contains both “descriptions of all published items of content” and “a reference 58 to at least one implementation 57 of that product.” *Id.* at 14 (quoting Ex. 1001, 9:37–48); Ex. 2020 ¶¶ 56–57; *see* PO Resp. 15–16 (quoting Ex. 1001, 11:56–59 (“At block 803 the download manager 1 stores the product definition, the implementations, and a list of all of the supported devices and provisioning protocols.”)).

Patent Owner contends that Petitioner maps the applications received by Mehta’s MAS to the claimed “plurality of items of content,” as well as to the claimed “implementations” of the items of content. PO Resp. 16. Patent Owner contends that Mehta does not disclose that its applications have different implementations for different device types. *Id.* at 18. According to Patent Owner, each application in Mehta is its own file, unlike an item of content in the challenged patent, which is made up of other subsidiary files, or implementations. *Id.* This means, according to Patent Owner, that each application of Mehta is for a separate device, rather than an item of content

having multiple implementations, each of which corresponds to a different device as claimed. *Id.* at 18–19.

Patent Owner further contends that Mehta's reference to functionally equivalent programs does not disclose that such programs have multiple implementations of an item of content. PO Resp. 21. According to Patent Owner, Mehta discloses two different items of content that share a function, not two implementations of a single piece of content. *Id.* Patent Owner contends that functionally equivalent programs, such as Microsoft Word and Apple Pages, are different applications that accomplish the same function, not different implementations of the same application. *Id.* at 22.

Petitioner contends that a software program in Mehta describes the claimed "item of digital content," and a binary file representing a version of that software program, where each version corresponds to a different set of device capabilities, describes the claimed "implementation" of the item of digital content. Reply 5 (citing Pet. 28–29). Petitioner contends that Figure 9D of Mehta shows an item of digital content, which is "Kbrowser," and an implementation, which is the .jar file of "Kbrowser." *Id.* at 6. Petitioner concludes that the Petition, contrary to Patent Owner's contention, does not point to the same application of Mehta to satisfy both the "item of digital content" and the "implementation" limitations. *Id.*

Petitioner contends that Mehta discloses the claimed "different implementations of at least one of the items of digital content" in describing that when a content provider submits an application, it may submit additional information about the application, including the URL, Title, Version, and Description. Reply 7 (citing Ex. 1003 ¶ 98, Figs. 9B and 9C). Petitioner contends that Mehta discloses that this additional information "allows the MAS to store and support functionally equivalent programs

having the same name that are capable of running on multiple kinds of devices," which describes the "plurality of different implementations of at least one of the items of digital content" as claimed. *Id*. (quoting Ex. 1003 ¶ 98); Ex. 1002 ¶ 66.

Petitioner contends that Patent Owner, in asserting that Microsoft Word and Apple Pages are functionally equivalent, but are not different implementations of the same content, does not address Mehta's disclosure of storing "functionally equivalent programs having the same name." Reply 8 (quoting Ex. 1003 ¶ 98). Petitioner further cites the deposition testimony of Patent Owner's expert Dr. Goodrich, who testifies that Microsoft Word for Windows and Microsoft Word for Apple Mac are "different implementations for the same product." Reply 9–10 (quoting Ex. 1029, 43:14–24, 47:15–22; 48:5–11).

Petitioner contends that, contrary to Patent Owner's contention, the 2-layer hierarchy shown in Figures 5 and 6 of the challenged patent are not required by the claims. Reply 10. Petitioner contends that under the plain and ordinary meaning, the claims require receiving and storing "a plurality of different implementations of at least one of the items of digital content," but do not require storing the different implementations in a multi-level database or data structure. *Id*. (citing Ex. 1001, 9:38–40, Fig. 5). Petitioner contends that the plain and ordinary meaning of this term is bolstered by the '790 patent's Specification, which discloses "[a]n implementation 57 can be simply a binary file ("a binary") representing the product." *Id*. (quoting Ex. 1001, 9:40–42; Ex. 1025, 2–3).

Patent Owner contends that Figure 9D of Mehta shows a single item of content, "Kbrowser," having a single implementation, the .jar file of "Kbrowser." PO Sur-Reply 3. According to Patent Owner, Figure 9D of

Mehta shows that Mehta discloses that a given application only has a single implementation, rather than "a plurality of different applications" as claimed. *Id*.

Patent Owner contends that its expert, Dr. Goodrich, testifies that the MAS of Mehta would list Microsoft Word for Windows and Microsoft Word for Apple Mac as separate applications, not different implementations of the same applications. PO Sur-Reply 6 (citing Ex. 1029, 47:15–48:20). According to Dr. Goodrich, "when Mehta is disclosing functionally equivalent . . . it's revealing it to describe how to disambiguate" programs "not clustered in terms of implementations." Ex. 1029, 45:11 –17. In Mehta, "functionally equivalent programs even with the same name can nevertheless be distinguished based on other metadata." *Id*. at 45:18–21. Patent Owner contends that once Microsoft Word for Windows and Microsoft Word for Apple Mac are submitted to the MAS of Mehta, "the metadata would distinguish them and they would be considered completely different products in this scenario." *Id*. at 7 (citing Ex. 1029, 47:15–48:20).

*Analysis*

We find that Petitioner persuasively shows that Mehta discloses both "receiving and storing . . . a plurality of items of digital content" and an "implementation of [an] item of digital content" as recited in claim 2. Both Petitioner and Patent Owner agree that Figure 9D of Mehta shows an item of digital content as claimed in describing "Kbrowser" and an implementation of the item of digital content as claimed in describing the .jar file of "Kbrowser." Reply 6; PO Sur-Reply 3. We agree with Petitioner and find that the applications received by Mehta's MAS describe the claimed "plurality of items of content." Pet. 27–28 (citing Ex. 1003 ¶¶ 59, 64, 68; Ex. 1001, 3:48–56). We also agree with Dr. Goodrich and find that the

application Microsoft Word describes an item of digital content. Ex. 2020 ¶ 39. Thus, the parties agree that Mehta describes the claimed plurality of items of digital content.

The dispute centers over whether Mehta discloses "receiving and storing a plurality of different implementations of at least one of the items of digital content, where each implementation of any given item of digital content corresponds to a different set of device capabilities." *See* PO Sur-Reply 3. The parties have framed this dispute, in part, as whether Microsoft Word for Windows and Microsoft Word for Apple Mac are different implementations of the same application or are different applications. Reply 8–11; PO Sur-Reply 6–7.

Dr. Goodrich, in his declaration, testifies that "Microsoft Word is [a] piece of content, while the versions of Microsoft Word for Windows and Microsoft Word for Apple Macs are different implementations." Ex. 2020 ¶ 39. Dr. Goodrich, in his deposition, when asked if "one of ordinary skill in the art at the time of the '790 patent would also understand that Microsoft Word for Windows and Microsoft Word for Mac are also functionally equivalent, correct?" answered "Yes . . . . But they would be even stronger than simply functionally equivalent. They would be different implementations of the same product." Ex. 1029, 43:14–24. However, later in his deposition, Dr. Goodrich testifies that Microsoft Word for Windows and Microsoft Word for Apple Mac are separate applications, not different implementations of the same application. Ex. 1029, 48:1–20. We disagree with this later testimony. Neither Dr. Goodrich nor Patent Owner persuasively explains why Dr. Goodrich changed his unambiguous position from both his declaration and his earlier deposition testimony.

For example, Dr. Goodrich testifies in his deposition that "for the Lion King example, a .MP3 and a .MOV are different implementations of the same product. They're also functionally equivalent, but functionally equivalent is broader." Ex. 1029, 45:7–11. Dr. Goodrich continues, "when Mehta is disclosing functionally equivalent, it is not referring to it as different implementations of the same product. Instead, it's [describing] how to disambiguate [applications] not clustered in terms of implementations . . . based on other metadata." *Id*. at 45:14–21. This explanation is unpersuasive because it is inconsistent with Dr. Goodrich's declaration testimony, in which Dr. Goodrich explicitly testifies that the different versions of Lion King, as well as the different versions of Microsoft Word, are different implementations of the same product. Ex. 2020 ¶ 39.

Specifically, in his declaration, Dr. Goodrich testifies that the "various versions of Lion King (such as an .mp3 file or an .mov file) are the implementations of the Lion King. For another example, . . . the versions of Microsoft Word for Windows and Microsoft Word for Apple Macs are different implementations." Ex. 2020 ¶ 39. Dr. Goodrich testifies again that "Microsoft Word for Windows and Microsoft Word for Apple Macs" are "multiple implementations of an individual item of digital content." Ex. 2020 ¶ 70. Further, the reason given in the explanation in his deposition, that Mehta needs to disambiguate applications that are not clustered in terms of implementations based on other metadata, would also apply to the different versions of Lion King, yet Dr. Goodrich consistently testifies that these different versions are different implementations, both in his declaration and in his deposition. *Id*.; Ex. 1029, 45:7–10.

Petitioner contends, and we agree, that the inconsistent testimony of Dr. Goodrich appears to be an attempt to cure Patent Owner's and Dr. Goodrich's incomplete analysis of Mehta's disclosure. *See* Reply 7–8. In particular, the Petition quotes Mehta's disclosure that the MAS stores "functionally equivalent programs having the same name that are capable of running on multiple kinds of devices that even may be written using different languages." Pet. 28 (quoting Ex. 1003 ¶ 98). Dr. Goodrich addresses this disclosure by explaining that two applications, such as Microsoft Word and Apple Pages, are functionally equivalent but are two different applications, not multiple implementations of a single application. Ex. 2020 ¶ 70. In this analysis, Dr. Goodrich does not address the full disclosure of Mehta, which describes that the "functionally equivalent programs hav[e] the same name" (Ex. 1003 ¶ 98), such as Dr. Goodrich's example of Microsoft Word for Windows and Microsoft Word for Apple Macs. *See id*. Thus, although Dr. Goodrich is correct in testifying that some functionally equivalent programs, such as Microsoft Word and Apple Pages, are not different implementations of an item of digital content, he is also correct in testifying that "Microsoft Word for Windows and Microsoft Word for Apple Macs" are "multiple implementations of an individual item of digital content." *Id*. Yet Dr. Goodrich does not identify any difference between the multiple implementations of Microsoft Word and the functionally equivalent programs having the same name as described by Mehta.

We agree with Petitioner that the subsequent inconsistent deposition testimony of Dr. Goodrich, namely, that Microsoft Word for Windows and Microsoft Word for Apple Macs are not different implementations, is an attempt to narrow the scope of the claimed "different implementations" by

improperly reading an example from the Specification into the claims. *See* Reply 10. Contrary to Dr. Goodrich's testimony, the claims do not exclude storing the "implementations" in Mehta's "flat database" (*see* Ex. 1029, 48:12–20), nor do the claims require "cluster[ing] in terms of implementations" (*see* Ex. 1029, 45:11–21). Although Figures 5 and 6 of the Specification show an example of arranging implementations in a 2-layer hierarchy, or a clustered rather than flat database, we do not read this example into the claims. The Federal Circuit has held that "it is improper to read limitations from a preferred embodiment described in the specification – even if it is the only embodiment – into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1327 (Fed. Cir. 2012); *Phillips*, 415 F.3d at 1323 (internal quotations omitted) ("[C]laims may embrace different subject matter than is illustrated in the specific embodiments in the specification.").

Patent Owner has not shown "a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Dealertrack*, 674 F.3d at 1327. To the contrary, the Specification discloses that an implementation "can be simply a binary file (a 'binary') representing the product" and "any particular product may have multiple implementations published on the download manager." Ex. 1001, 9:40–48. The Specification also discloses that "the invention is not limited to the embodiments described" and that "the specification and drawings are to be regarded in an illustrative sense rather than a restrictive sense." Ex. 1001, 15:11–18. We agree with Petitioner that the plain and ordinary meaning of the claim requires receiving and storing "a plurality of different implementations of at least one of the items of digital content," but does not

require storing the implementations in a multi-level data structure. *See* Reply 10 (citing Ex. 1029, 48:1–3, 48:12–16; Ex. 1001, 9:38–42, Fig. 5; Ex. 1025, 2–3).

For these reasons, we do not credit the deposition testimony of Dr. Goodrich that Microsoft Word for Windows and Microsoft Word for Apple Mac are different applications, not different implementations of the same application. Rather, we agree with the original testimony of Dr. Goodrich and find that Microsoft Word for Windows and Microsoft Word for Apple Mac are different implementations of the same application. Ex. 2020 ¶¶ 39, 70; Ex. 1029, 43:14–24. We agree with Petitioner and Mr. Wechselberger and find that Mehta's disclosure of receiving and storing functionally equivalent programs having the same name that are capable of running on multiple kinds of devices, such as Microsoft Word for Windows and Microsoft Word for Apple Mac, describes "receiving and storing a plurality of different implementations of at least one of the items of digital content, where each implementation of any given item of digital content corresponds to a different set of device capabilities." *See* Pet. 31; Reply 7–11; Ex. 1002 ¶¶ 65–66.

We find that Petitioner has shown by a preponderance of the evidence that Mehta discloses the <u>"receiving and storing" and "including"</u> limitations of claim 2.

<u>"Operating"</u>

Claim 2 recites "operating the server system to maintain a product catalog containing a description of the items of digital content, wherein the product catalog includes, in association with each item of digital content, a reference to each implementation of said item of digital content."

*The Petition's Contentions*

Petitioner contends that Mehta discloses this limitation in describing an MAS that includes a data repository that stores applications along with descriptions of the applications. Pet. 29–32 (citing Ex. 1003 ¶¶ 64, 67, 97–99). Based on the evidence and arguments of record, Petitioner has sufficiently demonstrated that Mehta discloses this limitation of claim 2.

*Summary of the Subsequent Contentions of the Parties*

Patent Owner contends that the claims require "maintaining a product catalog," with "the product catalog including, in association with each item of content, a reference to each implementation of said item of content." PO Resp. 23–24. Patent Owner contends that Figure 5 of the '790 patent demonstrates the relationship between a product entry and implementations of the product in the product catalog. *Id.* at 24.

Patent Owner contends that Mehta does not disclose "a 'product catalog including, in association with each item of content, a reference to each implementation'" as claimed. PO Resp. 25. In particular, Patent Owner recognizes that Petitioner maps the claimed "product catalog" to Mehta's data repository, and the claimed "reference" to Mehta's URL or other location reference of an application. *Id*. at 26. Patent Owner, in contending that the URL is not stored in Mehta's application profile, argues that the URL is used by the MAS to retrieve the application and store the application in applications store 1216. PO Resp. 26–27 (citing Ex. 1003 ¶ 131, Fig. 12). Patent Owner, relying on Figure 9A of Mehta, contends that a content provider submits Mehta's URL or other location reference of an application to a content provider website when submitting the application to the MAS. *Id.* at 27–28. According to Patent Owner, the URL or other location reference is the location of the application on the internet before it is

submitted to the MAS, but it is not a reference to the application in the MAS and is not stored in the data repository. *Id*. at 28 (citing Ex. 2020 ¶¶ 79–80).

Petitioner contends that once a content provider submits an application, the content provider website requests additional information about the application being submitted, which becomes part of the application profile. Reply 11 (citing Ex. 1003, Fig. 9B). Petitioner contends that the administrator of the content provider website uses information submitted by the content provider, which includes the submitted application, to create an application profile, which is stored and maintained in a data repository. *Id*. at 12 (citing Ex. 1003 ¶¶ 67, 99, Fig. 5, Fig. 9D). Petitioner contends that although the URL or other location reference is the location of the application before it is submitted to the MAS, the URL or other location reference is stored in the data repository. *Id*. at 13.

Patent Owner contends that Figure 5 and paragraphs 67 and 68 of Mehta, contrary to Petitioner's contention, do not mention the URL. PO Sur-Reply 8. Patent Owner contends that the URL shown in Figure 9D is used to identify an application to download, but does not indicate that the URL is stored in the application profile. *Id*. at 9.

*Analysis*

We agree with Petitioner that the URL shown in Figure 9D of Mehta is stored in an application profile, and the application profile is stored in the data repository for the reasons given by Petitioner. *See* Reply 11–13. In particular, Mehta discloses that an "Administrator uses the information submitted by the content provider . . . to create an application profile, which is stored and maintained in a data repository." Ex. 1003 ¶ 99; *see id*. at ¶ 98 ("additional information from the content provide[r] about the application to be submitted . . . becomes part of the application profile."). Figure 9D of

Mehta shows a section labeled "Application Profile" which includes a URL for the application. *Id.* at ¶ 99, Fig. 9D. Therefore, contrary to Patent Owner's contention, Figure 9D explicitly shows that the URL is part of the application profile. Given that Mehta discloses (a) a content provider submits information about an application, including a URL for the application, (b) an administrator uses the information submitted by the content provider to create an application profile which is stored in a data repository, and (c) the application profile includes the URL for the application as shown in Figure 9D, we are persuaded that Mehta describes including the URL in the application profile and storing the application profile in the data repository.

We disagree with Patent Owner's contention that the MAS has no reason to store the URL in the data repository after it has downloaded the application (PO Sur-Reply 9), because this contention is inconsistent with Mehta's description of storing application profiles in the MAS, and storing applications outside of the MAS. Ex. 1003 ¶¶ 73, 97–99, Fig. 5, Fig. 9D. We find that Mehta, consistent with Petitioner's contentions and Mr. Wechselberger's testimony, discloses that an "application profile . . . is stored and maintained in a data repository (e.g., data repository 511 in Fig. 5)," and that the application profile includes a URL. Ex. 1003 ¶ 99, Fig. 5, Fig. 9D; *see id.* at ¶¶ 73, 97–98. In addition, Figure 5 of Mehta shows "carrier's application store" and "remote application hosts," both of which are located outside of MAS 500. Mehta discloses that the content provider chooses whether to host the application on a carrier's application store or on a remote server. *Id.* at ¶ 97. Given that Mehta discloses storing the application profiles within MAS 500 of Figure 5 and hosting the applications outside of MAS 500 (either on the application store or on a remote server),

we disagree with Patent Owner that the MAS has no reason to store the URL. One reason to store the URL is because the application is hosted outside of the MAS as shown in Figure 5. We agree with Petitioner and find that Figure 5 of Mehta includes data repository 511 which stores application profiles, where each application profile includes a URL for an application as shown in Figure 9D. *See* Reply 12.

We find that Petitioner has shown by a preponderance of the evidence that Mehta discloses the "operating" limitation of claim 2.

<u>"Receiving a Request"</u>

Claim 2 recites "receiving a request from a wireless device used by one of the subscribers." Petitioner contends that Mehta discloses this limitation in describing an MAS receives a wireless services request from a wireless subscriber. Pet. 32–33 (citing Ex. 1003 ¶¶ 6061, 64, Fig. 1). Patent Owner does not contend otherwise. We find that Petitioner has shown that Mehta discloses this limitation of claim 2.

<u>"In Response"</u>

Claim 2 recites "in response to the request, selecting a portion of the product catalog to be presented to the subscriber, based on device capabilities of the wireless device used by the subscriber." Petitioner contends that Mehta discloses this limitation in describing an MAS that analyzes various profiles to determine whether an application version meets the devices requirements of a subscriber. Pet. 33–35 (citing Ex. 1003 ¶¶ 67, 139, Fig. 4). Patent Owner does not contend otherwise. We find that Petitioner has shown that Mehta discloses this limitation of claim 2.

<u>"Presenting"</u>

Claim 2 recites "presenting the selected portion of the product catalog to the subscriber via a wireless network, such that the selected portion, as

presented to the subscriber, provides only a single description of each item of digital content in said portion, regardless of the number of implementations of each said item."

*The Petition's Contentions*

Petitioner contends that Mehta discloses this limitation in describing an MAS that that filters the list of content to only identify those applications that are supported by the subscriber's device." Pet. 35–37 (citing Ex. 1003 ¶¶ 67, 9, 16, 117). We find that Petitioner has shown that Mehta discloses this limitation of claim 2.

*Summary of the Subsequent Contentions of the Parties*

Patent Owner contends that Mehta does not disclose the claimed "selected portion, as presented to the subscriber, provides only a single description of each item of digital content in said portion, regardless of the number of implementations of each said item." PO Resp. 29. Patent Owner also argues that the Petition does not explain how Mehta discloses this limitation. *Id.* at 29–30. In particular, Patent Owner recognizes that Petitioner relies on Mehta's application discovery process, which provides a list of applications that are supported by the subscriber's device to the subscriber, but asserts that Petitioner does not explain how Mehta's application discovery process describes this limitation. *Id.* at 31. Patent Owner also contends that Mehta's disclosure of functionally equivalent applications that have the same name but are written in different languages could result in two programs, "Program A" and "Program B," with the same name that are both compatible with a user's computer. *Id.* at 31–32. Patent Owner contends that in this case, the MAS of Mehta would show both applications to the user. *Id.* at 32. Thus, according to Patent Owner, Mehta

does not disclose "providing only a single description . . . regardless of the number of implementations" as claimed.

Petitioner contends that the Petition explains that Mehta expressly discloses that application discovery returns a list of content that can be downloaded that match criteria that are designated by the subscriber, and in some embodiments, "the MAS only lists those applications that are supported by the subscriber's device." Reply 13 (citing Pet. 36; Ex. 1003 ¶¶ 6, 117). Petitioner contends that Figure 11F of Mehta shows a screen display of a subscriber's personal access list of applications, which includes a name and description of each application in the list. *Id.* at 13–14. Petitioner contends that Figure 11F shows a single name and a single description of each application, which describes "only a single description of each item of digital content" as claimed. *Id.* at 14–15. Petitioner further contends that Figure 2 of Mehta also shows a single description of each game, or item of content. *Id.* at 15. Petitioner contends that Patent Owner's hypothetical regarding "Program A" and "Program B" should be disregarded because those programs have different names. *Id.* at 16.

Patent Owner contends that Figure 11F of Mehta shows a single description of each item of content because Figure 11F only shows items of content with a single implementation. PO Sur-Reply 10. Patent Owner contends that Mehta is silent on whether only a single description would be provided if there were multiple implementations. *Id.* at 11.

*Analysis*

We agree with Petitioner. Mehta discloses storing "functionally equivalent programs having the same name that are capable of running on multiple kinds of devices that even may be written using different languages." Ex. 1003 ¶ 98. Mr. Wechselberger testifies that this disclosure

shows that Mehta's "MAS receives, stores and supports functionally equivalent programs capable of running on multiple devices because each program corresponds to a different device having different device capabilities (e.g., written using different languages)." Ex. 1002 ¶ 66. This testimony is consistent with that of Dr. Goodrich, who testifies that "each application has a single version made for a particular device type." Ex. 2020 ¶ 66.

Dr. Goodrich later testifies that paragraph 98 of Mehta describes that there could be two functionally equivalent programs with the same name that are compatible with a single user's computer. *Id.* at ¶ 88; *see* PO Resp. 31–32 (citing Ex. 2020 ¶¶ 87–88). We do not credit this later testimony, because it is inconsistent with Dr. Goodrich's earlier testimony that "each application," or program of Mehta, is "made for a particular device type." Ex. 2020 ¶ 66. We agree with Mr. Wechselberger and find that a person of ordinary skill in the art at the time of invention would have understood that Mehta's disclosure of functionally equivalent programs having the same name that are capable of running on multiple kinds of devices means that each program corresponds to a different device having different capabilities.

Further, Mehta discloses that "the MAS only lists those applications that are supported by the subscriber's device. This allows the subscriber to avoid the problem of having to explicitly select a compatible application." Ex. 1003 ¶ 117; *see* Pet. 36–37 (citing Ex. 1002 ¶¶ 75, 77). Mr. Wechselberger testifies that a person of ordinary skill in the art at the time of invention would have understood this disclosure to mean that the MAS provides the subscriber with only a single subscriber-appropriate version that will work for the subscriber. Ex. 1002 ¶ 77. Although Patent Owner contends that Mehta is silent on whether only a single description

would be provided if there were multiple implementations (PO Sur-Reply 10–11), we agree with Mr. Wechselberger and find that when multiple implementations have the same name, each implementation corresponds to a different device, and therefore, the MAS would only present to the subscriber the one implementation that works with the subscriber's device. Ex. 1002 ¶¶ 66, 75, 77.

We agree with Petitioner that even though multiple implementations can have the same name, Mehta displays the name only once, regardless of the number of implementations that have the same name. *See* Reply 13–15; *see id.* at 16–17 (citing Ex. 1003 ¶ 67, Fig. 2); Pet. 36–37 (citing Ex. 1002 ¶¶ 75–77). In particular, we agree with Petitioner and find that Mehta displays a single description of the item "Amark" in Figure 11F only once, and displays a single description of each game shown in Figure 2 only once, even though multiple implementations of an item and multiple implementations of a game can have the same name. We find that Mehta, in displaying the title of an application only once as shown in Figures 2 and 11F, even though multiple applications can have the same title, describes "presenting . . . only a single description of each item of digital content . . . regardless of the number of implementations" of the item as claimed.

Returning again to Patent Owner's example of "Microsoft Word for Windows" and "Microsoft Word for Apple Mac," which are different implementations of the digital content item "Microsoft Word" as discussed above, we rely on the disclosure of Mehta and the testimony of Mr. Wechselberger in finding that when a user's computer[8] is an Apple Mac,

---

[8] Claim 2 recites "receiving a request from a wireless device." In the related district court proceeding, the court did not construe "wireless device," other than to say that it is "not restricted to 'personal mobile devices.'" Ex. 1025,

Mehta's MAS would determine that an implementation of Microsoft Word is compatible with the user's computer and would list a single description of this digital content item using the title of the item (in this case, Microsoft Word) as shown in Figures 2 and 11F, regardless of the number of implementations of the item having the same title "Microsoft Word." Ex. 1003 ¶¶ 98, 117, Fig. 2, Fig. 11F; Ex. 1002 ¶¶ 66, 75, 77.

We are persuaded that Petitioner has shown by a preponderance of the evidence that Mehta anticipates claim 2.

*3. Dependent Claims 3 and 4*

Claim 3 depends from claim 2 and recites "wherein said selecting a portion of the product catalog comprises: in response to the request, determining the identity of the wireless device used by the subscriber." Petitioner contends that Mehta discloses this limitation in describing that the subscriber verifier determines the type and capabilities of the subscriber device. Pet. 37–38 (citing Ex. 1003 ¶¶ 83–84). We find that Petitioner has shown that Mehta discloses this limitation of claim 3.

Claim 3 recites "wherein each implementation of the plurality of items of digital content has been previously associated in the server system with at least one device identity, according to corresponding device capabilities supported by the implementation." Petitioner contends that Mehta discloses this limitation in describing that the deployment manager provisions each application for specific device or subscriber profiles. Pet. 38 (citing Ex.

---

2; *see* Pet. 24. In arguing that "[b]oth programs [of Mehta] could be compatible with a single user's computer," Patent Owner indicates that the scope of the claimed "wireless device" encompasses a single user's computer. PO Resp. 31-32; Ex. 2020 ¶ 88.

1002 ¶ 79). We find that Petitioner has shown that Mehta discloses this limitation of claim 3.

Claim 3 recites "selecting the portion of the product catalog to be presented to the subscriber based on the identity of the wireless device used by the subscriber." Petitioner contends that Mehta discloses this limitation in describing that the initial list is based upon subscriber and device capabilities, and the final list to be presented to the subscriber is based on the type and capabilities of the subscriber's device. Pet. 38–39 (citing Ex. 1003 ¶¶ 67, 85, 139). We find that Petitioner has shown that Mehta discloses this limitation of claim 3.

Patent Owner does not raise any arguments with respect to claim 3. "Where a party does not raise any arguments with respect to any other claim limitation, nor does it separately argue the dependent claim, the dependent claim stands or falls together with the independent claim." *Incept LLC v. Palette Life Sciences, Inc.*, 77 F.4th 1366, 1375 (Fed. Cir. 2023) (internal citations and markings omitted). Claim 3 falls with independent claim 2.

Claim 4 depends from claim 2 and recites "receiving from the subscriber a request for one of the items of digital content in said portion of the product catalog." Petitioner contends that Mehta discloses this limitation in describing a data repository that stores applications, where subscribers of wireless services request and download the applications. Pet. 39–40 (citing Ex. 1003 ¶¶ 61, 64, 81–82, Fig. 1). Patent Owner does not contend otherwise. We find that Petitioner has shown that Mehta discloses this limitation of claim 4.

Claim 4 recites "selecting an implementation of the requested item of digital content, based on device capabilities of the wireless device used by the subscriber."

*The Petition's Contentions*

Petitioner contends that Mehta discloses this limitation in describing receiving a request to download an application, verifying that the request is appropriate and permitted for download to the device and user, and sending the application to the requesting device. Pet. 41 (citing Ex. 1002 ¶ 83).

*Summary of the Subsequent Contentions of the Parties*

Patent Owner contends that Petitioner maps Mehta's application discovery process to both "presenting the selected portion of the product catalog" recited in claim 2, and to "selecting an implementation of the requested item" recited in claim 4. PO Resp. 33. Patent Owner also contends that Mehta's application discovery process verifies applications based on device capabilities, therefore, subsequently "selecting an implementation" would not be based on device capabilities, because the compatibility of the applications with the device capabilities has already been verified. *Id*. at 33–34. Patent Owner contends that Mr. Wechselberger testifies that Mehta, during the application discovery process, filters a list of applications for compatibility with the wireless device, and therefore does not subsequently re-check the applications for compatibility. *Id*. at 34 (quoting Ex. 2021, 53:11–20).

Petitioner contends that Mehta's application discovery process filters a list of applications to include only appropriate applications that the user may select for download, and presents the list to the user. Reply 16–17. Petitioner contends that once a user selects an application to download, the MAS retrieves the application, verifies that the application is appropriate for download to that device, and sends the application to the device. *Id*. at 17. Petitioner contends that Mr. Wechselberger's deposition testimony is consistent with Mehta's disclosure. *Id*. Petitioner contends that Mehta,

consistent with Mr. Wechselberger's testimony, discloses that the MAS confirms that an application is compatible with a device during the application discovery process, then, when the application is selected for download, the verification routine checks whether the device has the resources required by the application, not whether the application is compatible. *Id*. at 17–18 (citing Ex. 2021, 53:11–20; Ex. 1003 ¶ 139).

Patent Owner contends that the application discovery process and the download process are alternative processes that are not taken one after another. PO Sur-Reply 11–14. Patent Owner further contends that even if Mehta discloses sequentially performing an application discovery process, then performing a download process that includes verifying whether a device has resources required by the application, Petitioner does not explain how verifying whether a device has resources required by an application describes "***selecting*** an implementation of the requested item of digital content" as claimed. *Id*. at 14–15 (emphasis in original).

*Analysis*

We agree with Petitioner and find that Mehta describes performing an application discovery process that displays a list of applications that are available and appropriate based on capabilities of the wireless device. Ex. 1003 ¶ 70. We agree with Petitioner and find that Mehta performs a selection process that includes receiving a request to download an application and verifying that the application is appropriate for the device. *Id*.; *see id*. at ¶¶ 64–67, 139, Figs. 3–5.

We disagree with Patent Owner that Mehta's use of the word "alternatively" means that Mehta performs either discovering applications or selecting an application for download but not both (PO Sur-Reply 11–14), and find that the selection process of Mehta is performed after the

application discovery process. Ex. 1003 ¶¶ 67, 70, 139, Figs. 3 and 4; Ex. 1002 ¶¶ 82–83. We find that Mehta uses the word "alternatively" to distinguish the process for selecting an application for download as shown in Figure 3 from the process of discovering applications as shown in Figure 4, not that only one of the two processes are performed. *See* Ex. 1003 ¶¶ 67, 70, 139, Figs. 3 and 4. Rather, we find that both processes would be performed sequentially. That is, a person of ordinary skill in the art would have understood that after the application discovery process of Mehta presents a list of appropriate applications to the user, the user then selects an application from the list for download. Ex. 1003 ¶¶ 67, 70, 139, Figs. 3 and 4; Ex. 1002 ¶¶ 82–83 (quoting Ex. 1003 ¶¶ 67, 70, 139). Otherwise, displaying the list of applications without then selecting and downloading one of the applications from the list would make no sense.

We do not agree with Patent Owner's contention that "during application discovery in Mehta, applications are selected 'based on device capabilities,' and so it would make no sense to check the application again" (PO Sur-Reply 14 (citing PO Resp. 33–35; *see* Ex. 2020 ¶ 93)) because Patent Owner's contention is inconsistent with the disclosure of Mehta, which describes selecting an application based on device capabilities when discovering applications and also when selecting the application for download. Ex. 1003 ¶¶ 67, 70, 139, Figs. 3 and 4. Contrary to Patent Owner's contention, we find that Mr. Wechselberger's deposition testimony—that Mehta describes an application discovery process that determines whether an application is compatible with the wireless device and a selection process that includes determining whether the device has resources required by the application—is consistent with the disclosure of Mehta. Ex. 2021, 53:11–20; Ex. 1002 ¶¶ 82–83; Ex. 1003 ¶¶ 67, 70, 139.

We agree with Petitioner and Mr. Wechselberger that Mehta's selection process that includes determining whether a device has resources required by an application describes "selecting an implementation of the requested item of digital content, based on device capabilities of the wireless device" as claimed. Ex. 1002 ¶¶ 82–83; Reply 17 (citing Pet. 41; Ex. 1003 ¶¶ 70, 139; Ex. 1002 ¶ 83). That is, Mehta's selection process only selects an implementation for download to a device when the device has the required resources. *Id*. We find that Petitioner has shown that Mehta discloses this limitation of claim 4.

Claim 4 recites "downloading the selected implementation of the item of digital content to the wireless device used by the subscriber." Petitioner contends that Mehta discloses this limitation in describing downloading the selected application to the subscriber device. Pet. 42–43 (citing Ex. 1002 ¶ 84, Fig. 3. Patent Owner does not contend otherwise. We find that Petitioner has shown that Mehta discloses this limitation of claim 4.

We are persuaded that Petitioner has shown by a preponderance of the evidence that Mehta anticipates claims 3 and 4.

*4. Independent Claim 9*

Petitioner contends that claim 9 recites limitations similar to those recited in claim 2, and that Mehta anticipates claim 9 for the reasons given in the Petition's analysis of claim 2. Pet. 46–47. Patent Owner disagrees for the reasons given in Patent Owner's analysis of claim 2. PO Resp. 12–32. We are persuaded that Petitioner has shown by a preponderance of the evidence that Mehta anticipates claim 9 for the reasons given in our analysis of claim 2.

*5. Dependent Claims 10 and 11*

Petitioner contends that claim 10 contains limitations similar to those recited in claim 3, that claim 11 recites limitations similar to those recited in claim 4, and that Mehta anticipates claims 10 and 11 for the reasons given in the Petition's analysis of claims 3 and 4. Pet. 48. Patent Owner does not present arguments regarding claim 10. Patent Owner contends disagrees with Petitioner's contention that claim 11 is anticipated by Mehta for the reasons given in Patent Owner's analysis of claim 4. PO Resp. 32–35. We are persuaded that Petitioner has shown by a preponderance of the evidence that Mehta anticipates claim 9.

*6. Claims 1 and 8*

As a result of reexamination, original claims 1 and 8 have been replaced by amended claims 1 and 8. Ex. 2018. Mr. Wechselberger testifies that the Petition and supporting evidence demonstrates that amended claims 1 and 8 are anticipated by Mehta and would have been obvious in view of Mehta and Schläpfer. Ex. 1026 ¶¶ 19, 53; *see id*. ¶¶ 20–52. Petitioner contends that amended claims 1 and 8 are anticipated by Mehta. Reply 29–30 (citing Ex. 1026; Ex. 1029, 17:6–17). Patent Owner disagrees for the reasons given in Patent Owner's analysis of claim 2. PO Resp. 12–32. We agree with Mr. Wechselberger and find that Petitioner has shown by a preponderance of the evidence that Mehta anticipates amended claims 1 and 8 for the reasons given in our analysis of claim 2.

### *C. Claims 1–14 As Obvious Over Mehta and Schläpfer*

#### *1. Schläpfer – Exhibit 1009*

Schläpfer is a white paper to "provid[e] insight into Java technology for the application development on mobile devices." Ex. 1009, 3. Schläpfer describes the Java 2 Micro Edition ("J2ME"), which is an edition of Java designed for embedded devices and resource-constrained devices. *Id.* at 4. A "[P]rofile" is "defined as a set of APIs for a specific vertical market and relies upon the underlying configuration's capabilities to create new, market-specific APIs." *Id.* at 4–6.

The Mobile Information Device Profile ("MIDP") addresses devices with a small display, touch screen or keypad, and capable of communicating via a mobile network with limited bandwidth. *Id.* at 4–6. Applications written "according to the MIDP specifications are called MIDlets." *Id.* Schläpfer discloses provision of MIDlets. *Id.* at 11. The MIDlets may be combined with supporting files, a manifest, and an application descriptor to form a "jar file." *Id.* at 7. The application descriptor includes mandatory attributes such as name, version, vendor, URL, and size. *Id.* at 7–8.

*Summary of Contentions Regarding Schläpfer's Prior Art Status*

Patent Owner contends that Schläpfer is not prior art because Petitioner has not established that it was accessible to a person of ordinary skill exercising reasonable diligence before the effective filing date of the '790 patent, which is June 19, 2003. PO Resp. 37; *see* Pet. 14–16 (contending that the effective filing date of the '790 patent is June 19, 2003); PO Resp. 9 (Patent Owner does not dispute Petitioner's contention that the effective filing date is June 19, 2003). Patent Owner contends that Petitioner's evidence, at best, shows that an individual accessed Schläpfer through a URL shown in a European Patent Specification (Ex. 1017, field

[56]) on November 29, 2002, but that Petitioner has not shown that a person of ordinary skill in the art could have found this URL using reasonable diligence, nor that such person of ordinary skill could have accessed Schläpfer through the URL. *Id.* at 38.

Petitioner relies on the testimony of a librarian, Ms. June Munford, in contending that the URL cited in Exhibit 1017 was referenced on Ericsson's public website by August 3, 2002, before the effective filing date of the '790 patent. Reply 20–21 (citing Ex. 1030 ¶ 9). Petitioner contends that "Ms. Munford concluded that 'Ericsson was clearly advertising and distributing copies of [Schläpfer] to the public as of August 3, 2002." *Id.* at 21.

Patent Owner contends that Ms. Munford's testimony shows a screenshot of Schläpfer located at a URL on August 3, 2003, which is after the effective filing date of the '790 patent, and a screenshot of a different website that includes the URL on August 3, 2002, which is before the effective filing date. PO Sur-Reply 16. Patent Owner contends that although the evidence shows that Schläpfer was located at the URL on August 3, 2003, a different document or a different version of Schläpfer may have been located at the URL on August 3, 2002. *Id.* at 16–17 (citing Ex. 2022, 15:8–16:3, 16:19–17:6, 19:22–20:14). Patent Owner also contends that even if Schläpfer was located at the URL before the effective filing date of the '790 patent, Petitioner has not shown that the URL was publicly accessible, because there may have been access restrictions. *Id.* at 17–18 (citing Ex. 2022, 23:20–24:6, 25:30–26:9, 26:16–28:5).

*Analysis*

We disagree with Patent Owner's contention that Petitioner has not shown, by a preponderance of evidence, that Schläpfer was located at the

URL before the effective filing date of the ’790 patent. First, although it is possible that an earlier version of Munford was located at the URL on August 3, 2002, we find this possibility unlikely given that Schläpfer itself lists a date of July 2001. Ex. 1009. Second, there is no evidence that other versions of Schläpfer or other documents were ever located at the URL. *See* Ex. 2022, 15:17–16:18 (Ms. Munford, when asked whether it was possible to change what the URL was pointing to, testifies that “I have no evidence that it happened.”), 17:15–22, 19:13–20, 20:16–21:10, 22:9–23:4. Finally, Ms. Munford’s testimony and supporting evidence that Schläpfer was located at the URL on August 3, 2002 is consistent with the URL of Exhibit 1017, which shows that Schläpfer was available at the URL on November 29, 2002. We rely on Exhibit 2017 and the testimony of Ms. Munford in finding that Petitioner shows, by a preponderance of evidence, that Schläpfer was located at the URL before the effective filing date of the ’790 patent. Ex. 1030 ¶¶ 6–9; Ex. 1017.

We also disagree with Patent Owner’s contention that Petitioner has not shown by a preponderance of evidence that Schläpfer was publicly accessible before the effective filing date of the ’790 patent. Again, although it is possible that the URL for Schläpfer may have had access restrictions, we find this possibility unlikely given that the URL was published on Ericsson’s website with no evidence of any access restrictions. Ex. 2022, 25:3–26:15 (Ms. Munford, when asked whether Ericsson’s website containing the URL pointing to Schläpfer had access restrictions, testifies that “[i]t is theoretically possible, although it would be a rather strange presentation given that it is offered freely in a Java-based competition” and that “the context of the content page suggests otherwise” because “it doesn’t outline any access restrictions. It doesn’t provide any

instructions for accessing [ ] material. It simply provides a link.”); Ex. 1030 ¶ 9.

Ms. Munford’s testimony is consistent with Exhibit 1017, which shows that the URL pointing to Schläpfer was accessed by someone external to Ericsson on November 29, 2002, which further indicates that the URL did not have access restrictions. We are persuaded by Ms. Munford’s testimony “that Ericsson was clearly advertising and distributing copies of [Schläpfer] to the public as of August 3, 2002.” Ex. 1030 ¶ 9.

We are persuaded that Petitioner has shown, by a preponderance of evidence, that Schläpfer was publicly accessible before the effective filing date of the ’790 patent. Accordingly, we find that Schläpfer is prior art to the ’790 patent.

#### *2. Reasons to Combine the Teachings of Mehta and Schläpfer*

Petitioner contends a person of ordinary skill would have had reason to combine the teachings of Mehta and Schläpfer because both references concern distributing digital contents to mobile devices over a wireless network. Pet. 66. Petitioner also contends Mehta provides a motivation to look to Schläpfer because Mehta “recognizes the issue of resource constraints on mobile devices and contemplates taking steps to address those constraints.” Pet. 67 (citing Ex. 1003 ¶¶ 10, 12). Petitioner contends that a person of ordinary skill would have combined Mehta’s MAS with Schläpfer’s teachings of limited screen space of mobile devices and limited bandwidth of the mobile network, and an application descriptor and associated attributes. *Id.* at 66 (citing Ex. 1009, 11). Mr. Wechselberger testifies that a person of ordinary skill in the art would have provided a single description of each supported application of Mehta in order to

accommodate the viewing capabilities of the requesting device as taught by Mehta, such as limited screen space and signal processing capabilities of the mobile device as taught by Schläpfer. Ex. 1002 ¶¶ 106–108.

Petitioner argues that a person of ordinary skill would have had a reasonable expectation of success in combining the teachings of Mehta and Schläpfer because the two references rely on Java for distributing digital content to mobile devices and refer to the specific J2ME edition of Java. Pet. 68. Petitioner also contends that a person of ordinary skill would have known that a provisioning model includes a corresponding set of provisioning attributes and descriptors. *Id.* at 68–70.

Patent Owner contends that a person of ordinary skill in the art would not have been motivated to combine the teachings of Mehta and Schläpfer. PO Resp. 41–43, 52. We address Patent Owner's contention in detail below in our analysis of the contentions of the parties.

*3. Claims 2–4 and 9–11 and Amended Claims 1 and 8*

*Summary of the Anticipation Contentions of the Parties*

Petitioner contends that Mehta discloses the limitations of claims 2–4 and 9–11 and amended claims 1 and 8 for the reasons given in the anticipation ground. Pet. 48–53, 63–65; Reply 29–30 (citing Ex. 1026; Ex. 1029, 17:6–17). Patent Owner disagrees for the reasons given in Patent Owner's analysis of claim 2. PO Resp. 35–52. We are persuaded that Petitioner has shown that Mehta anticipates amended claims 1 and 8 and claims 2 and 9 for the reasons given in our analysis of claim 2.

*The Petition's Contentions Regarding the Combination*

Petitioner further contends that to the extent Mehta alone may not disclose "provid[ing] only a single description of each item of digital content in said portion, regardless of the number of implementations of each said

item" as recited in claim 2, the combination of Mehta and Schläpfer teaches this limitation. Pet. 51–52. Petitioner contends that Mehta discloses the subscriber avoids the problem of having to explicitly select a compatible application when the MAS only lists the applications that are supported by the subscriber's device. *Id.* at 51 (citing Ex. 1003 ¶ 117). Petitioner contends that Schläpfer discloses that mobile devices have a small display and communicate over a mobile network with limited bandwidth. *Id.* (citing Ex. 1009, 7). Mr. Wechselberger testifies that a person of ordinary skill in the art would have provided a single description of each supported application of Mehta in order to accommodate the viewing capabilities of the requesting device as taught by Mehta, such as limited screen space and signal processing capabilities of the mobile device as taught by Schläpfer. Ex. 1002 ¶¶ 106–108.

*Summary of the Subsequent Contentions of the Parties*

Patent Owner contends that the combination of Mehta and Schläpfer does not teach "provid[ing] only a single description of each item of digital content in said portion, regardless of the number of implementations of each said item" as claimed, and that Petitioner relies on impermissible hindsight. PO Resp. 39–40. According to Patent Owner, Schläpfer discloses that the screen space and signal processing capabilities of mobile devices was limited, but does not suggest limiting the amount of content shown due to the limited screen space by only showing a single description of each item. *Id*. (citing Ex. 2020 ¶¶ 104–105). Dr. Goodrich testifies that there were many ways to limit the amount of content shown, such as displaying less information or only displaying the most valuable applications. Ex. 2020 ¶ 105.

Patent Owner contends that Mehta and Schläpfer are not analogous to each other because they are from different fields of endeavor. PO Resp. 41. According to Patent Owner, Mehta is from the field of provisioning applications, and Schläpfer is from the field of application development. *Id.* at 41–42 (citing Ex. 2020 ¶ 107). Patent Owner contends that Mehta's teaching of resource constraints is described in the context of provisioning applications, whereas that of Schläpfer is in the context of creating applications to be small. *Id.* at 42. Patent Owner contends that a person of ordinary skill would not have known how to combine Mehta and Schläpfer. *Id.* (citing Ex. 2020 ¶ 109). Patent Owner contends that Mehta only discloses single version applications without multiple applications, and that Mehta would have to be fundamentally changed to incorporate multiple versions of applications. *Id.* at 43 (citing Ex. 2020 ¶ 110).

Petitioner contends that Schläpfer teaches the known problem of a mobile devices having a small display screen with limited space. Reply 21 (citing Ex. 1009). Petitioner contends that Mehta teaches a small display screen for a mobile device that, when displaying a list of available applications, only lists the titles of those applications that are supported by the device. *Id.* at 21–22 (citing Ex. 1003, Fig. 2, ¶ 63). Petitioner contends that a person of ordinary skill in the art, when faced with the known problem of a mobile device that has a small display screen, would display only a single description of each item of content, such as the title of each available game as taught by Mehta, to yield the benefit of limiting the amount of information displayed on the small screen with limited space. *Id.* at 22–23 (citing Ex. 1003, Fig. 2; Ex. 1002 ¶¶ 105–108). Petitioner also contends that Mehta discloses "multiple implementations" as claimed, therefore, Mehta would not have to be fundamentally changed because it already incorporates

multiple versions of an application. *Id.* at 23 (citing Ex. 1029, 47:15–22, 54:21–55:10; Ex. 1003, Figs. 9B, 9D, and 10C).

Patent Owner contends that Schläpfer merely acknowledges the reality at the time that display space was limited, which Mehta already acknowledges. PO Sur-Reply 19. Patent Owner contends that because Mehta's display space is already limited, a person of ordinary skill in the art, after reading Schläpfer's duplicative disclosure, would not have had a reason to further limit data displayed by Mehta. *Id.* Patent Owner contends that even if one were motivated to limit the amount of displayed data, a person of ordinary skill could have done so by displaying less information, or by only displaying the most important applications. *Id.* at 19–20 (citing Ex. 2020 ¶ 105).

*Analysis*

We disagree with Patent Owner's contention that Mehta only displays a single implementation of each application for the reasons given above in our analysis of the anticipation ground. Therefore, we disagree with Patent Owner's contention that Mehta would have to be fundamentally changed in order to show multiple implementations. We also disagree with Patent Owner's contention that a person of ordinary skill would not have had a reasonable expectation of success in combining the two references. Rather, we agree with Petitioner that a person of ordinary skill in the art would have had a reasonable expectation of success in combining the teachings of Mehta and Schläpfer because both references use Java to distribute digital content to mobile devices. Pet. 68 (citing Ex. 1002 ¶ 139).

We disagree with Patent Owner's contention that Mehta and Schläpfer are non-analogous to claim 2. We find that the field of endeavor of the '790 patent is providing content to wireless devices and that Mehta and Schläpfer

are also in the field of providing content to wireless devices. Ex. 1001, 1:13–15 (The "present invention pertains to systems and methods for providing digital content to wireless service subscribers"); Ex. 1003 ¶ 2 ("The present invention relates to a method and system for . . . distributing wireless applications to wireless devices"); Ex. 1009, 3-2 (Discussing downloading Java applications to a device), 4-10 (The "user should be able to download applications to the mobile device"), 4-11 Fig. 2 (showing the process of downloading an application to the device, including performing application discovery, retrieving a descriptor for the application, and downloading the application); *see In re Bigio*, 381 F.3d 1320, 1325-26 (Fed. Cir. 2004) (citing *In re Deminski*, 796 F.2d 436, 442 (Fed. Cir. 1986)).

We disagree with Patent Owner's contention that Petitioner relies on impermissible hindsight. We agree with Petitioner that Schläpfer describes the known problem of a mobile device having limited resources such as a small display screen and that a person of ordinary skill would have therefore recognized that the amount of information displayed on the small screen would be limited. Pet. 51–52 (citing Ex. 1009, 4–6; Ex. 1002 ¶ 106); Reply 21–22 (citing Ex. 1002 ¶ 108). We agree with Petitioner that Mehta discloses displaying only the titles of applications such as games on the screen of the mobile device. Reply 22–23 (citing Ex. 1003 ¶ 63, Fig. 2; Ex. 1002 ¶¶ 105–108).

Although Dr. Goodrich identifies two other ways to accomplish limiting the amount of information shown on a small screen (Ex. 2020 ¶ 105), this testimony does no more than show three identified, predictable solutions. "When there is a design need . . . to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options." *KSR*, 550 US at 421. Here,

there is a design need to limit the amount of information displayed on a small screen as taught by Schläpfer and Mehta, therefore, a person of ordinary skill has good reason to pursue the known option of displaying only a single description of each item of digital content regardless of the number of implementations of each item as taught by Mehta.

We find that a person of ordinary skill in the art at the time of invention, faced with the known problem of displaying items of digital content on a mobile device having a small display screen as taught by Schläpfer, would have displayed only a single description of each item of digital content—such as the title—regardless of the number of implementations of each item as taught by Mehta for the benefit of limiting the amount of information displayed on the small display screen as suggested by both Schläpfer and Mehta.

We are persuaded that Petitioner has shown by a preponderance of the evidence that the combination of Mehta and Schläpfer renders obvious claims 2–4 and 9–11 and amended claims 1 and 8.

*4. Claims 5 and 12*

Claim 5 depends from claim 4 and recites "associating each of the items of digital content in the server system with a plurality of different provisioning models, each of the provisioning models corresponding to a different set of device capabilities."

*The Petition's Contentions*

Petitioner contends that Mehta discloses this limitation in describing a plurality of different provisioning models, and that a person of ordinary skill in the art would have associated each of the items of digital content with the provisioning models for the benefit of distributing content for use on a

particular device by a particular customer, in order to handle the device capabilities. Pet. 54–55 (citing Ex. 1003 ¶¶ 59, 85, 131).

*Summary of the Subsequent Contentions of the Parties*

Patent Owner contends that Mehta discloses four different provisioning models, walled-garden provisioning, open provisioning, static provisioning, and dynamic provisioning, but that Petitioner does not explain why these models correspond to device capabilities. PO Resp. 44. Patent Owner contends that the four provisioning models do not have anything to do with any set of device capabilities. *Id*. at 46 (citing Ex. 2020 ¶¶ 113–115). Patent Owner contends that Mr. Wechselberger's deposition testimony that Mehta describes additional provisioning models is not in the Petition and is incorrect. *Id*. at 48–52.

Petitioner contends that Mehta has extensive disclosures about provisioning. Reply 23 (citing Ex. 1003 ¶¶ 11–15, 72–76, 80–81, 135–144). Petitioner contends that Mehta's provisioning refers to "the customizing and distributing of content for a particular use, for example, for use on a particular kind of subscriber device by a particular customer," and that a person of ordinary skill in the art would have therefore understood that Mehta discloses more than the four exemplary models identified in its specification. *Id*. at 23–24 (citing Ex. 1002 ¶¶ 59, 116).

Petitioner contends that Mehta's provisioning process considers device capabilities, and that a person of ordinary skill in the art would have employed provisioning models that correspond to particular device capabilities. *Id*. at 24 (citing Ex. 1003 ¶ 85; Ex. 1002 ¶¶ 115–116). Petitioner contends that Mehta discloses using multiple provisioning models simultaneously, such as walled garden and static provisioning. *Id*. Petitioner contends that Mehta discloses "[p]rovisioning includes one or

more of the steps of retrieving, inspecting . . . and packaging, and may include additional steps as needed to ready an application for downloading to a target device." *Id*. at 25 (citing Ex. 1003 ¶ 64). Petitioner contends that a person of ordinary skill in the art would have recognized that various considerations in the provisioning process, such as device capabilities, application packaging, or encryption, may require selection of additional provisioning models based on device capabilities. *Id*. (citing Ex. 1003 ¶¶ 12, 64, 85; Ex. 1002 ¶ 116).

Patent Owner contends that Petitioner's argument that Mehta describes more than four provisioning models is a new theory.
PO Sur-Reply 21. Patent Owner contends that the only four provisioning models identified in the Petition are walled garden, open, dynamic, and static. *Id*. at 22. Patent Owner contend that although the Petition contends that Mehta discloses "at least four different types of provisioning models," this contention does not explain how Mehta's general discussion of provisioning meets this claim limitation. *Id*. at 22–23. Patent Owner also contends that Mehta's disclosure of provisioning in general does not teach provisioning models corresponding to different sets of device capabilities. *Id*. at 24–25.

*Analysis*

We disagree with Patent Owner's contention that the Petition does not explain how Mehta teaches each of "the provisioning models corresponding to a different set of device capabilities" as claimed. *See* PO Resp. 44–45. The Petition contends that, in view of Mehta's teachings that provisioning is the customizing and distributing of content for use on a particular kind of subscriber device, a person of ordinary skill in the art would have associated each of the items of digital content with a plurality of different provisioning

models for the benefit of handling different sets of device capabilities. Pet. 54–55 (citing Ex. 1003 ¶¶ 8–9, 59, 61, 85, 131; Ex. 1002 ¶¶ 115–116); see Reply 23–25 (citing Ex. 1003 ¶¶ 8–9, 11–15, 64, 72–76, 80–81, 85, 112, 135–144, Fig. 6; Ex. 1002 ¶¶ 115–16). We agree with Petitioner and find that Mehta teaches different provisioning models for applications to handle different device capabilities. Ex. 1003 ¶¶ 8–9, 11–15, 59, 61, 64, 72–76, 80–81, 85, 112, 131, 135–144, Fig. 6; Ex. 1002 ¶¶ 115–16.

For example, Mehta discloses that "content is provisioned by . . . packaging code for the intended subscriber device" and that "[d]uring the provisioning process, . . . content can be packaged appropriate to the requesting device." Ex. 1003 ¶¶ 10, 12. Mehta discloses that "[p]rovisioning . . . is the customizing and distributing of content . . . for use on a particular kind of subscriber device." *Id.* ¶ 59. Mehta discloses that the "MAS 105 also provides a multitude of tools . . . for customizing the applications." *Id.* ¶ 61. Mehta discloses that provisioning "may include additional steps as needed to ready an application for downloading to a target device. *Id.* ¶ 64. Mehta discloses that a device verifier "determines the type and capabilities of the subscriber device . . . and determines whether the device capabilities are sufficient to support a specific application." *Id.* ¶ 85. Mehta discloses creating a device profile for each device that is supported by the MAS, and using information from the device profile to verify device capabilities during the provisioning process. *Id.* ¶ 112. Mehta discloses "Provisioning Components 1214" that "enable the MAS 1209 . . . to verify the appropriateness of the request for use by . . . a particular subscriber device, to customize the requested application appropriately, and to send the provisioned application to the subscriber device 1201." *Id.* ¶ 131.

We find that Mehta's packaging code, device profiles, multitude of tools, and additional steps teach the claimed "provisioning models." We find that Mehta's disclosure of provisioning using packaging code appropriate to the requesting device teaches the claimed "each of the provisioning models corresponding to a different set of device capabilities." Ex. 1003 ¶ 10, 12. We find that Mehta's disclosure of creating a device profile for each device and using information from the device profile to determine capabilities of the device during provisioning teaches the claimed "each of the provisioning models corresponding to a different set of device capabilities." *Id.* ¶¶ 85, 112, 131. We find that Mehta's disclosure of a multitude of tools for customizing the application for use on a particular kind of subscriber device, as well as Mehta's disclosure of additional steps to ready an application for downloading to a target device, teach the claimed "each of the provisioning models corresponding to a different set of device capabilities." *Id.* ¶¶ 61, 64; *see id.* ¶¶ 59, 131. We agree with Petitioner that the provisioning of Mehta includes customizing an application for use on a particular device, and that a person of ordinary skill in the art would have selected appropriate provisioning models of Mehta, such as packaging code appropriate to the requesting device, the device profile of the requesting device, a multitude of tools, and additional steps, in order to customize the application according to the capabilities of the device as taught by Mehta. Pet. 54–55; Reply 23–25.

We disagree with Patent Owner's contention that the four types of provisioning models discussed in Mehta, walled-garden, open, dynamic, and static, do not teach provisioning models corresponding to different device capabilities. *See* PO Resp. 45–50. We find that the names of these four types of provisioning "are made for convenience of discussion alone, as the

different types of provisioning share many similar functions." Ex. 1003 ¶ 61. For example, Mehta uses the term static provisioning or pre-provisioning to describe an application that has already been provisioned and is available for downloading, and dynamic provisioning to describe an application that has not been previously provisioned. *Id.* ¶¶ 8, 15, 65, 131. Mehta discloses that both walled-garden and open types of provisioning use either a statically provisioned application or a dynamically provisioned application. *See id.* ¶ 64 (The steps to provision applications "are applicable to either provisioning scenario—using walled-garden or open provisioning"), ¶¶ 15, 65–66 (Describing provisioning by using a pre-provisioned application if it exists, otherwise, dynamically provisioning the application); Reply 24–25. Mehta discloses that both the statically provisioned applications and the dynamically provisioned applications are customized according to the capability of the subscriber device. Ex. 1003 ¶ 65 (Disclosing that pre-provisioned applications are pre-customized and dynamically provisioned applications are dynamically customized). Thus, contrary to Patent Owner's contention, each of Mehta's four provisioning types identified in the Petition customizes an application according to the capability of the subscriber device, and does so using provisioning models corresponding to different sets of device capabilities as discussed above.

We disagree with Patent Owner's contention that Petitioner's Reply raises a new theory that Mehta vaguely discloses more than four provisioning models because Mehta generally discusses provisioning. PO Sur-Reply 21. Petitioner contends in Reply that Mehta's extensive disclosure regarding provisioning teaches considering device capabilities in order to customize content for a particular device, and that a person of ordinary skill in the art, after considering the device's capabilities, would

have customized content by selecting additional provisioning models based on the device's capabilities in order to ready an application for downloading to the device. Reply 23–25 (citing Ex. 1003 ¶¶ 8–9, 11–15, 64, 72–76, 80–81, 85, 112, 135–144, Fig. 6; Ex. 1002 ¶¶ 115–16).

Similarly, the Petition contends that, in view of Mehta's teachings that provisioning is the customizing and distributing of content for use on a particular kind of subscriber device, a person of ordinary skill in the art would have associated each of the items of digital content with a plurality of different provisioning models for the benefit of handling different sets of device capabilities. Pet. 54–55 (citing Ex. 1003 ¶¶ 8–9, 59, 61, 85, 131; Ex. 1002 ¶¶ 115–116). Petitioner's contentions in the Petition as well as the Reply rely on Mehta's teachings of different provisioning models as discussed above. We find that Petitioner did not raise a new argument in Reply. Rather, Petitioner's Reply properly responds to arguments raised in Patent Owner's Response. *See* 37 C.F.R. § 42.23; *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064 (Fed. Cir. 2015).

We find that the combination of Mehta and Schläpfer teaches this limitation of claim 5.

Claim 5 recites "each provisioning model including a provisioning protocol and a corresponding set of provisioning attributes and descriptors for provisioning digital content in wireless devices."

*The Petition's Contentions*

Petitioner contends that the combination of Mehta and Schläpfer teaches this limitation. Pet. 55. Petitioner contends that Mehta discloses extending known protocols using well-known techniques to provide support for additional protocols. *Id.* (citing Ex. 1003 ¶ 71). Petitioner contends that a person of ordinary skill would have included a set of provisioning

attributes and descriptors for the provisioning model as taught by Schläpfer. *Id.* at 55–56 (citing Ex. 1009).

*Summary of the Subsequent Contentions of the Parties*

Patent Owner contends that Petitioner has not shown how Schläpfer's disclosure of an application descriptor that includes attributes such as name, size, and URL has anything to do with the claimed provisioning model. PO Resp. 51–52; PO Sur-Reply 25–26. Patent Owner contends that Petitioner has not shown motivation to combine Mehta and Schläpfer because Mehta's provisioning models have nothing to do with Schläpfer's descriptors and attributes. PO Resp. 52. Patent Owner further contents that Schläpfer and Mehta are non-analogous art. PO Sur-Reply 26.

Petitioner contends that the scope of the claimed "provisioning descriptors," read in light of the Specification, encompasses at least the disclosed embodiment of a content descriptor that is downloaded during provisioning and includes attributes such as name, size, and URL. Reply 25–26 (citing Ex. 1001, 13:28–33, 13:36–37); Pet. 68–69. Petitioner contends that the application descriptor of Schläpfer, which is sent to the mobile device during provisioning and includes attributes such as name, size, and URL, teaches "provisioning attributes and descriptors" as claimed. *Id.* at 25. Petitioner contends that a person of ordinary skill in the art would have known that provisioning models include a corresponding set of provisioning attributes and descriptors and would have looked to Schläpfer's teachings for guidance in implementing the provisioning attributes and descriptors. *Id.* at 28–29 (citing Ex. 1002 ¶ ¶ 140–41).

*Analysis*

We find that Schläpfer discloses an application descriptor that includes attributes such as name, size, and URL. Ex. 1009, 4–6, 4–7. We

find that Schläpfer discloses that the application descriptor is downloaded to a device during provisioning. *Id*. at 4–10, 4–11, 6–17, 6–18. We agree with Petitioner that the application descriptors and attributes described by Schläpfer teach the claimed "provisioning attributes and descriptors." We agree with Mr. Wechselberger and find that a person of ordinary skill in the art would have understood that the provisioning models taught by Mehta would include the provisioning attributes and descriptors taught by Schläpfer. Ex. 1002 ¶¶ 118, 140–41. We find that including the provisioning attributes and descriptors taught by Schläpfer in the provisioning models of Mehta "simply arranges old elements with each performing the same function it had been known to perform and yields no more than one would expect from such an arrangement," therefore, "the combination is obvious." *KSR*, 550 US at 417.

We find that the combination of Mehta and Schläpfer teaches this limitation of claim 5.

Claim 12 recites limitations similar to those found in claim 5. Petitioner contends that the combination of Mehta and Schläpfer teaches the limitations of claim 12 for the reasons given in its analysis of claim 5. Pet. 65. Patent Owner disagrees for the reasons given in Patent Owner's analysis of claim 5. PO Resp. 50–52.

We are persuaded that Petitioner has shown by a preponderance of the evidence that the combination of Mehta and Schläpfer renders obvious claims 5 and 12.

*5. Claims 6 and 13*

Claim 6 depends from claim 5 and recites "receiving from the subscriber a request for one of the items of digital content in said portion of

the product catalog." Petitioner contends that Mehta discloses this limitation for the reasons given in its analysis of claim 4. Pet. 56.

Claim 6 recites "identifying device capabilities of the wireless device used by the subscriber." Petitioner contends that Mehta discloses this limitation in describing determining the type and capabilities of the subscriber device. Pet. 56–57 (citing Ex. 1003 ¶¶ 64, 85).

Claim 6 recites "selecting one of a plurality of provisioning models associated with the requested item in the server system, based on the device capabilities of the wireless device used by the subscriber." Petitioner contends that Mehta discloses this limitation in describing that the MAS selects an appropriate provisioning model based on device capabilities. Pet. 57–58 (citing Ex. 1003 ¶¶ 89, 61, 64, 131).

Claim 6 recites "packaging the requested item according to the selected provisioning model." Petitioner contends that Mehta discloses this limitation in describing that during the provisioning process, the content can be packaged appropriate to the requesting device. Pet. 58 (citing Ex. 1003 ¶¶ 12, 15).

Claim 6 recites "provisioning the requested item in the wireless device used by the subscriber according to the selected provisioning model." Petitioner contends that Mehta discloses this limitation in describing that the application is provisioned for a specific device. Pet. 59–60 (citing Ex. 1003 ¶¶ 64, 66, 131, Fig. 3).

Claim 13 recites limitations similar to those recited in claim 6. Petitioner contends that Mehta teaches the limitations of claim 6 for the reasons given in Petitioner's analysis of claim 6. Pet. 65.

We are persuaded that Petitioner has shown that the combination of Mehta and Schläpfer renders obvious claims 6 and 13.

*6. Claims 7 and 14*

Claim 7 depends from claim 6 and recites "said packaging the requested item comprises creating a provisioning descriptor for the requested item according to the selected provisioning model, and associating the provisioning descriptor with the requested item." Petitioner contends that the combination of Mehta and Schläpfer teaches this limitation. Pet. 60–62. Petitioner contends that Mehta describes packaging content appropriate to the requesting device during the provisioning process, and that Schläpfer discloses provisioning applications accompanied by an application descriptor. *Id.* at 61 (citing Ex. 1003 ¶ 12; Ex. 1009, 78, 1112).

Claim 7 recites "said provisioning the requested item in the wireless device comprises sending the packaged requested item to the wireless device used by the subscriber according to a provisioning protocol associated with the selected provisioning model." Petitioner contends that Mehta discloses this limitation in describing sending the packaged application to the requesting subscriber device according to the determined protocol. Pet. 62–63 (citing Ex. 1003 ¶¶ 70, 134, Fig. 5).

Claim 14 recites limitations similar to those recited in claim 7. Petitioner contends that the combination of Mehta and Schläpfer teaches the limitations of claim 14 for the reasons given in Petitioner's analysis of claim 7. Pet. 65.

We are persuaded that Petitioner has showed that the combination of Mehta and Schläpfer renders obvious claims 7 and 14.

## VIII. CONCLUSION

In summary, we determine a preponderance of the evidence establishes claims 1–14 of the ’790 patent are unpatentable, as shown in the following table:[9]

| **Claim(s)** | **35 U.S.C. §** | **Reference(s)/Basis** | **Claims Shown Unpatentable** | **Claims Not Shown Unpatentable** |
|---|---|---|---|---|
| 1–4, 8–11 | 102 | Mehta | 1–4, 8–20 | |
| 1–14 | 103 | Mehta, Schläpfer | 1–14 | |
| **Overall Outcome** | | | 1–14 | |

[9] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner’s attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

## IX. ORDER

It is hereby:

ORDERED that claims 1–14 of the ’790 patent have been proven by a preponderance of the evidence to be unpatentable; and

FURTHER ORDERED that, because this is a final written decision, parties to this proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

FOR PETITIONER:

Aliza Carrano
acarrano@willkie.com
Indranil Mukerji
imukerji@willkie.com
Heather Schneider
hschneider@willkie.com

FOR PATENT OWNER:

Christine Lehman
clehman@reichmanjorgensen.com
Michael Matulewicz-Crowley
Mmatulewicz-crowley@reichmanjorgensen.com
Jamie Cardenas-Navia
Jcardenas-navia@reichmanjorgensen.com
Naveed Hasan
nhasan@reichmanjorgensen.com

US007233790B2

(12) **United States Patent**
**Kjellberg et al.**

(10) **Patent No.: US 7,233,790 B2**
(45) **Date of Patent: Jun. 19, 2007**

(54) **DEVICE CAPABILITY BASED DISCOVERY, PACKAGING AND PROVISIONING OF CONTENT FOR WIRELESS MOBILE DEVICES**

(75) Inventors: **Rikard M. Kjellberg**, Santa Cruz, CA (US); **Sheng Liang**, Cupertino, CA (US); **Tomas G. Lund**, Menlo Park, CA (US); **William Chan**, San Mateo, CA (US); **Ramakrishna Chinta**, Sunnyvale, CA (US); **Xinbi Chen**, Palo Alto, CA (US)

(73) Assignee: **Openwave Systems, Inc.**, Redwood City, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 753 days.

(21) Appl. No.: **10/600,746**

(22) Filed: **Jun. 19, 2003**

(65) **Prior Publication Data**

US 2004/0054786 A1 Mar. 18, 2004

**Related U.S. Application Data**

(60) Provisional application No. 60/393,024, filed on Jun. 28, 2002, provisional application No. 60/392,383, filed on Jun. 28, 2002, provisional application No. 60/393,041, filed on Jun. 28, 2002, provisional application No. 60/392,999, filed on Jun. 28, 2002.

(51) **Int. Cl.**
*H04M 3/00* (2006.01)
(52) **U.S. Cl.** .................... **455/419**; 455/418; 455/414.1
(58) **Field of Classification Search** ................ 455/419, 455/418, 414.1

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,835,724 A 11/1998 Smith

(Continued)

FOREIGN PATENT DOCUMENTS

EP 0 992 922 A2 4/2000

(Continued)

OTHER PUBLICATIONS

Austaller, Gerhard, et al.: "Gulliver Beans: Generating Device Optimized and Individualized Content for WAP Applications", Proc. Workshop Information Design for Mobile Web Services, [Online] May 15, 2000, pp. 1-7, XP-002266242.

(Continued)

*Primary Examiner*—Creighton Smith
(74) *Attorney, Agent, or Firm*—Blakely Sokoloff Taylor & Zafman LLP

(57) **ABSTRACT**

A network server system includes a download manager that manages the publication, purchase and delivery of digital products from multiple suppliers to wireless services subscribers in multiple domains. Product suppliers can publish and manage their products on the server system via a computer network and make their products available to the subscribers for purchase or licensing. The subscribers in each domain can access the server remotely to purchase rights to download and use the products on associated wireless communication devices. Multiple different implementations of any product can be maintained, where each implementation corresponds to a different set of device capabilities. Each product can also be associated with multiple different provisioning models, each corresponding to a different set of device capabilities.

**14 Claims, 14 Drawing Sheets**



U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,895,471 | A | 4/1999 | King et al. | |
| 6,049,892 | A | 4/2000 | Casagrande et al. | |
| 6,076,166 | A | 6/2000 | Moshfeghi et al. | |
| 6,161,140 | A | 12/2000 | Moriya | |
| 6,167,441 | A | 12/2000 | Himmel | |
| 6,223,289 | B1 | 4/2001 | Wall et al. | |
| 6,275,692 | B1 | 8/2001 | Skog | |
| 6,311,215 | B1 | 10/2001 | Bakshi et al. | |
| 6,430,624 | B1 | 8/2002 | Jamtgaard et al. | |
| 6,438,576 | B1 | 8/2002 | Huang et al. | |
| 6,587,880 | B1 | 7/2003 | Saigo et al. | |
| 6,912,385 | B2 * | 6/2005 | Namba et al. | 455/419 |
| 2001/0037192 | A1 | 11/2001 | Shimamoto et al. | |
| 2001/0047477 | A1 | 11/2001 | Chiang | |
| 2002/0065944 | A1 | 5/2002 | Hickey et al. | |
| 2002/0078253 | A1 | 6/2002 | Szondy et al. | |
| 2002/0194219 | A1 | 12/2002 | Bradley et al. | |
| 2002/0194473 | A1 | 12/2002 | Pope et al. | |
| 2003/0017826 | A1 | 1/2003 | Fishman et al. | |
| 2003/0027581 | A1 * | 2/2003 | Jokinen et al. | 455/456 |
| 2003/0054794 | A1 | 3/2003 | Zhang | |
| 2003/0060188 | A1 * | 3/2003 | Gidron et al. | 455/408 |
| 2003/0084165 | A1 | 5/2003 | Kjellberg et al. | |
| 2003/0101329 | A1 | 5/2003 | Lahti et al. | |
| 2004/0024867 | A1 | 2/2004 | Kjellberg | |
| 2004/0054787 | A1 | 3/2004 | Kjellberg et al. | |
| 2004/0248570 | A1 | 12/2004 | Denenberg et al. | |
| 2005/0071418 | A1 | 3/2005 | Kjellberg et al. | |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| WO | WO 98/35469 | A2 | 8/1998 |
| WO | WO 98/35469 | A3 | 8/1998 |
| WO | WO 01/97482 | A1 | 12/2001 |
| WO | WO 02/23857 | A2 | 3/2002 |
| WO | WO 02/27543 | A2 | 4/2002 |

OTHER PUBLICATIONS

Ellipsus Systems: “Ellipsus’ Mobile Application Provisioning System”, White Paper, [Online] Sep. 23, 2001, pp. 0-10, XP-002266188.

Erik Bladh et al., “GPRS—Applicability and Expectations”, Växjö University, School of Mathematics and Systems Enigneering, Reports from MSI, Aug. 2002, pp. 1-64.

“A Vision for Dynamic Java Services Provisioning, The Java Services Vending Machine Concept”, Jun. 2001, Version 1.0, Sun Microsystems, Inc., pp. 1-25.

Sheila Riley, “Sun-Microsoft Spat Now Carrying Over To Wireless World”, Investor’s Business Daily, 1 page.

* cited by examiner


CONTENT SUPPLIER
CONTENT SUPPLIER
DOWNLOAD MANAGER
SUBSCRIBER
SUBSCRIBER

FIG. 1


SERVER
25A
SERVER
25B
24
29
COMPUTER NETWORK
1
DOWNLOAD MANAGER
23
GATEWAY
22
WIRELESS NETWORK
21A
21B

FIG. 2


1
DOWNLOAD MANAGER
34
PROTOCOL HANDLERS
31
DELIVERY MANAGER
36
SECURITY MANAGER
DEVICE CAPABILITY MANAGER 37
PERSONAL VAULT
38
STORE FRONT 39
NOTIFICATION MANAGER 40
32
PRODUCT MANAGER
51
PRODUCT WORKFLOW MANAGER
CONTENT ANALYSIS MANAGER 52
PRICING MANAGER 53
CATALOG 54
PUBLISHED CONTENT 35
BUSINESS AND OPERATIONS MANAGER
33
OA&M
61
DOMAIN MANAGER
62
PAYMENT MANAGER
63
PROVISIONING MANAGER
28
PREPAID
POSTPAID
ONLINE
64

FIG. 3


37
41
DEVICE MANAGER
42
DEVICE HANDLER MANAGER
43
DELIVERY CONTEXT CACHE
44
XWap Profile Handler
User Agent Handler
Quarantine Handler
45
DEVICE DAO
46
DEVICE INFO
47
UAProfParser
48
UAProfResolver
49
Dm-config.xml
50
Device Vocabulary.xml

FIG. 4


CATALOG
PRODUCT
DEVICES SUPPORTED
DESCR.
IMPLEMENTATION
DEVICES SUPPORTED
IMPLEMENTATION
DEVICES SUPPORTED
54
56
57A
57B
58A
58B
59
59A
59B
60

FIG. 5


PRODUCT
56
IMPLEMENTATION (BINARY)
57A
IMPLEMENTATION
57B
BINARY
61A
BINARY
61B

FIG. 6


POST-PAID
PRE-PAID
ONLINE
64
SUBSCRIBER PROVIDER PROFILE
73
PRODUCT CATALOG
54
72
SUBSCRIBER PROFILE
71
SESSION

FIG. 7


RECEIVE INPUTS FROM PRODUCT SUPPLIER DEFINING A PRODUCT AND SUBMITTING ONE OR MORE IMPLEMENTATIONS
801
RECEIVE INPUT FROM CONTENT SUPPLIER SPECIFYING ONE OR MORE DEVICES (ACTUAL OR GENERIC) WHICH SUPPORT EACH IMPLEMENTATION AND ONE OR MORE PROVISIONING PROTOCOLS EACH IMPLEMENTATION
802
STORE PRODUCT DEFINITION, IMPLEMENTATIONS, SUPPORTING DEVICES AND PROVISIONING PROTOCOLS
803
DETERMINE SET OF ALL POSSIBLE DEVICES WHICH SUPPORT PRODUCT AND STORE SET IN ASSOCIATION WITH PRODUCT
804

FIG. 8


901
CLIENT DEVICE CONNECTS TO DOWNLOAD MANAGER
902
IDENTIFY DOMAIN OF SUBSCRIBER
903
SELECT LANGUAGE AND CURRENCY BASED ON DOMAIN
904
IDENTIFY CLIENT DEVICE AND DEVICE CAPABILITIES
NO
RECEIVED REQUEST TO VIEW PRODUCTS FROM CLIENT DEVICE?
YES
906
DETERMINE WHICH PRODUCTS CLIENT DEVICE SUPPORTS
906
SEND RESPONSE TO CLIENT DEVICE TO ENABLE CLIENT DEVICE TO DISPLAY ONLY DESCRIPTIONS OF PRODUCTS WHICH CLIENT DEVICE SUPPORTS, IN APPROPRIATE LANGUAGE AND CURRENCY FOR SUBSCRIBER'S DOMAIN

FIG. 9


RECEIVE SUBSCRIBER'S SELECTION OF A PRODUCT TO PURCHASE
1001
PRICING MANAGER CALLS ALL REGISTERED RATING ADAPTERS
1002
RATING ADAPTERS ADJUST PRICE OF SELECTED PRODUCT, IF APPROPRIATE
1003
PRICING MANAGER PRESENTS LICENSE OBJECT TO SUBSCRIBER
1004
SUBSCRIBER CONFIRMED PURCHASE?
1005
YES
NO
PROVISIONING MANAGER REQUESTS PAYMENT MANAGER TO CHARGE APPLICABLE PRICE FOR THE PRODUCT
1006
PAYMENT MANAGER LOCATES APPLICABLE PAYMENT HANDLER BASED ON DOMAIN TO WHICH SUBSCRIBER BELONGS AND SUBSCRIBER'S PREFERRED PAYMENT METHOD
1007
PAYMENT HANDLER PERFORMS CHARGING ACTIONS
1008

FIG. 10


CLIENT DEVICES
DEVICE FOCUS
DELIVERY
MIDP OTA
NOKIA OTA
WAP OTA
MOTOROLA OTA
MIDP OTA
DF
MMS
SMS
SMTP
PACKAGING
WAP CD
NOKIA GCD
MIDP JAR/JAD
MMS
ERICSSON
DF
PROTOCOL ADAPTERS
CONTENT
J2ME MIDP
J2SE
NATIVE CODE
XXX
MP3
WAV
MIDI
BMP
GIF
JPEG
MPEG
LOCAL/ REMOTE CONTENT STORAGE
CONSUMER FOCUS
PRODUCT INFORMATION
APPLICATIONS
GAMES
BUSINESS
STRATEGY
HOME FINANCE
SOUND
MUSIC
RING TONES
JINGLES
OTHER
IMAGES
WALL PAPER
STREAMING
VIDEO CLIPS
OTHER
PRODUCT CATALOG

FIG. 11


SELECT AN IMPLEMENTATION OF THE PRODUCT BASED ON DEVICE CAPABILITIES OF CLIENT DEVICE
1201
RETRIEVE CONTENT TYPE OF THE SELECTED IMPLEMENTATION
1202
SELECT ONE OF THE PROVISIONING MODELS AVAILABLE FOR THE IMPLEMENTATION, BASED ON DEVICE CAPABILITIES AND CONTENT TYPE OF IMPLEMENTATION
1203
CREATE PROVISIONING DESCRIPTOR FOR THE IMPLEMENTATION BASED ON SELECTED PROVISIONING MODEL
1204
DOWNLOAD CONTENT DESCRIPTOR TO CLIENT DEVICE
1205
RECEIVE REQUEST FOR CONTENT FROM CLIENT DEVICE
1206
DOWNLOAD IMPLEMENTATION TO CLIENT DEVICE USING PROVISIONING PROTOCOL OF SELECTED PROVISIONING MODEL
1207

FIG. 12


CLIENT DEVICES
21
IP LOAD BALANCER
139
HOST
JVM
APP SERVER
WEB CONTAINER
JSPs
SERVLETS
APP COMPONENTS
BUSINESS LOGIC
131
132
133
134
135
136
137
138
WEB LAYER
ACCESS INSIDE ONE JVM
NO PROTOCOL STACK ROUND TRIPS ONCE INSIDE THE JVM
BUSINESS LAYER AND DATA ACCESS LAYER
DATABASE
140

FIG. 13


140
PROCESSOR(S)
141
147
ROM
SOFTWARE
142
147
RAM
SOFTWARE
146
143
147
MASS
STORAGE
SOFTWARE
144
COMM
148
145
I/O

FIG. 14

# DEVICE CAPABILITY BASED DISCOVERY, PACKAGING AND PROVISIONING OF CONTENT FOR WIRELESS MOBILE DEVICES

This application claims the benefit of U.S. provisional patent applications Nos.: 60/393,024; 60/392,383; 60/393,041; and 60/392,999, each of which was filed on Jun. 28, 2002, and each of which is incorporated herein by reference.

## FIELD OF THE INVENTION

At least one embodiment of the present invention pertains to systems and methods for providing digital content to wireless services subscribers, and more particularly, to facilitating management and delivery of digital content from multiple content suppliers to multiple wireless services subscribers in multiple domains.

## BACKGROUND

Personal mobile communication/computing devices, such as cellular telephones, personal digital assistants (PDAs) and two-way pagers, have become commonplace in many countries. These devices are referred to collectively herein as “mobile devices” or “wireless devices”. The current state-of-the-art of mobile devices has advanced far beyond that of their predecessors. For example, early cellular telephones were used analog signals to communicate over wireless telecommunications networks (or simply “wireless networks”) and were nothing more than mobile telephones. Today’s cellular telephones typically are all digital and provide many other functions in addition to telephony capability. For example, many of the latest generation of mobile telephones (and other mobile devices) allow their users to play games, access World Wide Web pages, exchange email, exchange and download files, exchange short messaging service (SMS) messages, and send and receive video.

With new mobile devices providing a wider range of capabilities, there is increasing demand among the users of these devices (i.e., wireless services subscribers) for new and interesting types of digital content that can be used on these mobile devices, such as games and other applications, images, ring tones, screensavers, wallpapers, etc. Although newer mobile devices often come pre-provisioned with certain digital products when first acquired by the subscriber, it is desirable to allow subscribers to acquire additional digital products for use in their mobile devices as such products become available. While this capability already exists, currently subscribers acquire digital content directly from the content suppliers (typically via the wireless network and the Internet). This process is inconvenient if a subscriber wishes to acquire various different items of digital content from different suppliers, since the subscriber must navigate to the web sites of different suppliers. Therefore, it is further desirable to make many different types of digital content available to subscribers at one time through a centralized “store”.

From the content supplier’s perspective, another impediment to the efficient distribution of digital content is the fact that different mobile devices often require different content packaging formats and provisioning protocols. In order to make a given item of digital content available to multiple mobile devices supporting different provisioning models, a digital content supplier will normally deploy that item of content multiple times, packaging it differently for each of



the provisioning models. For example, an image to be delivered to Nokia-COD phones and Sprint-GCD OTA phones would be deployed twice, custom-packaged for each of those two delivery modes. It is very burdensome for digital content suppliers to have to package and provision the digital content they produce in a manner that is suitable for all of the devices in the marketplace. Moreover, it is difficult for content suppliers to keep up with the constant changes in device capabilities for the many mobile devices in the marketplace. Consequently, there is often a gap between the interoperability of a given digital product and how effective it can be used on a device. Therefore, the problem exists of how to efficiently allow many digital content providers to distribute many different types of digital content to subscribers using many different types of mobile devices.

A related problem is how to charge subscribers for the digital content they acquire. In one known system. The wireless carrier’s system is capable of connecting to an external billing system and provides billing events to that system when a subscriber performs a chargeable action. However, this scenario assumes that all subscribers belong to a single organization that also owns the billing system. Furthermore, it assumes that a single currency is used. Yet many multi-national organizations have a parent company with subsidiaries in many countries. Different countries have different currencies, taxes and other charges. Each subsidiary may implement its own support/business infrastructure to deal with local regulations and customs, particularly with respect to the billing process. Consequently, the carrier’s system must be able to generate billing events and direct them to the appropriate external billing system. Furthermore, it must be able to present the customer with a charge for each service, in the applicable currency and expressed in a way that is appropriate considering local taxes, fees and other regulations.

One way to address this problem, which only partially solves it, is to use credit card systems. In this scenario, the credit card company acts as an intermediary in the billing process. This approach consolidates all billing at one point. Settlement is done between the product/service provider and the subscriber provider (e.g., the wireless carrier) for a fee. This approach, however, does not handle the currency, taxes, fees and regulations issues mentioned above.

## SUMMARY OF THE INVENTION

One aspect of the invention is a method and apparatus for providing access to content for use on wireless communication devices. Multiple items of content are stored in a server system, to be made available for use in wireless communication devices used by multiple wireless services subscribers. Each of the items of content is associated in the server system with multiple different provisioning models for provisioning the content in wireless communication devices. Each of the provisioning models corresponds to a different set of device capabilities.

In another aspect of the invention, multiple different implementations of at least one of the items of content are received, where each implementation corresponds to a different set of device capabilities. A product catalog containing a description of the items of content is also maintained. The product catalog includes, in association with each item of content, a reference to each implementation of the item of content.

Other features of the present invention will be apparent from the accompanying drawings and from the detailed description which follows.

## BRIEF DESCRIPTION OF THE DRAWINGS

One or more embodiments of the present invention are illustrated by way of example and not limitation in the figures of the accompanying drawings, in which like references indicate similar elements and in which:

FIG. **1** illustrates the relationship between the download manager, content suppliers, and subscribers;

FIG. **2** shows a network architecture in which a download manager in accordance with the invention can be deployed;

FIG. **3** schematically shows the components of the download manager;

FIG. **4** shows the components of the device capability manager;

FIG. **5** shows the relationship between a product entry and implementations of the product in the product catalog;

FIG. **6** shows the relationship between a product and its implementations;

FIG. **7** shows how various data elements are used in the billing process;

FIG. **8** illustrates a simplified process by which a product can be listed in the product catalog in a way that facilitates device-tailored product discovery and provisioning;

FIG. **9** shows a process by which the product catalog is displayed to a subscriber;

FIG. **10** shows a process by which a purchase of a product can be made using the download manager;

FIG. **11** illustrates the separation, within the download manager, of content from how the content is provisioned;

FIG. **12** illustrates a process by which a product is provisioned in a client device using the appropriate one of various provisioning protocols;

FIG. **13** shows an example of the software deployment architecture of the download manager; and

FIG. **14** illustrates the hardware architecture of a computer system in which the download manager can be implemented.

## DETAILED DESCRIPTION

A system and method for efficiently managing the publication, purchase and delivery of digital content from multiple content suppliers to multiple wireless services subscribers in multiple domains are described below. As used in this description, the terms "digital content", "digital product", "content", and "product" are used interchangeably and mean software and/or data embodying things such as games and other applications, applets or the like; images; screensavers; wallpaper; ring tones; etc., particularly (but not necessarily exclusively) those designed for use in mobile devices such as cellular telephones, personal digital assistants (PDAs), and other small-footprint wireless/mobile devices. For convenience the terms "purchase" or "buy" are used to mean either actual purchase or any other conventional way in which a subscriber can acquire rights to use digital content (e.g., by acquiring a license).

### Overview

As described in greater detail below, a system which manages publication, purchase and delivery of digital content is implemented in a network server system that includes one or more server computer systems on a network. The server system includes an application server referred to herein as the "download manager". Digital content suppliers can publish and manage their products using the download manager via a computer network, such as the Internet, and can make their products available to wireless services subscribers through the download manager for purchase or licensing. Subscribers can access the server system via wireless networks to purchase rights to download and use the digital content on their wireless communication devices.

FIG. **1** illustrates the relationship between the download manager, content suppliers, and wireless services subscribers (users of mobile devices). The download manager **1** acts as an intermediary between multiple content suppliers **2** (e.g., **2**A, **2**B, etc.) and multiple customers (e.g., **3**A, **3**B, etc.), e.g., wireless services subscribers, belonging to multiple "domains". In the supply chain process for distribution of digital content, a content supplier **2** adds a digital product to the set of products managed by the download manager **1** (i.e., products "in the store"). The supplier **2** then associates various attributes with the product. Once the product has been submitted to the product store, a product administrator associated with the download manager **1** verifies its quality and determines whether it should be made available to the customers **2** or if it should be rejected. Once the product is approved, customers **2** can buy the product by accessing the download manager **1** from their client devices.

To facilitate description, it is henceforth assumed herein that the customers are users of mobile devices and, therefore, are subscribers of warless services (although that need not be the case); thus, customers are henceforth called "subscribers" herein. Note, however, that the techniques described herein need not be limited to wireless services subscribers or mobile client devices.

### Domains and Partner Management

Among other advantageous features, the download manager **1** facilitates partner management. A "partner", as the term is used herein, is an entity that holds a relationship to a subscriber for purposes of delivery of digital products, billing, returns, etc. For example, a partner can be an Internet portal, an Internet Service Provider (ISP), a wireless carrier, an application service provider (ASP), etc. A partner also appoints a number of content suppliers to supply products to the product store. Partner management is the concept of being able to assign responsibility for various parts of the digital product supply chain to different categories of users.

The entities "within the store" (managed by the download manager **1**) belonging to a partner are partitioned into entities called "domains". A "domain", as the term is used herein, is an entity, defined in the download manager **1**, that describes the billing relationship between a partner and a set of subscribers, as well as describing a partitioning of product space and administrative responsibilities. As such, a domain can represent a grouping of wireless services subscribers, such as a wireless carrier or a subsidiary of a wireless carrier, a business enterprise, or any other defined group of wireless services subscribers. The domain manager maintains a database of data defining the associations between domains and partners, administrators, subscribers and products.

Domains facilitate the proper billing of subscribers from multiple organizations and/or with multiple wireless carriers (or other subscriber providers), and facilitate presentation of product descriptions to subscribers in the languages and currencies appropriate for their local countries or regions.

The domain entity is also used in the download manager **1** to classify other entities as belonging to a domain **1**-to-**1**, belonging to a domain **1**-to-many, many-to-many, or not

belonging to a domain. In general, a domain captures the following relationships to the subscribers:

1) how subscribers are charged for the products they purchase and in which currency;
2) to which user groups the subscribers can belong;
3) from which product categories the subscribers can select products; and
4) which products are accessible to the subscribers.

In certain embodiments of the invention, a domain has the following properties:

a name (localized)
a description (localized)
a uniform resource locator (URL) to a web site giving further description of the domain
a contact address including contact person, contact telephone numbers, fax numbers and postal address
the currency to use for billing and display purposes
reference to handlers for various different payment models (e.g., online payment, pre-payment and post-payment)
a set of references to rating handlers used for adjustment of product prices

The name and the descriptions have localized values for the set of languages registered in the system.

The distinction between domain entities and non-domain entities also forms the basis for delegated administration. More specifically, for each domain, the responsibility for supplying products, approving or rejecting products, etc. can be delegated to different suppliers and administrators. Thus, each domain is associated with a set of administrators that handle the products in the store. In certain embodiments of the invention, these administrators include a system administrator, a domain administrator, a product administrator, and a customer care administrator.

The system administrator is the overall administrator for the download manager **1**, who can create new domains and their respective domain administrators to help regulate it. He also maintains the ability to control non-domain entities such as devices, content types, etc. The domain administrator is the overall administrator for a given domain. He has the ability to manage all of the suppliers and subscribers for his domain as well as create product and customer care administrators for the domain. The product administrator is responsible for managing the entire product lifecycle for the content submitted by the domain's suppliers. The customer care administrator is responsible for managing subscribers belonging to the domain. Each subscriber belongs to only one domain and can only see products for the domain to which he belongs.

A partner appoints a number of content suppliers who provide products to the product store. A supplier can only submit products to the domain(s) to which he belongs. The relationship between suppliers and domains is many-to-many. Products are approved and deployed separately for each domain.

From the content supplier's perspective, all entities in the download manager **1** that are domain-related are only selectable based on the domains to which the supplier can provide products. For example, a supplier can only choose from among the product categories and license models that belong to the domains to which the supplier has the right to supply products.

Network Environment

FIG. **2** shows a network architecture in which a download manager in accordance with the invention can be advantageously deployed. One or more wireless networks **22** are connected to a computer network **24** through corresponding gateways **23**. The computer network **24** may be the Internet, although alternatively, it could be essentially any other type of computer network, such as a corporate intranet, a local area network (LAN), etc., or a combination of such networks.

A number of mobile client devices **21** (e.g., **21**A, **21** B, etc.) operate on each wireless network **22**. A number of servers **25** (e.g., **5**A, **5**B, etc.) operate on the computer network **24** to provide a variety of services for the mobile devices **21** and/or to one or more non-mobile client devices **29** coupled to the computer network **24**. For example, the servers **25** may include World Wide Web servers, file servers, application servers, etc.

Each gateway **23** is operated by the wireless carrier of the wireless network to which it is directly connected. Each gateway **23** provides an interface between a particular wireless network **22** and the computer network **24** (e.g., the Internet), providing routing and, if necessary, appropriate protocol translation and/or content transcoding. In some cases, the gateway **23** may be a standalone device or system. In other cases, the gateway **3** may be part of a more-capable server system that provides additional value-added services to users of client devices **21**; such as a proxy service **27**, a provisioning manager **28**, etc.

A download manager **1** in accordance with the present invention is connected to the computer network **24**, either directly (as shown) or indirectly. The download manager **1** can be, but does not have to be, operated by a wireless carrier.

Download Manager

FIG. **3** schematically shows the download manager in greater detail, according to certain embodiments of the invention. In the illustrated embodiment, the major components of the download manager include a delivery manager **3l**, a product manager **32**, a business & operations manager **33**, and multiple protocol handlers **34**. Each of these components is preferably implemented as software, data, or a combination of software and data. However, in other embodiments, some or all of these components could be implemented in hardwired circuitry. The download manager **1** may also include a database **35** of published content, as shown, although at least some of the published content may instead be stored remotely.

The product manager **32** is the download manager's interface to the various content suppliers and provides centralized product cataloging (including enabling qualified content suppliers to register content for analysis and publication) and complete product life cycle support (i.e., management of content submission, analysis, approval, publication, use, maintenance, and eventual deactivation). The term "publication", as used herein, means making a product available on the download manager to wireless services subscribers for downloading to their client devices. The delivery manager **31** is the download manager's interface to the various subscribers and is responsible for delivering purchased digital content to subscribers, including invoking a protocol handler appropriate for communicating with each requesting mobile device. The protocol handlers **34** support multiple product discovery protocols and multiple product delivery protocols simultaneously. Hence, the protocol handlers **34** include product discovery handlers (e.g., a WAP handler, a Web handler, a Motorola Discovery handler) and product delivery handlers (e.g., a MIDP OTA handler, a Motorola OTA handler, a Nokia COD OTA handler). The business & operations manager **33** is mainly responsible for

managing domain information and processes for charging subscribers for purchases of content. These components are described further below.

As shown in FIG. **3**, the delivery manager **31** in certain embodiments includes a security manager **36**, a device capability manager **37**, a personal vault **38**, a storefront **39**, and a notification manager **40**. The storefront **39** is a conventional graphical user interface for allowing subscribers to make online purchases. It can be branded to a particular wireless carrier, for example, or other business entity. The security manager **36** is responsible for authentication of subscribers and client devices for purposes of purchasing content and preferably can support multiple authentication schemes, such as HTTP-based authentication, MSISDN/NIA based authentication, etc. The personal vault **38** stores, on a subscriber-by-subscriber basis, information to facilitate digital rights management (DRM), such as product licenses and/or other "purchase" information of the products purchased by each subscriber. This allows a subscriber to remove downloaded content from a mobile device without losing rights to the product, or to recover products on a device in cases of device hard reset, loss, etc.

The notification manager **40** can provide various types of notifications to subscribers using various communication channels, such as email, SMS, and WAP Push. The notification manager **40** can generate notifications automatically, such as notifications of new products or product upgrades, or in response to commands from a system administrator, such as account notifications, notifications of special promotions, etc.

The device capability manager **37** is responsible for device recognition (e.g., supporting device recognition through UAProf using Profile headers and Profile-Diff headers), device capability determination (e.g., retrieving device descriptors using best efforts and appending device capabilities to the session context), and device capability management (e.g., automated management of UAProf capable devices and quarantine of undefined or partially defined devices). As described further below, recognition of devices and their capabilities is used for a variety of purposes, such as to filter the set of available products that a subscriber can discover when connecting to the download manager **1**, to select the appropriate implementations of products that are purchased, and to select the appropriate provisioning model for provisioning a purchased product in a client device.

FIG. **4** shows the components of the device capability manager **37** according to an embodiment of the invention. The device capability manager **37** includes a device manager **41**, a device handler manager **42**, a delivery context cache **43**, a set of device recognition handlers **44**, a device data access object (DAO) **45**, a device information database **46**, a UAProf parser **47**, a UAProf resolver **48**, a dm-config.xml file **49**, and a DeviceVocabulary file **50**. The device information database **46** stores information identifying mobile devices and their corresponding capabilities. The device manager **41** contains all of the business logic that supports the user interface and the rest of the download manager **1**. The device DAO **45** contains all data logic and scripted query language necessary to communicate with the device information database **46**.

The device handler manager **42** is responsible for discovering and determining the types of devices accessing the download manager **1**. Upon startup of the download manager **1**, the device handler manager **42** loads the device recognition handlers **44** ordered by the dm-config.xml file **49**. This order is then used to determine which headers are to be processed first. The delivery context cache **43** is used to help improve performance on subsequent look-ups. If no device capabilities can be found or processed by the chain of handlers **44**, the device handler manager **42** then uses a default delivery context as defined by an administrative user interface.



The illustrated embodiment includes three device recognition handlers **44**: an XwapProfile handler, a UserAgent handler, and a quarantine handler. The XwapProfile handler is responsible for processing the "x-wap-profile" and "x-wap-profil-diff" request headers in requests from mobile (client) devices. It makes use of the UAProf parser **47** to parse RDF-compliant files and the UAProf resolver **48** to resolve the differences of the headers. The UAProf parser **47** parses RDF-compliant files. The UAProf resolver **48** reads resolution rules from the device-vocabulary.xml configuration file **50** and uses these rules to help merge x-wap-profile and x-wap-profile-diff headers.

The UserAgent handler is responsible for processing the "user-agent" request headers. It uses regular expression matching to best match the capabilities with the incoming "user-agent" header. If no user-agent header can be found or one is found but does not match to any existing capabilities, the request header is passed to the next handler in the chain.

The quarantine handler is responsible for processing any "accept" request headers. If the quarantine handler finds a user-agent header, it will add a new record in a device match table. Otherwise, it will simply return a delivery context with a set of capabilities determined by the "accept" headers and capabilities already defined by the default device profile.

The device capability manager **37** is capable of managing client devices in either of two categories: actual devices and generic devices. In response to client device requests, the device capability manager **37** uses actual device information from the request and any applicable stored generic device definitions to recognize the accessing client device and its capabilities. The system administrator can define devices (or device capabilities) in either category. An actual device is a particular make and model of client device, such as "Nokia 6310". Actual devices are identified solely from incoming requests, based on the UserAgent and x-wap-profile headers in the requests, for example. A generic device is a predefined device or set of device capabilities. Examples of some generic device definitions are: all Nokia devices (e.g., "vendorname=nokia"), all devices with display size >40, and all devices which support SMS. In response to client device requests, the device capability manager **37** uses the UserAgent or x-wap-profile header to identify the actual device accessing the system and to look up its corresponding capabilities in the device information database **46**, which are combined with any applicable generic device definitions to determine the capabilities of the client device. The use of this information is described further below.

It is useful now to define two types of device capabilities which the device capability manager is able to resolve: static capabilities and active capabilities. As defined in the download manager, "static" capabilities are the well-known set of attributes for a given device which are defined during pre-processing, not on-the-fly. These are associated with a client device as identified in the UserAgent or x-wap-profile headers. Generic devices, as defined above, only have static capabilities. "Active" capabilities represent a dynamic collection of attributes extracted during an interaction between the client device and the download manager, typically from the Accept headers. These two types of device capabilities are stored separately in the device information database **46**.

The ability for a user to discover content based on the static (well-known) capabilities of his device is valuable.

With the number of device manufacturers and content providers in the market, there is often a gap between the interoperability of a given content and how effective it can be run on a device. By using the system's unique ability to capture the capabilities of a device and for content suppliers to select compatible devices for their content, the download manager **1** is capable of targeting supported products to their respective devices for a subscriber. In addition, the download manager **1** is able to easily adapt to the ever-changing modifications to capabilities and requirements and is highly scalable as more devices and content are pushed into the system, without a substantial decrease in performance.

Referring again to FIG. **3**, the product manager **32** in certain embodiments includes a product workflow manager **51**, a content analysis manager **52**, a pricing manager **53**, and a product catalog **54**. The product workflow manager **51** allows the system administrator to define and modify details of the product workflow for processing content submitted by content providers. An example of a product workflow is (n chronological order): 1) submission, 2) content analysis, 3) listing of content in the product catalog, 4) usage of the content, 5) maintenance of content, and 6) content retirement (i.e., cancellation or deletion).

The content analysis manager **52** manages the process of verifying content quality and compliance with various requirements when the content is initially submitted by the content supplier (e.g., compliance with its declared type, content structure resource utilization, etc.). Content must pass the content analysis process satisfactorily before being listed in the product catalog **54** (i.e., published).

The pricing manager **53** allows administrators to add, modify and delete license for products in the store. The pricing manager **53** also includes and invokes a set of rating handlers at the time of purchase, which can adjust the price of the product based on various factors (e.g., promotions, applicable rebates, etc.), as described further below.

The product catalog **54** contains descriptions of all published items of content (products). Referring to FIG. **5**, the catalog **54** includes, for each product entry **56**, a reference **58** to at least one implementation **57** of that product. An implementation **57** can be simply a binary file (a "binary") representing the product. In some cases, however, an implementation **57** may represent two or more binaries **61**, as shown in FIG. **6**. Also as represented in FIG. **5** and FIG. **6**, any particular product may have multiple implementations published on the download manager, each of which may be designed for a different specific client device or set of client devices.

Hence, any particular product entry in the catalog **54** can include references to multiple implementations of the product. However, the products shown to any particular subscriber when the subscriber views the catalog are filtered according to the device capabilities of the subscriber's device. More specifically, only those products that have at least one implementation compatible with the subscriber's device are shown to the subscriber. As shown in FIG. **5**, each implementation entry **57** also includes a list (**59**A or **59**B) of devices supported by that implementation. Each product entry **56** in the catalog **54** includes a list **59** of the devices that are supported by that product. Which represents the aggregation of all of the devices supported by all of the implementations **57** of that product.

In addition, for any particular product, the catalog may include a description **60** of the product in multiple different languages, to accommodate subscribers in different countries. Product descriptions **60** are shown to each subscriber in the appropriate language, and the prices of products are shown in the appropriate currency, according to the domain of which the subscriber is a member. The domain of the subscriber is identified by the domain manager **62**, as described below.

Referring again to FIG. **3**, the business & operations manager **33** in certain embodiments includes an operation administration and management (OA&M) module **61**, a domain manager **62**, and a payment manager **63**. The OA&M module **61** provides a Web based user interface for administering the download manager **1**. It supports role-based delegation of administration duties (e.g., system administrator, domain administrator, product administrator, customer care administrator, etc.) and interfaces with the provisioning manager to provide logging and reporting of key events and transactions.

The payment manager **63** is responsible for the process of charging subscribers when they purchase content and supports multiple different languages and currencies, partitioned by domain. The approach to billing and payment assumes that there are local billing mechanisms in place, each of which has an established relationship to the subscriber already. The local billing mechanism operates in the local currency using the local taxes, fees and other applicable charges for the subscriber's region. It also invoices at intervals that are customary for the region.

In certain embodiments of the invention, a subscriber can select the preferred payment model to use of three available payment models:

Online payment—payment is performed 'just-in-time'. A typical implementation performs the payment transaction at the time of the purchase.

Pre-paid payments—payment is performed before purchase and the purchase is deducted from the pre-paid amount.

Post payments—payment is performed after the purchase by invoice.

A separate payment handler of a set of payment handlers **64** is accessible to the payment manager **63** for each of these payment models (see FIG. **3**), and the payment manager is responsible for invoking the appropriate payment handler **64** at the time of purchase.

Referring now to FIG. **7**, anytime a subscriber logs in to the download manager, a session **71** is created. The session **71** holds a reference to a unique subscriber profile **72** associated with the subscriber. Each subscriber has such a subscriber profile, which points to the organization that holds the billing relationship with the subscriber (i.e., the partner responsible for invoicing the subscriber) and an indication of the subscriber's selected payment model (i.e., post-paid, pre-paid, or online).

The download manager **1** also maintains a subscriber provider profile **73** for each subscriber provider (e.g., wireless carrier, etc.). Each subscriber provider profile **73** holds a reference to each of the payment handlers **64**, an indication of the local currency, and an indication of any value added tax and/or other charges that normally apply to the offered services in the region.

The product catalog **54**, as described above, holds the name, description and price of each product, as well as information indicating the supported devices. There is a separate entry for each supported local currency. There are no dependencies between the prices in various currencies for the same product.

This approach allows a product (or service) to have many different prices, on in each supported currency. There are no dependencies between prices other than that they all apply to

one product. This approach, therefore, supports localized pricing policies and local taxes, etc.

The payment manager **63** includes a set of rating handlers (not shown), which are responsible for adjusting the price of products based on various factors, such as promotional offers, applying rebates, etc. Prices of content may change from time to time, subject to factors such as rebates, promotions, etc. At the time of purchase, the price of the product is determined by invoking the rating handlers. Each rating handler is called by the payment manager **63** with a reference to the corresponding product license and a reference to the subscriber. The rating handler is responsible for adjusting the price, if appropriate, and returning a new price.

Each of the payment handlers includes a charge method. During purchase the charge method of the registered payment handler for the payment model selected by the subscriber is called. The argument to the charge method is a data structure, ChargeDetailRecord, generated by the payment manager **63**, which holds information about the subscriber, the product, the product license with the price, and the domain of the subscriber. The charge method can either approve the charge and, thus, allow the purchase, or it can deny the purchase.

Referring again to FIG. **3**, the domain manager **62** manages the associations between domains and partners, subscribers, suppliers, and products, and stores all of the domain information. As noted above, each domain can have the following properties:

a name (localized)
a description (localized)
a uniform resource locator (URL) to a web site giving further description of the domain
a contact address including contact person, contact telephone numbers, fax numbers and postal address
the currency to use for billing and display purposes
reference to handlers for online payment, pre-payment and post-payment
a set of references to rating handlers

The domain manager **62** enables flexible business models to be implemented via revenue sharing between, and charging by, different stakeholders (partners).

Various aspects of the operation of the download manager **1** will now be described further with reference to FIGS. **8** through **13**. FIG. **8** illustrates a simplified process by which a product can be listed in the product catalog in a way that facilitates device-tailored product discovery and provisioning, according to an embodiment of the invention. Certain operations in the product workflow are not shown in FIG. **8** to facilitate explanation, such as content analysis and approval. Initially, at block **801** the download manager **1** receives inputs from a product supplier defining a product and one or more implementations of that product. At block **802**, the download manager receives inputs from the supplier specifying one or more devices (actual or generic) which support each implementation and one or more provisioning protocols to be used for each implementation. At block **803** the download manager **1** stores the product definition, the implementations, and a list of all of the supported devices and provisioning protocols. Finally, at block **804** the download manager **1** determines the set of all possible devices which support the product and stores this information in association with the product information in the product catalog **54**.

FIG. **9** shows a process by which the catalog is displayed to a subscriber, according to an embodiment of the invention. At block **901** a client device operated by the subscriber connects to the download manager **1**. The domain manager **62** then identifies the domain of the subscriber at bock **902** based on its stored domain and subscriber associations. At block **903**, the product manager **32** selects the language and currency to be used based on the domain of the subscriber (each domain has one language and currency). At block **904**, the device capability manager **37** identifies the client device (e.g., from the UserAgent or x-wap-profile header) and its corresponding set of static (well-known) device capabilities. When a request to view available products is received from the client device (block **905**), at block **906** the product manager **32** determines from the product catalog **54** which products are supported by the client device, based on the (static) capabilities of the client device. The download manager **1** then sends a response to the client at block **907**, to cause the client device to display product information relating to only those products supported by the client device, in the appropriate currency and language for the subscriber's domain.

FIG. **10** shows a process by which a purchase of a product can be made, according to an embodiment of the invention. After displaying the product catalog **54** to the subscriber, the download manager **1** receives the subscriber's selection of the product to purchase at block **1001**. At block **1002** the pricing manager **53** calls all of the registered rating adapters. The rating adapters then adjust the price of the selected product, if appropriate, at block **1003**. At block **1004** the pricing manager **53** then presents a license object indicating the price to the subscriber. If the subscriber confirms the purchase (block **1005**), then at block **1006** the provisioning manager requests the payment manager **63** to charge the applicable price for the product. The payment manager **63** responds at block **1007** by selecting the applicable payment handler **44** based on the domain to which the subscriber belongs and the subscriber's preferred payment model (pre-paid, post-paid, or online). Finally, at block **1008** the selected payment handler **44** performs the charge method to complete the transaction.

Multiple Provisioning Models

Different client devices often require different content provisioning protocols and packaging formats. In order to make a given item of digital content available to multiple mobile devices supporting different provisioning models, a digital content supplier would normally have to deploy that item of content multiple times, packaging it differently for each of the provisioning models. The download manager **1**, however, separates content from how it is provisioned to a device. As described above and as illustrated conceptually in FIG. **11**, in the download manager **1** the product information is separated from the content itself, the content is separated from how it is packaged for delivery, the packaged content is separated from the delivery mechanism, and the delivery mechanism is separated from the discovery mechanism (the mechanism by which the subscriber discovers a product). By virtue of this separation, a content supplier is able to deploy content only once, targeting a wide range of devices, and the download manager **1** will deliver the content to those devices over a wide range of provisioning protocols.

When a product is submitted to the download manager **1** by a supplier, the supplier specifies which devices are supported by each implementation of the product. This information is then stored by the download manager **1** and used to select the proper packaging and provisioning protocol when the product is subsequently purchased.

The provisioning model used to provision a particular product in a particular client device is based on the device capabilities of the client device as well as the content type

of the best-fit implementation. A provisioning "model", in this context, includes a particular provisioning protocol and a content packaging format. The ability to deliver the "best-fit" content based on "active" (dynamic) capabilities of a device is advantageous. Content provisioning provides the second part of targeting products to a given subscriber based on his device's capabilities. Whereas product discovery as described above relies on the "static" capabilities, provisioning relies on the "active" capabilities to determine the exact and often new enhancements of the client device. Given that a device can be fitted or enhanced with new features not described by the default set of capabilities originally intended for the device, the download manager **1** can use these active capabilities to find the best match content to provision to the device.

FIG. **12** illustrates a process by which a product is provisioned in a client device using the appropriate one of various provisioning protocols. At block **1201**, in response to a subscriber purchasing a product, the delivery manager **31** selects the best implementation of the product based on the device capabilities (static and active) of the client device. At block **1202** the download manager retrieves the content type of the selected implementation (e.g., MIDlet, EXE file, applet, iAppli, etc.). At block **1203** the download manager **1** selects the appropriate provisioning model available for that implementation, based on the device capabilities of the client device and the content type of the selected implementation. The provisioning manager **28** then creates a content descriptor for the implementation at block **1204**, based on the selected provisioning model. The content descriptor specifies the name of the content to be provisioned, the size of the content, a location (e.g., a URL) at which the content is stored, and the content type of the content. The content descriptor is unique to the provisioning handler (protocol) of the selected provisioning model.

The provisioning manager **28** then downloads the content descriptor to the client device at block **1205**. The client device parses the descriptor and then requests the content. When the provisioning manager **28** receives the request for the content from the client device at block **1206**, the provisioning manager **28** responds at block **1207** by downloading the content using the provisioning protocol of the selected provisioning model (e.g., COD OTA, Openwave Download Fun, MIDP OTA, etc.)

Download Manager Deployment Architecture

FIG. **13** shows an example of the software deployment architecture of the download manager **1** at a high level, according to an embodiment of the invention. Each instance of the download manager **1** resides on a host **131** that has access to a database **140**. The host **131** is a server-class computer system including an operating system (e.g., Solaris). The database **140** may represent multiple physical databases, which in aggregate store all of the data used by the download manager **1** (i.e., product information, subscriber information, partner information, domain information, etc.). In the illustrated embodiment, each host **131** includes a Java Virtual Machine (JVM) **132** which runs on top of the operating system and which hosts an application server **133**. On top of the application server **133** is a Web container **134** that contains Java Server Pages (JSPs) **135** and servlets **136** as well as application components **137** including the business logic and data access layer **138** of the download manager **1**.

The download manager **1** is formed by the Web container **134** and its contents, the application components **137**, and at least a portion of the database **140**. Horizontal scaling can be achieved by adding more hosts**131** hosting instances of the download manager **1**. In that case, an Internet Protocol (IP) load balancer **139** provides sticky load balancing, i.e., directing all session-specific traffic to the same host.



The above-described software architecture (i.e., the download manager) can be implemented in one or more conventional server-class computer systems. FIG. **14** illustrates the hardware architecture of such a computer system at a high-level. Note that this architecture is also representative of at least some client devices that access the download manager **1**. Note also that FIG. **14** is a conceptual representation which represents any of numerous possible specific physical arrangements of hardware components; however, the details of such arrangements are not germane to the present invention and are well within the knowledge of those skilled in the art.

The processing system shown in FIG. **14** includes one or more processors **140**, i.e. a central processing unit (CPU), read-only memory (ROM) **141**, and random access memory (RAM) **142**, each connected to a bus system **146**. Also coupled to the bus system **146** are a mass storage device **143**, a data communication device **144**, and in some embodiments, one or more additional input/output (I/O) devices **145**.

The processor(s) **140** may be, or may include, one or more programmable general-purpose or special-purpose microprocessors or digital signal processors (DSPs), microcontrollers, application specific integrated circuits (ASICs), programmable logic devices (PLDs), or a combination of such devices. The bus system **146** includes one or more buses or other physical connections, which may be connected to each other through various bridges, bus controllers and/or adapters such as are well-known in the art. For example, the bus system **146** may include a "system bus", which may be connected through one or more adapters to one or more expansion buses, such as a Peripheral Component Interconnect (PCI) bus, HyperTransport or industry standard architecture (ISA) bus, small computer system interface (SCSI) bus, universal serial bus (USB), or Institute of Electrical and Electronics Engineers (IEEE) standard 1394 bus (sometimes referred to as "Firewire"). In alternative embodiments, some or all of the aforementioned components may be connected to each other directly, rather than through a bus system.

The mass storage device **143** may be, or may include, any one or more devices suitable for storing large volumes of data in a non-volatile manner, such as a magnetic disk or tape, magneto-optical (MO) storage device, or any of various types of Digital Versatile Disk (DVD) or Compact Disk (CD) based storage, or a combination of such devices.

The data communication device **144** is a device suitable for enabling the processing system to communicate data with a remote processing system over a data communication link **148**, and may be, for example, a conventional telephone modem, a wireless modem, an Integrated Services Digital Network (ISDN) adapter, a Digital Subscriber Line (DSL) modem, a cable modem, a radio transceiver, a satellite transceiver, an Ethernet adapter, or the like.

The I/O devices **145** (which may be omitted in a system that operates exclusively as a server and provides no direct local user interface) may include, for example, one or more devices such as: a pointing device such as a mouse, trackball, touchpad, or the like; a keyboard; audio speakers; and/or a display device such as a cathode ray tube (CRT), a liquid crystal display (LCD), or the like. Other variations upon the illustrated set of components can be implemented in a manner consistent with the invention.

Software (including instructions and data) **147** to implement the techniques described above may be stored in one or more of ROM **141**, RAM **142**, and mass storage device **143**. In certain embodiments, the software **147** may be initially loaded into the processing system by downloading it from a remote system through the communication device **144**.

Thus, a system and method for managing the publication, purchase and delivery of digital content from multiple content suppliers to multiple wireless services subscribers in multiple domains have been described. Although the present invention has been described with reference to specific exemplary embodiments, it will be recognized that the invention is not limited to the embodiments described, but can be practiced with modification and alteration within the spirit and scope of the appended claims. Accordingly, the specification and drawings are to be regarded in an illustrative sense rather than a restrictive sense.

What is claimed is:

**1**. A method of providing access to content for use on wireless communication devices, the method comprising:

receiving and storing a plurality of items of content to be made available for use in wireless communication devices used by a plurality of wireless services subscribers, including receiving a plurality of different implementations of at least one of the items of content, where each implementation of any given item of content corresponds to a different set of device capabilities; and

maintaining a product catalog containing a description of the items of content, the product catalog including, in association with each item of content, a reference to each implementation of said item of content.

**2**. A method of providing access to digital content for use on wireless communication devices, the method comprising:

receiving and storing in a server system a plurality of items of digital content to be made available for use in wireless communication devices used by a plurality of wireless services subscribers, including receiving and storing a plurality of different implementations of at least one of the items of digital content, where each implementation of any given item of digital content corresponds to a different set of device capabilities;

operating the server system to maintain a product catalog containing a description of the items of digital content, wherein the product catalog includes, in association with each item of digital content, a reference to each implementation of said item of digital content;

receiving a request from a wireless device used by one of the subscribers;

in response to the request, selecting a portion of the product catalog to be presented to the subscriber, based on device capabilities of the wireless device used by the subscriber; and

presenting the selected portion of the product catalog to the subscriber via a wireless network, such that the selected portion, as presented to the subscriber, provides only a single description of each item of digital content in said portion, regardless of the number of implementations of each said item.

**3**. A method as recited in claim **2**, wherein said selecting a portion of the product catalog comprises:

in response to the request, determining the identity of the wireless device used by the subscriber, wherein each implementation of the plurality of items of digital content has been previously associated in the server system with at least one device identity, according to corresponding device capabilities supported by the implementation; and

selecting the portion of the product catalog to be presented to the subscriber based on the identity of the wireless device used by the subscriber.

**4**. A method as recited in claim **2**, further comprising:

receiving from the subscriber a request for one of the items of digital content in said portion of the product catalog;

selecting an implementation of the requested item of digital content, based on device capabilities of the wireless device used by the subscriber; and

downloading the selected implementation of the item of digital content to the wireless device used by the subscriber.

**5**. A method as recited in claim **4**, further comprising associating each of the items of digital content in the server system with a plurality of different provisioning models, each of the provisioning models corresponding to a different set of device capabilities, each provisioning model including a provisioning protocol and a corresponding set of provisioning attributes and descriptors for provisioning digital content in wireless devices.

**6**. A method as recited in claim **5**, further comprising:

receiving from the subscriber a request for one of the items of digital content in said portion of the product catalog;

identifying device capabilities of the wireless device used by the subscriber;

selecting one of a plurality of provisioning models associated with the requested item in the server system, based on the device capabilities of the wireless device used by the subscriber;

packaging the requested item according to the selected provisioning model; and

provisioning the requested item in the wireless device used by the subscriber according to the selected provisioning model.

**7**. A method as recited in claim **6**, wherein:

said packaging the requested item comprises creating a provisioning descriptor for the requested item according to the selected provisioning model, and associating the provisioning descriptor with the requested item; and

said provisioning the requested item in the wireless device comprises sending the packaged requested item to the wireless device used by the subscriber according to a provisioning protocol associated with the selected provisioning model.

**8**. A system comprising:

a network interface through which to communicate over a communication network; and

a download manager to

receive and store a plurality of items of content to be made available for use in wireless communication devices used by a plurality of wireless telecommunications subscribers, including receiving a plurality of different implementations of at least one of the items of content, where each implementation of any given item of content corresponds to a different set of device capabilities; and

maintain a product catalog containing a description of the items of content, the product catalog including, in association with each item of content, a reference to each implementation of said item of content.

**9**. A system comprising:

a processor; and

a storage facility accessible to the processor and containing code which, when executed by the processor, causes the processing system to

receive and store a plurality of items of digital content to be made available for use in wireless communication devices used by a plurality of wireless telecommunications subscribers, including receiving and storing a plurality of different implementations of at least one of the items of digital content, where each implementation of any given item of digital content corresponds to a different set of device capabilities;

maintain a product catalog containing a description of the items of digital content, wherein the product catalog includes, in association with each item of digital content, a reference to each implementation of said item of digital content;

receive a request from a wireless device used by one of the subscribers;

in response to the request, select a portion of the product catalog to be presented to the subscriber, based on device capabilities of the wireless device used by the subscriber; and

cause the selected portion of the product catalog to be presented to the subscriber via a wireless telecommunications network, such that the selected portion, as presented to the subscriber, provides only a single description of each item of digital content in said portion, regardless of the number of implementations of each said item.

**10**. A system as recited in claim **9**, wherein selection of said portion of the product catalog comprises:

in response to the request, determining the identity of the wireless device used by the subscriber, wherein each implementation of the plurality of items of digital content has been previously associated in the server system with at least one device identity, according to corresponding device capabilities supported by the implementation; and

selecting the portion of the product catalog to be presented to the subscriber based on the identity of the wireless device used by the subscriber.

**11**. A system as recited in claim **10**, wherein said storage facility further contains code which, when executed by the processor, causes the processing system to:

receive from the subscriber a request for one of the items of digital content in said portion of the product catalog;

select an implementation of the requested item of digital content, based on device capabilities of the wireless device used by the subscriber; and

download the selected implementation of the item of digital content to the wireless device used by the subscriber.

**12**. A system as recited in claim **11**, wherein said storage facility further contains code which, when executed by the processor, causes the processing system to:

associate each of the items of digital content in the server system with a plurality of different provisioning models, each of the provisioning models corresponding to a different set of device capabilities, each of the provisioning models including a provisioning protocol and a corresponding set of provisioning attributes and descriptors for provisioning digital content in wireless devices.

**13**. A system as recited in claim **12**, wherein said storage facility further contains code which, when executed by the processor, causes the processing system to:

receive from the subscriber a request for one of the items of digital content in said portion of the product catalog;

identify device capabilities of the wireless device used by the subscriber;

select one of a plurality of provisioning models associated with the requested item in the server system, based on the device capabilities of the wireless device used by the subscriber;

package the requested item according to the selected provisioning model; and

provision the requested item in the wireless device used by the subscriber according to the selected provisioning model.

**14**. A system as recited in claim **13**, wherein packaging the requested item comprises creating a provisioning descriptor for the requested item according to the selected provisioning model, and associating the provisioning descriptor with the requested item; and

wherein provisioning the requested item in the wireless device comprises sending the packaged requested item to the wireless device used by the subscriber according to a provisioning protocol associated with the selected provisioning model.

* * * * *

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2025-1131

**Short Case Caption:** VideoLabs, Inc. v. Netflix, Inc.

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 12,197 words.
- [ ] the filing has been prepared using a monospaced typeface and includes __________ lines of text.
- [ ] the filing contains __________ pages / __________ words / __________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. __________).

Date: 02/07/2025

Signature: /s/ Jaime F. Cardenas-Navia

Name: Jaime F. Cardenas-Navia